UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ENERGY MICHIGAN, INC., and
ASSOCIATION OF BUSINESSES
ADVOCATING TARIFF EQUITY,

                Plaintiffs,                            Case Number 20-12521

v.                                                    Honorable David M. Lawson

DANIEL C. SCRIPPS, SALLY A. TALBERG,
and TREMAINE L. PHILLIPS,

                Defendants,

and

CONSUMERS ENERGY COMPANY,

                Intervening defendant.

_____/

## OPINION AND ORDER DENYING DEFENDANTS' MOTION TO DISMISS

The plaintiffs, associations representing electric power sellers and industrial electricity customers, have filed a complaint challenging orders issued by the Michigan Public Service Commission (MPSC) that implement legislation regulating the amount of electrical generating capacity required of energy suppliers. The orders establish "local clearing requirements," a term that refers to the amount of electricity that a supplier must obtain from sources within certain federally designated geographic zones. The plaintiffs seek a declaration that the orders violate the Constitution's Commerce Clause, U.S. Const. art. I, § 8 cl. 3, contending that the orders favor in-state electrical producers and suppliers over their out-of-state counterparts. The defendants — the commissioners and chairperson of the MPSC — move to dismiss the complaint, arguing that it fails to state a viable claim. At oral argument, the Court granted the motion in part and dismissed the MPSC as a defendant because the lawsuit against it is prohibited by the Eleventh Amendment

and the State's sovereign immunity. Because the complaint states a viable claim that the remaining defendants must rebut with a factual presentation, the motion will be denied in all other respects.

I.

Electricity, a commodity that is essential to modern life, cannot be stored easily in quantities that are required daily by commercial and residential users. It must be generated in volumes that match demand in real time and transmitted over facilities that minimize degradation and maximize reliability. All of that is accomplished in this region through an electrical grid — that is, an interconnected network for electricity delivery from producers to consumers — which is jointly regulated by federal and state authorities. The federal government regulates the wholesale electric power market (with some exceptions), and state governments regulate the retail markets. *See F.E.R.C. v. Elec. Power Supply Ass'n*, 577 U.S. 260, 264 (2016) (citing the Federal Power Act, 41 Stat. 1063, as amended, 16 U.S.C. § 791a *et seq.*).

Federal regulatory authority for wholesale energy and transmission markets is lodged in the Federal Energy Resource Commission (FERC) under the Federal Power Act. The Michigan legislature has charged the MPSC with the responsibility of regulating retail electricity markets within the state. Both entities share the task of ensuring adequate capacity (sometimes referred to as "resource adequacy"), meaning that electrical energy suppliers must be able to deliver electricity to customers during times of peak demand.

Over 20 years ago, FERC conferred authority on institutions known as Regional Transmission Organizations (RTO) to regulate wholesale markets. These institutions are comprised of public and non-public utilities, state officials, and certain interest groups, and, although participation is voluntary, the organizations address operational and reliability issues. *Reg'l Transmission Orgs.*, 90 FERC ¶ 61, 201, at 1, 4 (2000). The primary RTO that oversees the

wholesale electricity market in the Midwest is the Midcontinent Independent System Operator, Inc., or "MISO," established in 2001. It engages in forward planning for successive one-year periods to ensure that the market will have the capacity to deliver a supply of electricity to meet demand when it is at its highest. Its jurisdiction is divided into ten local resource zones. Zone 7 comprises most of Michigan's lower peninsula, and the Upper Peninsula is in Zone 2, along with much of Wisconsin. *See* MISO, *2020/2021 Planning Res. Auction (PRA) Results* (April 14, 2020), p. 5, available at https://cdn.misoenergy.org/2020-2021%20PRA%20Results442333.pdf (last visited July 12, 2021).

In many states, the supply of electricity to retail consumers is controlled by a single state-owner or regulated utility responsible for "electricity generation, transmission, and sale to retail consumers." *Hughes v. Talen Energy Mktg., LLC*, --- U.S. ---, 136 S. Ct. 1288, 1292 (2016). Michigan is one of a handful of states (17 in number) that has partially deregulated retail energy markets; it allows other electrical suppliers to sell electricity to retail customers. There are four "categories" of such suppliers: (1) public utilities (i.e., investor-owned utilities, like intervening defendant Consumers Energy Company); (2) municipal-owned utilities; (3) cooperative electric utilities; and (4) alternative electricity suppliers. *In re Reliability Plans of Elec. Utils. for 2017-2021*, 505 Mich. 97, 104, 949 N.W.2d 73, 78 (2020).

This case primarily involves the fourth category: alternative electricity suppliers. Those entities do not generate electricity; they buy it from other sources, in some instances well beyond the State's boundaries. They do not build or maintain transmission facilities; they use other electricity providers' infrastructure to deliver it to their customers. They are, in a sense, electricity power brokers that furnish their customers an "alternative" for the upstream provider of their

electricity. The label "alternative electricity supplier" has no relation to the means of electricity generation, such as renewable energy.

Alternative energy suppliers came into the picture after Michigan partially deregulated its energy markets in 2000, allowing retail customers to purchase electricity from a provider other than a local utility. Mich. Pub. Acts 141, 142 (2000). Alternative energy suppliers "are not subject to the MPSC's complete power and jurisdiction, although they are subject to the MPSC for some purposes." *In re Reliability Plans*, 505 Mich. at 104, 949 N.W.2d at 78. For instance, the state legislature charged the MPSC with ensuring that alternative electricity suppliers furnish no more than 10% of any utility's average retail sales. Mich. Pub. Act 286 (2008).

Another area within the MPSC's jurisdiction deals with capacity. In 2016, to address concerns about the long-term reliability of the State's electricity supply, the Michigan Legislature passed Public Act 341 of 2016 ("Act 341"), which is the subject of this action. Act 341 maintained the 10% retail electric choice cap and added new, state-specific capacity obligations. *See* Mich. Comp. Laws § 460.6w. That statute "require[s] each electricity provider to demonstrate enough capacity, including in-state capacity, to meet peak demand." *In re Reliability Plans*, 505 Mich. at 127, 949 N.W.2d at 90.

The legislation authorizes the MPSC to coordinate retail capacity regulation with the wholesale retail electricity market regulated by MISO. *Ibid.* (Section "460.6w uses capacity measurement vocabulary also used by MISO in its capacity planning and has the same goal — ensuring grid reliability by requiring that each provider supply enough electric capacity and enough local capacity.").

Each year, electricity providers (sometimes called "load serving entities"), including public utilities and alternative electricity suppliers, submit to MISO their anticipated electricity capacity

- 4 -

(the amount of electricity output that a generation unit can produce reliably), so that MISO can ensure short-term reliability. Mot. Intervene, ECF No. 16, PageID.232-33. MISO also sets a "planning reserve margin requirement" for each provider. *In Re Reliability Plans*, 505 Mich. at 109, 949 N.W. 2d at 81 (citing *Midcontinent Indep. Sys. Operator, Inc*., 165 FERC ¶ 61,067, at p. 2 (2018)). Under this planning requirement, an electricity provider must demonstrate that it not only has enough overall capacity but that enough of its capacity is generated locally (the "local clearing requirement"). *Ibid.*

The Michigan Supreme Court observed that efficiency in the wholesale electricity market "requires some geographically based planning" because "when there are insufficient local resources available to meet demand, resources must come from afar." *Id.* at 110, 949 N.W. 2d at 81. And reliance on distant resources can undermine reliability "[g]iven the constrains of the electrical grid in moving power large distances from state to state." *Ibid.* (citing Borenstein & Bushnell, *Electricity Restructuring: Deregulation or Reregulation?*, 23 Reg. 46, 51 (2000)).

MISO's local clearing requirement sets the total amount of capacity that must originate within a MISO zone to reduce the risk of blackouts. *Midcontinent Indep. Sys. Operator, Inc*., 165 FERC ¶ 61,067, at p. 2 (2018). MISO determines these capacity thresholds by ascertaining the amount of electricity resources a zone's grid reasonably could be expected to import during peak demand times (i.e., MISO calculates anticipated congestion constraints on out-of-zone resources). *In Re Reliability Plans*, 505 Mich. at 111, 949 N.W. 2d at 82. The rest must be supplied from within each respective zone. *Ibid.*

MISO enforces these requirements using certain economic tools that derive from market forces. For instance, electricity producers satisfy the local clearing requirements by acquiring enough "Zonal Resource Credits." *Ibid.* Electricity providers can accumulate Zonal Resource

Credits in three ways. First, they can supply power from plants within their respective zones. Second, they can contract with other providers within the zone to purchase electricity produced locally. And third, if a producer cannot do either of those, it can participate in MISO's single-year "Planning Resource Auction." *Id.* at 111, 949 N.W. 2d at 82. The auction is a marketplace through which any registered provider can buy or sell units of capacity across zones. *Ibid.*

MISO then totals the amount of in-zone capacity that the zone's providers report through the three options. *Ibid.* If MISO concludes that a zone cannot satisfy the local clearing requirement, MISO penalizes providers in the zone who relied on the auction for enough Zonal Resource Credits to meet their requirements by raising the auction's clearing price significantly (each provider pays in proportion to the amount it relied on the auction). *Id.* at 112, 949 N.W. 2d at 82.

Under the authority of Act 341, the MPSC replicated these capacity requirements and enforcement mechanisms for the in-state retail electricity market, with some material differences. Act 341 relies on MISO's "local resource zones" to ascertain the local clearing requirement. The Act defines its local clearing requirement as "the amount of capacity resources required to be in the local resource zone in which the electric provider's demand is served to ensure reliability in that zone as determined by the appropriate independent system operator for the local resource zone in which the electric provider's demand is served [which, as relevant to this case, is MISO] and by the commission under [subsection 460.6w(8)]." Mich. Comp. Laws § 460.6w(12)(d). The MPSC has the statutory obligation to "[r]equire . . . that each alternative electric supplier, cooperative electric utility, or municipally owned electric utility demonstrate to the commission . . . that [it] . . . owns or has contractual rights to sufficient capacity to meet its capacity obligations . . . ." Mich. Comp. Laws § 460.6w(8)(b).

The MPSC held a technical conference with various electricity providers to determine how each provider would meet the requirements, and after evaluating the data it authorized a local clearing requirement for individual electricity providers (including alternative electricity suppliers), requiring that they each own or contract to acquire a certain amount of locally-generated electricity on a four-year forward basis. Compl., ECF No. 1, PageID.8, ¶ 24; *see* September 2017 MPSC Order, No. U-18197, ECF No. 16, PageID.264-314. The MPSC's order was issued on September 15, 2017, but it determined that it would not impose the local clearing requirement until after the 2021 planning year to gather more information through a formal hearing process. *Ibid.*

Michigan's local clearing requirement differs from MISO's in two material respects. First, MISO takes an aggregate approach. If the total capacity from a local resource zone does not satisfy MISO's local clearing requirement, energy providers that outsourced their capacity (by purchasing capacity through the Planning Resource Auction) must pay a steep penalty. *In Re Reliability Plans*, 505 Mich. at 112, 949 N.W. 2d at 82 n.10 (the auction rate is set at a cost to build a new combustion turbine in the zone, which can spike the cost of entry from $1.50 per unit to $260). Under this regime, an alternative electricity supplier could conceivably outsource most (if not all) of its electricity if other in-zone generators supply enough local capacity. But rather than looking at a local resource zone as a whole, Act 341 targets each electricity provider individually, mandating that they each satisfy a local clearing requirement by either producing or purchasing locally-generated energy. In other words, each alternative electricity supplier is individually responsible for contributing to the reliability of the grid and cannot ride on the backs of other load servicing entities to satisfy that responsibility. *See* Mich. Comp. Laws § 460.6w(8)(b) (obligating the MPSC to "[r]equire . . . that *each* alternative electric supplier, cooperative electric utility, or municipally

owned electric utility demonstrate to the commission . . . that [it] . . . owns or has contractual rights to sufficient capacity to meet its capacity obligations . . . .") (emphasis added).

Second, the enforcement mechanisms are somewhat different. Like MISO, the MPSC uses economic tools to enforce the in-zone generation requirement for a certain amount of the electrical energy that suppliers sell. Under MISO's regulations, an alternative electricity supplier that outsources the bulk of its supplied electricity must pay a steep penalty if the applicable zone's aggregate local clearing requirement is not met. But it can outsource electricity, nevertheless. In contrast, if an energy supplier, including an alternative electricity supplier, does not comply with Public Act 341's local clearing requirement, the incumbent electric utility (like Consumer's Energy) must provide capacity service to the energy suppliers' customers as the designated provider of last resort. Mich. Comp. Laws § 460.6w(7)-(8). When that happens, the noncompliant power supplier must pay the utility providing the backup capacity a "state reliability mechanism" charge. *Ibid.*; *In re Implementing Section 6w of 2016 PA 341 for Cloverland Elec. Coop.*, 329 Mich. App. 163, 169; 942 N.W.2d 38, 43 (2019). Thus, Michigan's local clearing requirement ensures (as opposed to heavily incentivizes) that a certain amount of power is produced locally.

The plaintiffs derisively — and inaccurately — refer to the local clearing requirement as a "Buy Local Power Rule." They challenged the local clearing requirement in the state courts, arguing that Act 341 did not authorize the MPSC to impose the requirement on each electricity provider and instead allowed only an aggregate requirement as implemented by MISO. The Michigan Supreme Court unanimously rejected that challenge, holding that "[t]he Legislature enacted [section] 460.6w to require *each* electricity provider to demonstrate enough capacity, including in-state capacity, to meet peak demand." *In Re Reliability Plans*, 505 Mich. at 127, 949

N.W. 2d at 90 (emphasis added). It noted that "the statute accounts for in-zone capacity in the providers' individual local clearing requirement." *Id.* at 127, 949 N.W. 2d at 91.

On June 28, 2018, the MPSC issued an order approving "a so-called incremental need methodology for calculating the [local clearing requirement] and imposed that new [clearing] requirement upon all electric providers, including" alternative electricity suppliers. Compl., ECF No. 1, PageID.9, ¶ 28; *see* June 2018 MPSC Order, No. U-18444, ECF No. 1-1. The MPSC determined that the local clearing requirement should be included in electricity providers' capacity obligations for MISO Zone 7, which covers most of Michigan's Lower Peninsula, but that it should be implemented on a gradual basis, as preexisting generators are retired. June 2018 MPSC Order, No. U-18444, ECF No. 1-1, PageID.145. The MPSC established the local clearing requirement for Zone 7 at "2.7% for planning year 2022 and 5.3% for planning year 2023." August 2018 Staff Memorandum, ECF No. 1-2, PageID.153. The MPSC set the local clearing requirement for Zone 2 (the Upper Peninsula and Wisconsin) at 0%, meaning that it determined that there was enough resource capacity within the zone to maintain the reliability of the grid for four years forward.

After the Michigan Supreme Court rejected the plaintiffs' administrative challenge to Act 341's local clearing requirement, the plaintiffs filed the present action against the MPSC, MPSC Chair Daniel C. Scripps, and MPSC Commissioners Sally A. Talberg and Tremaine L. Phillips in their official capacities. The plaintiffs contend that the individualized local clearing requirement violates the so-called dormant Commerce Clause, citing U.S. Const. Art I, § 8, cl. 3, and seek a declaratory judgment to that effect as well as a permanent injunction preventing the defendants from implementing the requirement. Consumers Energy Corporation was permitted to intervene as a defendant. The defendants' motion to dismiss the complaint is now before the Court.

II.

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007)).  A "claim is facially plausible when a plaintiff 'pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Matthew N. Fulton, DDS, P.C. v. Enclarity, Inc.*, 907 F.3d 948, 951-52 (6th Cir. 2020) (quoting *Iqbal*, 556 U.S. at 678).  When reviewing the motion, the Court "must 'construe the complaint in the light most favorable to the plaintiff[] [and] accept all well-pleaded factual allegations as true.'" *Id.* at 951 (quoting *Hill v. Snyder*, 878 F.3d 193, 203 (6th Cir. 2017)).

When deciding a motion under Rule 12(b)(6), the Court looks to the pleadings.  *Jones v. City of Cincinnati*, 521 F.3d 555, 562 (6th Cir. 2008).  The Court also may consider the documents attached to them, *Commercial Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 335 (6th Cir. 2007) (citing Fed. R. Civ. P. 10(c)), documents referenced in the pleadings that are "integral to the claims," *id.* at 335-36, documents that are not mentioned specifically but which govern the plaintiff's rights and are necessarily incorporated by reference, *Weiner v. Klais & Co., Inc.*, 108 F.3d 86, 89 (6th Cir. 1997), *abrogated on other grounds by Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506 (2002), and matters of public record, *Northville Downs v. Granholm*, 622 F.3d 579, 586 (6th Cir. 2010); *see also Cates v. Crystal Clear Tech., LLC*, 874 F.3d 530, 536 (6th Cir. 2017) (instructing that "'[w]hen a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations.'") (quoting *Williams v. CitiMortgage, Inc.*, 498 F. App'x 532, 536 (6th Cir. 2012)).  However, beyond that, assessment of the facial sufficiency of

the complaint ordinarily must be undertaken without resort to matters outside the pleadings. *Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1104 (6th Cir. 2010).

The Commerce Clause states that "Congress shall have Power . . . [t]o regulate Commerce . . . among the several States. . . ." U.S. Const. art. I, § 8, cl. 3. "While the Commerce Clause gives Congress authority to regulate interstate commerce, the converse is that states cannot impede Congress's power by 'unjustifiably . . . discriminat[ing] against or burden[ing] the interstate flow of articles of commerce.'" *Byrd v. Tennessee Wine and Spirits Retailers Ass'n*, 883 F.3d 608, 623 (6th Cir. 2018) (quoting *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 99 (1994)). Thus, the "'Clause, by negative implication, restricts the States' ability to regulate interstate commerce.'" *Am. Beverage Ass'n v. Snyder*, 735 F.3d 362, 369 (6th Cir. 2013) (quoting *Huish Detergents, Inc. v. Warren Cnty., Ky.*, 214 F.3d 707, 712 (6th Cir. 2000)). This "negative" aspect, commonly referred to as the dormant Commerce Clause, "is driven by concern about 'economic protectionism — that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'" *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337–38 (2008) (quoting *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273–74 (1988)).

Under this doctrine, states are free to enact laws regulating "matters of local state concern, even though [these laws] in some measure affect[ ] commerce, provided [they] do[ ] not materially restrict the free flow of commerce across state lines, or interfere with it in matters with respect to which uniformity of regulation is of predominant national concern." *S. Pac. Co. v. State of Arizona ex rel. Sullivan*, 325 U.S. 761, 770 (1945). The dormant Commerce Clause prohibits States from "build[ing] up [their] domestic commerce by means of unequal and oppressive burdens upon the industry and business of other States." *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 272–73 (1984)

(internal quotation marks and citation omitted; alteration in original) (striking down as unconstitutional a Hawaii excise tax that exempted beverages produced within the State).

The defendants mount three attacks against the complaint. First, they contend that the local clearing requirement cannot violate the dormant Commerce Clause as a matter of law because Congress, through the Federal Power Act, expressly authorized states to regulate electricity in this manner. Second, they say that even if Congress did not authorize the state policy, it does not overtly discriminate against out-of-state economic interests because (a) the policy treats all in-state electric providers the same, and (b) the policy borrowed federally designated geographic zones instead of using its own territorial boundaries. Third, they argue that if the Court should find that Michigan's law only incidentally burdens out-of-state commerce, this incidental burden is outweighed by Michigan's legitimate interest in regulating the electric grid, ensuring reliability, and promoting health and safety.

## A.

It is well established that "[w]here state or local government action is specifically authorized by Congress, it is not subject to the [dormant] Commerce Clause even if it interferes with interstate commerce." *White v. Massachusetts Council of Constr. Emp'rs, Inc*., 460 U.S. 204, 213 (1983). The defendants contend that the Federal Power Act provides such specific authorization. It does not.

Congressional authorization for a state to regulate interstate commerce "must be unmistakably clear." *S.–Cent. Timber Dev., Inc. v. Wunnicke,* 467 U.S. 82, 91 (1984). The permission need not be "expressly state[d]"; "it need only clearly allow the state to engage in such activity." *Am. Trucking Ass'ns, Inc. v. New York State Thruway Auth.*, 886 F.3d 238, 245 (2d Cir. 2018). But "Congress must manifest its unambiguous intent before a federal statute will be read

to permit or to approve [ ] a violation of the Commerce Clause." *Wyoming v. Oklahoma*, 502 U.S. 437, 458 (1992).

The defendants contend that the Federal Power Act's distinction between regional wholesale electricity markets and local retail markets furnishes justification for the State's policy, including the local clearing rule. And it is true that the Act does not give FERC regulatory authority "over facilities used for the generation of electric energy or over facilities used in local distribution or only for the transmission of electric energy in intrastate commerce." 16 U.S.C. § 824(b). But this case does not present a challenge to Michigan's regulation of "local distribution" or "intrastate commerce." 16 U.S.C. § 824(b)). Instead, the local clearing requirement as determined by the MPSC can affect the transfer of electricity "from a State and consumed at any point outside thereof." *Id.* § 824(c).

The Supreme Court rejected the broad reading of the Federal Power Act advocated by the defendants here in *Wyoming v. Oklahoma*, a case that the parties hardly discuss. The facts are dissimilar, but the legal principle is the same. In that case, the State of Wyoming brought a Commerce Clause challenge against the State of Oklahoma's legislation that required coal-fired electric generating plants in Oklahoma producing power for sale in Oklahoma to burn a mixture of coal containing at least 10% Oklahoma-mined coal. *Id.* 502 U.S. at 440-41. Oklahoma argued that the "'saving clause' of the Federal Power Act, 16 U.S.C. § 824(b)(1), which reserves to the States the regulation of local retail electric rates, makes permissible the Act's discriminatory impact on the movement of Wyoming coal in interstate commerce." *Id.* at 457. The Supreme Court "found nothing" in the Federal Power Act's text "or legislative history 'evinc[ing] a congressional intent to alter the limits of state power otherwise imposed by the Commerce Clause.'" *Id.* at 458 (quoting *New England Power Co. v. New Hampshire*, 455 U.S. 331, 341

(1982)).  Instead, the Court concluded that its "decisions have uniformly subjected Commerce Clause cases implicating the Federal Power Act to scrutiny on the merits."  *Ibid.* (quoting *New England Power Co.,* 455 U.S. 331*; Arkansas Elec. Coop. Corp. v. Arkansas Pub. Serv. Comm'n*, 461 U.S. 375, 393 (1983)).

The defendants mistakenly rely on *Hughes v. Talen Energy Mktg., LLC*  as supporting the idea that the Federal Power Act does not foreclose states "from encouraging the production of new or clean generation [i.e., managing local electric resources] through measures untethered to a generator's wholesale market participation.'"  136 S. Ct. at 1299.  But the State's local clearing rule can impact a power generator's market participation because it regulates the source of some of the electric power that alternative electricity suppliers sell within the state.  In fact, the whole point of the local clearing rule is to ensure that electricity providers maintain "enough . . . *in-state* capacity [] to meet peak demand."  *In Re Reliability Plans*, 505 Mich. at 127, 949 N.W. 2d at 90  (2016).  *Hughes* does not help the defendants here; it merely amounted to a "limited" holding that a Maryland regulation on wholesale electricity rates was preempted by the Federal Power Act.  The Court did not address the Commerce Clause at all.  *Hughes,* 136 S. Ct. at 1296 n.7, 1299.  The plaintiffs do not argue that the Federal Power Act preempts state law.

The defendants also cite various agency materials expressing an understanding that the federal and state governments engage in a joint effort when regulating resource adequacy (capacity).  *E.g. Cal. Indep. Sys. Operator Corp.*, 116 FERC P 61,274 at ¶ 1112 (2006); *In re MISO*, 162 FERC P 61176 (February 28, 2018) at ¶ 67; MISO Amicus Br., ECF No. 20-2.  But these materials are irrelevant to this analysis.  The Supreme Court repeatedly made clear that an inquiry under the Commerce Clause must focus on whether Congress intended to authorize a specific state action; it does not consider agency or other federal interests or understandings.

*Sporhase v. Nebraska, ex rel. Douglas*, 458 U.S. 941, 960 (1982) ("Congress' intent and policy to sustain state legislation from attack under the Commerce Clause [must be expressly stated]"); *White*, 460 U.S. at 213; *S.–Cent.*, 467 U.S. at 91; *Wyoming*, 502 U.S. at 458. And the defendants offer no authority indicating that courts may consider non-Congressional materials like those cited for this analysis.

Congress has not immunized states from Commerce Clause challenges through the Federal Power Act.

### B.

Where Congress has not "unmistakably clear[ly]" authorized state action, the Commerce Clause challenge follows two successive inquiries. *Int'l Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 644 (6th Cir. 2010). First, the Court asks "'whether the statute discriminates against interstate commerce, either by discriminating on its face, by having a discriminatory purpose, or by discriminating in practical effect." *Cherry Hill Vineyards, LLC v. Lilly*, 553 F.3d 423, 431–32 (6th Cir. 2008) (citing *E. Ky. Res. v. Fiscal Ct.*, 127 F.3d 532, 540 (6th Cir. 1997)). "If the statute is discriminatory, . . . it is virtually *per se* invalid, unless the state can demonstrate that it 'advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.'" *Id.* at 432 (quoting *Granholm v. Heald*, 544 U.S. 460, 489 (2005)). Second, "if the state regulation is neither discriminatory nor extraterritorial, then the court must apply the balancing test established in *Pike* [*v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)]." *Snyder*, 735 F.3d at 368.

The defendants argue that the local clearing requirement is not an extraterritorial regulation. The plaintiffs do not contend that it is. Instead, they insist that the regulation discriminates against out-of-state interests on its face and in effect.

A state law can be found to discriminate against interstate commerce if it endorses "'differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.'" *Snyder*, 735 F.3d at 370 (quoting *United Haulers Ass'n, Inc. v. Oneida–Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007)). "The magnitude and scope of the discrimination has no bearing on the determinative question" of "whether discrimination has occurred*." Assoc. Indus. of Missouri v. Lohman*, 511 U.S. 641, 650 (1994).

The parties agree that Act 341, by itself, does not offend the Commerce Clause, since it does not explicitly mandate that each electricity provider source at least some of its electric capacity locally. *See* Mich. Comp. Laws § 460.6w(12)(d) (which uses MISO's "zone" terminology in defining "local clearing requirement"). However, the plaintiffs argue that the MPSC's (and the state supreme court's) interpretation — that the Act permits an individualized local clearing requirement on all electricity providers — impermissibly discriminates against out-of-state commercial interests by essentially establishing a quota for how much electricity sold by each alternative electricity supplier must be generated within Zone 7. *See* September 2017 MPSC Order, ECF No. 16, PageID.309 (concluding that the "Commission has the authority under Section 6w to apply a local clearing requirement to individual electric providers."); August 2018 Staff Memorandum, ECF No. 1-2, PageID.153 (setting the "locational requirement [for Zone 7] [at] 2.7% for planning year 2022 and 5.3% for planning year 2023.").

The defendants argue that the local clearing requirement does not discriminate against out-of-state economic interests because it subjects all electricity suppliers to the same capacity requirements regardless of where they are located. That argument, however, does not square with *Dean Milk Co. v. City of Madison*, 340 U.S. 349 (1951), a case the defendants did not discuss or even mention. The plaintiffs in that case challenged a Madison, Wisconsin ordinance that required

milk sold in Madison to be processed at a facility located within five miles of the City. *Id.* at 350. The Court found this ordinance unconstitutionally discriminatory in effect because it "exclude[d] from distribution in Madison . . . milk produced and pasteurized in Illinois." *Id.* at 354. The Court found it "immaterial" that in-state interests were burdened in addition to out-of-state interests. *Id.* at 354 n.4. It follows, then, that Michigan's local clearing requirement can be seen to burden Michigan-based electric providers as it potentially excludes from distribution in Michigan some measure of electricity generated from outside the State.

The defendants rely on a pair of Eighth Circuit cases for the idea that the discrimination analysis must focus on the location of the entity impacted by the local regulation. One case, *Ben Oehrleins & Sons & Daughter, Inc. v. Hennepin County*, 115 F.3d 1372 (8th Cir. 1997), addressed a Minnesota county ordinance that required waste generated within the county to be transferred to facilities within that same county. The district court held that the statute was unconstitutional because it discriminated against interstate commerce by prohibiting out-of-state entities full access to the local market in waste processing. *Id.* at 1386. The court of appeals upheld the part of the decision striking down the portion of the ordinance that restricted out-of-state exports but reversed as to waste that stays within Minnesota. *Id.* at 1384-86. In doing so, the Eighth Circuit rejected the district court's reliance on a "market access theory" that "assumes that an out-of-state concern that permanently locates an operation within the state [here, a foreign corporation that built an incinerator in Minnesota] is still an 'out-of-state' entity that can complain that a law that even-handedly restricts a local market is 'discriminatory.'" *Id.* at 1386.

The relevance of this decision to the present dispute is not readily apparent. *Hennepin County* stands for the unremarkable proposition that "[a] Delaware corporation doing business in Minnesota could not argue that it is discriminated against by Minnesota laws that apply equally to

all businesses operating in the state." *Id.* at 1386-87. But the thrust of the plaintiffs' complaint is not that the local clearing rule erects barriers to the local market. Instead, it is that the MPSC's capacity enforcement mechanism could require plaintiff Energy Michigan's member entities to purchase some locally generated electricity.

The defendants also cite *LSP Transmission Holdings, LLC v. Sieben,* 954 F.3d 1018 (8th Cir. 2020), for the same idea: that the plaintiffs cannot complain about the local clearing requirement because they are located in the state and therefore they do not represent out-of-state interests. In *LSP Transmission*, the court addressed a Minnesota law that granted a right of first refusal over the construction of new transmission lines to incumbent transmission companies (those that already owned and operated transmission lines, some of which were based out of state) whose systems would connect to the new line. *Id.* at 1024. The court of appeals found no fault with the right of first refusal provision because it drew "a neutral distinction between existing electric transmission owners whose facilities will connect to a new line and all other entities, regardless of whether they are in-state or out-of-state." *Id.* at 1027. Although the court noted that laws "that restrain both intrastate and interstate commerce may [at time] be discriminatory," this was "not such a case" because the regulation ultimately addressed "'the particular structure or methods of operation in . . . a market," not the market itself. *Id.* at 1028-29 (quoting *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 127 (1978)). Once again, the holding here does not address the plaintiff's main complaint, which is that Michigan's individualized local clearing requirement "is not geographically neutral."

The defendants also argue that the individualized local clearing requirement does not facially discriminate against out-of-state commercial interests because it "borrowed federally designated geographic zones, instead of constructing its own territorial boundaries," and that the

Second Circuit "found this relevant in similar circumstances." Mot. Dismiss, ECF No. 20, PageID.567 (citing *Allco Fin. Ltd. v. Klee,* 861 F.3d 82 (2d Cir. 2017)). They say that because MISO's local resource zones can include multiple states (for example, Zone 2 includes Michigan's Upper Peninsula and Wisconsin), the local clearing requirement is not facially discriminatory and currently operates to allow purchases from out of state to be treated identically to those from in the state when the federally determined boundaries reach across state lines. The defendants concede, however, that Local Resource Zone 7, the only zone currently impacted by the MPSC's local clearing requirement, encompasses Michigan exclusively. Moreover, even if Zone 7 included a couple other Midwestern States, the "dormant Commerce Clause prevents regional economic balkanization as well as state-by-state balkanization." *Allco Fin. Ltd.,* 861 F.3d at 103 n.16 (citing *Ne. Bancorp, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 472 U.S. 159, 174 (1985)).

The plaintiffs in this case have alleged plausibly that the individualized local clearing requirement burdens interstate commerce by requiring alternative electricity suppliers to demonstrate that they can supply a certain part of their electricity inventory that is generated locally. That requirement does not necessarily amount to economic protectionism, which is the chief evil that the "'negative' aspect of the Commerce Clause" is intended to prevent. *Wyoming*, 502 U.S. at 454 (quoting *New Energy Co.,* 486 U.S., at 273-74). But it is enough to require that the defendants justify the regulation under Commerce Clause jurisprudence.

## C.

If a state law discriminates against interstate commerce "in practical effect," the State must "demonstrate that it 'advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.'" *Cherry Hill Vineyards*, 553 F.3d at 432 (quoting *Granholm*, 544 U.S. at 489). And when the state law "regulates [commerce] even-handedly to

effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142 (citing *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 443 (1960)).

The defendants have identified at least two legitimate "local" purposes served by the MPSC's local clearing requirement: fortifying the reliability of the electric grid, which protects against blackouts; and ensuring that all electricity providers contribute capacity to the electric grid. The plaintiffs question whether an individual local clearing requirement is the best way to achieve these goals, but there can be no question under either test that the goals themselves are enormously important. Federal courts have long recognized that "the regulation of utilities is one of the most important of the functions traditionally associated with the police power of the States." *Arkansas Elec. Co-op. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 377 (1983); *see New York v. FERC*, 535 U.S. 1, 24 (2002) ("FERC has recognized that the States retain significant control over local matters even when retail transmissions are unbundled."); *Entergy Nuclear Vt. Yankee, LLC v. Shumlin*, 733 F.3d 393, 417 (2d Cir. 2013) ("[S]tates have broad powers under state law to direct the planning and resource decisions of utilities under their jurisdiction.") (quoting *S. Cal. Edison Co., San Diego Gas & Elec. Co*., 71 FERC ¶ 61,269, at *8 (June 2, 1995) (alteration in original)).

The plaintiffs argue that these purposes can be achieved by resorting to MISO's aggregate local clearing capacity requirements as they are applied to wholesale markets. The defendants disagree. And they point out that an individual requirement promotes fair competition by requiring that each load servicing entity contributes its fair share to grid health and reliability. *See Am. Trucking Assocs., Inc. v. Mich. Pub. Serv. Comm'n*, 545 U.S. 429, 438 (2005) (holding that the dormant Commerce Clause does not seek to relieve those engaged in interstate commerce from

their share of state tax burdens) (citing *D.H. Holmes Co. v. McNamara,* 486 U.S. 24, 29 (1988) (stating that "the Constitution [does not] displace[] States' authority 'to shelter [their] people from menaces to their health or safety")).

That is a debate that cannot be resolved at the pleading stage of the case. It is enough to say that the plaintiffs have stated a viable Commerce Clause claim challenging the MPSC's local clearing rule, and the defendants will be able to bring forth some evidence to show that its actions are justified.

III.

As noted above, the Court previously granted in part the defendants' motion to dismiss as to the MPSC. However, the plaintiffs have stated sufficient facts in their complaint as to the other defendants to withstand a challenge under Federal Rule of Civil Procedure 12(b)(6).

Accordingly, except as to the order dismissing the MPSC from the case (ECF No. 43), it is **ORDERED** that the motion to dismiss (ECF No. 20) is **DENIED** in all other respects.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: July 15, 2021