UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ENERGY MICHIGAN, INC., and
ASSOCIATION OF BUSINESSES
ADVOCATING TARIFF EQUITY,

                    Plaintiffs,                        Case Number 20-12521

v.                                          Honorable David M. Lawson

DANIEL C. SCRIPPS, SALLY A. TALBERG,
and TREMAINE L. PHILLIPS,

                    Defendants,

and

CONSUMERS ENERGY COMPANY,

                    Intervening defendant.

_____/

## OPINION AND ORDER DENYING MOTIONS FOR SUMMARY JUDGMENT

In a complaint, the plaintiffs allege that certain orders issued by the Michigan Public Service Commission (MPSC) that implement legislation regulating the amount of electrical generating capacity required of energy suppliers violate the Constitution's Commerce Clause, U.S. Const. art. I, § 8 cl. 3. The legislation, known as Act 341 passed in 2016, created a State Reliability Mechanism (SRM) intended to ensure the reliable delivery of electricity to the state's retail consumers. As explained in an earlier opinion in this case denying the defendants' motion to dismiss, plaintiff Energy Michigan, Inc. is an association representing electric power sellers, known as "alternative energy suppliers" (AES); plaintiff Association of Businesses Advocating Tariff Equity (ABATE) represents industrial electricity customers. *Energy Michigan, Inc. v. Scripps*, --- F. Supp. 3d ---, No. 20-12521, 2021 WL 2964724, at *1 (E.D. Mich. July 15, 2021). The MPSC's orders establish "local clearing requirements" (LCRs), a term that refers to the

amount of electricity that a supplier must obtain from sources within certain federally designated geographic zones. The plaintiffs seek a declaration upsetting those orders so they can import and sell electricity from outside the resource zone without any obligation to ensure that a portion of it is generated within the zone. They contend that the orders economically disadvantage them and favor local electric utilities. The defendants, including the intervening defendant, contend that the orders are lawful and necessary to ensure the long-term health and reliability of the grid that furnishes electricity to retail customers in Michigan. All parties have moved for summary judgment. The motions are fully briefed, and oral argument will not assist in their disposition. The Court, therefore, will decide the motion on the papers submitted. E.D. Mich. LR 7.1(f)(2).

As discussed in the earlier opinion, a Commerce Clause challenge of this nature requires the Court to determine first whether the state law discriminates against interstate commerce on its face, or in its essential purpose, or in "practical effect." *See Energy Michigan*, 2021 WL 2964724, at *9 (citing *Cherry Hill Vineyards, LLC v. Lilly*, 553 F.3d 423, 431-32 (6th Cir. 2008)). If it does, the law is invalid unless the state shows a legitimate local purpose that cannot be served by alternate, nondiscriminatory means. If the law does not discriminate and has only incidental effects on interstate commerce, the Court then must determine if the burden on interstate commerce is "clearly excessive" when measured against the local benefits. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

The record presented by the parties shows that the MPSC's local clearing rule does not discriminate against interstate commerce on its face, and its purpose is not to benefit in-state economic interests at the expense of out-of-state commercial actors. However, the evidence presents a question of fact whether the local clearing rule discriminates in practical effect against alternative energy suppliers. Similarly, fact questions preclude a determination as a matter of law

on whether the state's legitimate purpose of ensuring electrical grid health and security can be achieved in a nondiscriminatory way.  And the balancing under *Pike* is so fact-bound that summary judgment is not a viable option for resolving the questions presented.  Therefore, the motions for summary judgment will be denied.

I.

A.

The rather complex background of the MPSC's orders in the context of the complimentary scheme of federal and state regulations of the electric power grid was discussed in the earlier opinion denying the motion to dismiss.  *See Energy Michigan*, 2021 WL 2964724, at *1-4.  Those facts (taken from the complaint and the public record) are incorporated here, supplemented below by the discovery record that the parties submitted.

Until the year 2000, Michigan electricity customers purchased their electric power almost exclusively from local utility companies.  In that year, the state legislature passed the Customer Choice and Electricity Reliability Act, Public Acts 141 and 142 of 2000, Mich. Comp. Laws § 460.10 *et seq.*, which allowed electricity customers the option of purchasing electricity from an alternative electricity supplier.  The legislature later capped AESs' market share at 10%.  Public Act 286 (2008), Mich. Comp. Laws § 460.10a(1)(a).  Currently, in Michigan there are four "categories" of electricity suppliers, sometimes referred to as "load servicing entities" (LSEs): (1) public utilities (i.e., investor-owned utilities, like intervening defendant Consumers Energy Company); (2) municipal-owned utilities; (3) cooperative electric utilities; and (4) alternative electricity suppliers.  *In re Reliability Plans of Elec. Utilities for 2017-2021*, 505 Mich. 97, 104, 949 N.W.2d 73, 78 (2020).  The first three categories generally generate and deliver their own electricity.  AESs provide electricity to retail customers through the existing local infrastructure.

They do not necessarily generate the electricity they sell, and they may obtain some or all of it from sources outside Michigan.  The MPSC, as authorized by the state legislature, has promulgated rules that prescribe the amount of electricity that LSEs must source within certain regions within Michigan.  Those rules are the subject of the plaintiffs' challenge in this case.

As explained in the earlier opinion, because electricity cannot be stored easily at present, an electric grid network is used to deliver electrical energy to consumers in a way that allows generation (supply) to match demand in real time.  Under the Federal Power Act, as amended, 41 Stat. 1063, 16 U.S.C. § 791a *et seq.*, the Federal Energy Resource Commission (FERC) is given the responsibility for regulating wholesale energy and transmission markets, *F.E.R.C. v. Elec. Power Supply Ass'n*, 577 U.S. 260, 264 (2016).  States regulate the retail markets within their boundaries.  *Ibid.*  In Michigan, that responsibility falls to the MPSC.  The two agencies work cooperatively to ensure that there is adequate capacity so that energy suppliers will be able to meet commitments to deliver electricity to customers continuously, especially during times of peak demand.

B.

All parties acknowledge that ensuring the availability of adequate electricity generation capacity to meet demand requires considerable planning.  FERC has conferred regulatory authority upon Regional Transmission Organizations (RTO) to plan for resource adequacy in wholesale markets.  RTOs are comprised of public and non-public utilities, state officials, and certain interest groups.  *Reg'l Transmission Orgs.*, 90 FERC ¶ 61,201, at 1, 4 (2000).  The Midcontinent Independent System Operator, Inc., or "MISO," established in 2001, is the RTO that oversees electricity transmission planning for fifteen states in the Midwest and South (and one Canadian province), including nearly all of Michigan.

MISO's forward planning for resource adequacy focuses on successive one-year periods to ensure that the market will have the capacity to deliver a supply of electricity to meet demand when it is at its highest.  Its jurisdiction is divided into ten local resource zones.  Zone 7 comprises most of Michigan's lower peninsula, and the Upper Peninsula is in Zone 2, along with much of Wisconsin.  *See* MISO, *2020/2021 Planning Res. Auction (PRA) Results* (April 14, 2020), p. 5, available at https://cdn.misoenergy.org/2020-2021%20PRA%20Results442333.pdf (last visited February 18, 2022).

One physical reality incorporated into planning decisions is that electrical energy degrades when it is transmitted over long distances due to energy losses that naturally occur over transmission facilities and "transmission constraints," terms that refer to the current-carrying capability of the facilities in the transmission system.  Dauphinias Aff., ¶¶ 116-117, 119-120, ECF No. 55-4, PageID.21019-20.  To address those energy losses, MISO implements a local clearing rule as part of its overall planning.  Each year, electricity suppliers submit to MISO their anticipated electric capacity (the amount of electricity output that a generation unit can produce reliably), so that MISO can ensure short-term reliability.  *In re Reliability Plans*, 505 Mich. at 109, 949 N.W.2d at 81.   MISO also sets a "planning reserve margin requirement" (PRMR) for each provider.  *Ibid.* (citing *Midcontinent Indep. Sys. Operator, Inc*., 165 FERC ¶ 61,067, at p. 2 (2018)).  Under this planning requirement, electricity providers must demonstrate that they not only have enough overall capacity for the upcoming year but that enough capacity is generated locally (the "local clearing requirement").  *Id.* at 109-10, 949 N.W.2d at 81.

MISO's local clearing requirement sets the total amount of capacity that must originate within a MISO zone to reduce the risk of blackouts.  *Midcontinent Indep. Sys. Operator, Inc*., 165 FERC ¶ 61,067, at p. 2 (2018).  MISO determines these capacity thresholds by ascertaining the

amount of electricity resources a zone's grid reasonably could be expected to import during peak demand times (i.e., MISO calculates anticipated congestion constraints on out-of-zone resources). *In Re Reliability Plans*, 505 Mich. at 111, 949 N.W. 2d at 82.  Zone 7's local capacity requirement is relatively high due to "the age and reliability of resources within the zone, the geographic nature of the zone (a peninsular state with limited interconnection), and the amount of available transmission import capacity."  MPSC Order No. U-18197, ECF No. 64-5, PageID.2460. Accordingly, a certain amount of "geographically based planning" is necessary because reliance on far-off resources can cause congestion and undermine reliability "[g]iven the constrains of the electrical grid in moving power large distances from state to state."  *In Re Reliability Plans*, 505 Mich. at 110, 949 N.W. 2d at 81 (citing Borenstein & Bushnell, *Electricity Restructuring: Deregulation or Reregulation?*, 23 Reg. 46, 51 (2000)).

MISO effectuates local capacity demands by requiring electricity providers to have sufficient "Zonal Resource Credits" from within a given MISO zone.  *Id.* at 111, 949 N.W. 2d at 82.  Electricity providers can accumulate Zonal Resource Credits in three ways.  First, they can supply power from plants within their respective zones.  Second, they can contract with other providers within the zone to purchase electricity produced locally.  And third, if a producer cannot do either of those, it can participate in MISO's single-year "Planning Resource Auction" (PRA). *Ibid*.  The PRA is a process through which any registered provider can buy or sell units of capacity across zones.  *Ibid.*

Michigan's Act 341, which created the SRM, established an integrated resource planning (IRP) process to ensure that Michigan LSEs are able to deliver enough energy to service peak loads.  The legislation added new, state-specific capacity obligations alongside those imposed by MISO, while maintaining the 10% cap on supply from AESs.  *See* Mich. Comp. Laws § 460.6w.

- 6 -

The statute requires "that each alternative electric supplier, cooperative electric utility, or municipally owned electric utility demonstrate to the commission . . . that [it] . . . owns or has contractual rights to sufficient capacity to meet its capacity obligations . . . ."   Mich. Comp. Laws § 460.6w(8)(b).   The MPSC concluded that the statute compelled it to set a local clearing requirement for each individual electricity provider, requiring that each owns or contracts to acquire a certain amount of locally-generated electricity on a four-year forward basis.   *In re Reliability Plans of Elec. Utilities*, 505 Mich. at 116-17, 949 N.W.2d at 85; *see* MPSC Order No. U-18197, ECF No. 64-5, PageID.2456-68.   The MPSC issued an order creating the local clearing requirement on September 15, 2017, but the Commission determined that it would not enforce it until after the 2021 planning year to ensure fairness and gather more information through a formal hearing process.   *Ibid*.   The MPSC also ordered that the local clearing requirement be implemented on a gradual basis as preexisting generators are retired.   MPSC Order No. U-18444, ECF No. 1-1, PageID.145.

Michigan's local clearing requirement differs from MISO's in two material respects.   First, MISO takes an aggregate approach.   If the total capacity from a local resource zone does not satisfy MISO's local clearing requirement, energy providers that outsourced their capacity (by purchasing capacity through the Planning Resource Auction) must pay a steep penalty.   *In Re Reliability Plans*, 505 Mich. at 112, 949 N.W. 2d at 82 n.10 (the auction rate is set at a cost to build a new combustion turbine in the zone [referred to as the Cost of New Entry, or CONE], which can vary from $1.50 per unit to $260).   The CONE price in Zone 7 for the 2020 planning year was $260.   Under this regime, an alternative electricity supplier could conceivably outsource most (if not all) of its electricity if other in-zone generators supply enough local capacity.   But rather than looking at a local resource zone as a whole, Act 341 targets each LSE individually, mandating that they each

satisfy a local clearing requirement by either producing or purchasing a certain amount of locally-generated energy.  In other words, each alternative electricity supplier is individually responsible for contributing to the reliability of the grid and cannot ride on the backs of other load servicing entities to satisfy that responsibility.  *See* Mich. Comp. Laws § 460.6w(7)-(8).  All resources that MISO counts toward meeting its local capacity requirement count toward meeting Michigan's local clearing requirement, as do new and existing resources, and certain long-term out-of-state capacity contracts.  MPSC Order No. U-18444, ECF No. 1-1, PageID.139-41.

Second, the enforcement mechanisms are somewhat different.  Like MISO, the MPSC uses economic tools to enforce the in-zone generation requirement for a certain amount of the electrical energy that suppliers sell.  Under MISO's regulations, an alternative electricity supplier that outsources the bulk of its supplied electricity must pay a steep penalty if the applicable zone's aggregate local clearing requirement is not met.  *In Re Reliability Plans*, 505 Mich. at 112, 949 N.W. 2d at 82.  But it can outsource electricity, nevertheless.  In contrast, if an energy supplier, including an alternative electricity supplier, does not comply with Act 341's local clearing requirement, an incumbent electric utility (like Consumer's Energy) must provide capacity service to the energy suppliers' customers as the designated provider of last resort.  Mich. Comp. Laws § 460.6w(7)-(8).  When that happens, the noncompliant power supplier must pay the utility providing the backup capacity a SRM charge.  *Ibid.*; MPSC Order No. U-18197, ECF No. 64-5, PageID.2436.  The plaintiffs' expert estimates that, at current rates, the charge may be $330 to $375 per MW-day, higher than the $260 penalty MISO imposed in 2020.  Dauphinias Aff., ¶¶ 63-64, ECF No. 55-4, PageID.2104-05.

If not for the self-imposed stay for the present litigation, the MPSC would have established the local clearing requirement for Zone 7 beginning in planning years 2022 and 2023, at 2.7% and

5.3%, respectively.  August 2018 Staff Memorandum, ECF No. 1-2, PageID.153.  The MPSC would have set the local clearing requirement for Zone 2 at 0%, meaning that it determined that there was enough resource capacity within the zone to maintain the reliability of the grid for four years forward.  *Ibid.*  The MPSC expects all electricity providers to meet Michigan's local clearing requirements for the 2024-25 planning year, despite MISO Zone 7's recent capacity shortfall in the 2020 planning year.  MPSC Order No. U-20886, ECF No. 51-9, PageID.2000-03.  To account for changes in load levels, the MPSC will continue to reevaluate its local clearing requirements every two years.  MPSC Order No. U-18444, ECF No. 1-1, PageID.145.

## C.

The parties through their respective expert witnesses hotly dispute the purpose, intention, need, and consequences of the local clearing rule established by the MPSC.  The plaintiffs' expert, James R. Dauphinais, an electrical engineer and industry consultant for AESs and their customer organizations, including plaintiff ABATE, opined that Michigan's local clearing requirement is not needed to provide a reliable grid because MISO's zonal capacity requirement adequately protects state interests, already accounts for electricity capacity lost in transmission from out-of-state generation, and already provides significant incentives for in-state generation.  Dauphinias Aff., ¶¶ 118-21, 133-37, ECF No. 55-4, PageID.2120, 2132-33.  He goes further, suggesting that there is no limit to the importation of power across Michigan's state line except "the laws of man," *id.* at ¶¶ 126-27, PageID.2121, even though he acknowledged the physical limitations of the electric transmission system, *id.* at ¶¶ 116-117, 119-120, PageID.2119-20.  Dauphinais also criticizes the MPSC's methodology for calculating the local clearing requirement, arguing that it favors incumbent utilities by compelling AESs to purchase their electricity from them, supporting the plaintiffs' reference to the local clearing requirement as a "Buy Local Power Rule."

Dauphinais speculates that Michigan's local clearing requirement will benefit public utilities, which will be able to produce enough capacity for themselves, incur significantly less risk locating generation resources in Michigan, and can effectively force AESs to purchase capacity from them. *Id.* at ¶ 95-108, PageID.2114-18.

The defendants and intervening defendant rely on in-house expert witnesses.  Roger A. Doherty, an engineering specialist in the MPSC's Resource Adequacy and Retail Choice Section, explains that Michigan's local clearing requirement is necessary because it imposes a four-year forward planning requirement, while MISO's Planning Resource Auction and obligations are for the upcoming year only.  Doherty Rep., ECF No. 51-2, PageID.1888-89, 1907-08.  Even so, he states that the local clearing requirement "represents a small percentage" of each electric provider's total capacity obligation, and that this will be the case for "the next several years," e.g., until 2029, because the MPSC desired to limit the burden and allow for a gradual ramp-up.  *Id.* at PageID.1902.  He points out that the MPSC has established procedures for reevaluating and reassessing the local clearing requirement every other year, and he argues that this means that the MPSC's methodology will change over the long term.  *Id.* at PageID.1896, 1903.  And even if it does not, he concludes that the methodology does not require electricity providers to produce more capacity than is necessary to meet MISO's zonal local capacity requirement unless they do so voluntarily.  *Id.* at PageID.1903-05.

Doherty points out that over the last several years, MISO's own local clearing requirement for Zone 7 was between 91.8% and 99.6% of the Zone's planning reserve margin requirement, and that likely would continue into the foreseeable future.  *Id.* at PageID.1905.  He concludes, therefore, that regardless of the State's LCR, to meet MISO's resource adequacy requirement, "nearly all capacity serving Zone 7 load must be located in Zone 7."  *Ibid.*  He disputes Mr.

Dauphinais's opinion that there is excess generation capacity in Zone 7, instead asserting that "[t]he Zone needs nearly all its capacity to be located within the Zone to meet the [reliability] standards." *Ibid.*

Intervening defendant Consumers Energy relies on the opinions of Thomas P. Clark, its Executive Director of Electric Supply, and Timothy J. Sparks, Consumers's Vice President of Electric Grid Integration. Clark stated that the SRM implemented under the authority of Act 341 was intended to ensure the reliability of the electrical grid in Michigan in cooperation with MISO. Clark Rep., ECF No. 50-3, PageID.1558. He opined that the four-year forward planning requirement for all LSEs complimented MISO's requirement and that the regulations promote equitable contribution to Michigan's resource reliability requirements. *Id.* at PageID.1558-59.

Clark explained that an LSE can demonstrate that it meets its PRMR for MISO's requirement (and avoid the auction and risk of penalties) by, among other methods, submitting a Fixed Resource Adequacy Plan (FRAP) demonstrating that it owns or has secured sufficient resources to meet MISO's requirements. *Id.* at PageID.1560. And he points out that the state requirements are defined not by state boundaries but instead with reference to MISO's zones. *Id.* at PageID.1565. He suggested that although MISO's PRA, its price-setting formula, or the one-year forward planning requirement were intended to incentivize in-zone generation capacity, they were insufficient to achieve that result.

Timothy Sparks took this concept one step further. He noted that the PRA is a residual, short-term process that takes place only two months before the delivery year, and he believes that it is not intended to create a comprehensive capacity market. Timothy Sparks Rep., ECF No. 50-6, PageID.1737. Any attempt to make it so undermines grid reliability, Sparks opines, because only weeks remain to remedy any capacity shortfall. *Id.* at PageID.1737-38. That is why, he says,

the MPSC must plan further ahead.  Moreover, that Michigan is "geographically and electrically a peninsula" limits how much electricity can be imported.  *Id.* at PageID.1735.

Sparks asserted that MISO's aggregate local capacity requirement is inadequate to ensure grid reliability in Michigan.  He pointed out that in 2017, the MPSC projected that MISO Zone 7 might not have enough local capacity resources to meet MISO Zone 7's local capacity requirement by 2022, compromising reliability.  *Id.* at PageID.1739.  And this came to pass even earlier than predicted, with the Zone failing to meet its local capacity requirement in the 2020 planning year. *Ibid.*  Sparks predicts that similar shortfalls will soon occur, explaining that Consumers Energy's supply cushion is shrinking and that, as a result, it has not been able to meet its load ratio share since 2018-19.  *Id.* at PageID.1748-49.  In other words, he says, AESs cannot indefinitely rely on Consumers Energy to serve as a buffer.  *Ibid.*  Nor can they rely on unregulated merchant generation owners to fill the gap, as merchant generators have not built new capacity for alternative electricity suppliers since 2004.  *Id.* at PageID.1742.  Sparks suggests that this dearth of new capacity indicates that MISO's economic tools are insufficient to incentivize new local generation, even when the PRA price approaches CONE.  *Id.* at PageID.1740-42.

Sparks states that public utilities are making significant investments to build generating capacity to service their electric customers.  That investment is secured through Michigan's IRP process, which, through the MPSC, ensures a rate structure that furnishes certainty for the utility to recover its long-term costs.  But that planning does not include capacity to cover AESs' loads. He concluded that "[w]hile utilities plan to meet their own loads, no utility has responsibility for planning to meet AES load, and the PRA, even when clearing at CONE, does not incentivize anyone to plan for the AES load."  *Id.* at PageID.1742-43.

In his report, Sparks turns the tables on the plaintiffs' economic argument — their "Buy Local Power" premise — contending instead that relying exclusively on MISO's aggregate LCR actually subsidizes AESs.  He says that because public utilities locate most of their capacity in Michigan, "AESs opposing [Michigan's] LCR are attempting to use utility resources they are not paying for to satisfy reliability requirements for their customers." *Id.* at PageID.1746.  Moreover, Sparks cited data that indicate his employer, Consumers Energy, likely will not benefit from selling capacity to AESs because over the last several years it did not have very much excess capacity to sell. *Id.* at PageID.1747-48.  And he contends that allowing AESs to serve their customers without sourcing their supply within Zone 7 will result in "unfair" cost-shifting, or even service curtailment, to Michigan's retail electricity customers. *Id.* at PageID.1741, 1747.

## D.

The plaintiffs challenged Michigan's local clearing requirement in the state courts, arguing that Act 341 did not authorize the MPSC to impose the requirement on each electricity provider and instead allowed only an aggregate requirement as implemented by MISO.  The Michigan Supreme Court unanimously rejected that challenge, holding that "[t]he Legislature enacted [section] 460.6w to require *each* electricity provider to demonstrate enough capacity, including in-state capacity, to meet peak demand." *In Re Reliability Plans*, 505 Mich. at 127, 949 N.W. 2d at 90 (emphasis added).

The plaintiffs then filed the present action against the MPSC, MPSC Chair Daniel C. Scripps, and MPSC Commissioners Sally A. Talberg and Tremaine L. Phillips in their official capacities.  The plaintiffs contend that the individualized local clearing requirement violates the so-called dormant Commerce Clause, citing U.S. Const. Art I, § 8, cl. 3, and seek a declaratory judgment to that effect as well as a permanent injunction preventing the defendants from

implementing the requirement.  Consumers Energy Corporation was permitted to intervene as a defendant.  The Court dismissed the MPSC as a defendant because the lawsuit against it is prohibited by the Eleventh Amendment and the State's sovereign immunity.  *Energy Michigan*, 2021 WL 2964724, at * 1.  After the Court denied the remaining defendants' motion to dismiss the complaint, the parties filed cross-motions for summary judgment.

II.

The fact that the parties have filed cross-motions for summary judgment does not automatically justify the conclusion that there are no facts in dispute.  *Parks v. LaFace Records*, 329 F.3d 437, 444 (6th Cir. 2003) ("The fact that the parties have filed cross-motions for summary judgment does not mean, of course, that summary judgment for one side or the other is necessarily appropriate.").  Instead, the Court must apply the well-recognized summary judgment standard when deciding such cross motions: the Court "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party."  *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003); Fed. R. Civ. P. 56(c).

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When reviewing the motion record, "[t]he court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

The party bringing the summary judgment motion must inform the court of the basis for its motion and identify portions of the record that demonstrate that no material facts are genuinely in dispute. *Alexander*, 576 F.3d at 558 (citing *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)). "Once that occurs, the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Ibid.* (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).

"[T]he party opposing the summary judgment motion must do more than simply show that there is some 'metaphysical doubt as to the material facts.'" *Highland Capital, Inc. v. Franklin Nat'l Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) (internal quotation marks omitted). Instead, that party must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for" that party. *Anderson*, 477 U.S. at 252. If the non-moving party, after sufficient opportunity for discovery, is unable to meet its burden of proof, summary judgment is clearly proper. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

When challenged, the party who bears the burden of proof must present a jury question as to each element of its claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991). It must be emphasized, however, that "[i]n evaluating the evidence, [the court] 'draw[s] all reasonable inferences therefrom in a light most favorable to the non-moving party.'" *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003) (quoting *PDV Midwest Ref., LLC v. Armada Oil & Gas Co.*, 305 F.3d 498, 505 (6th Cir. 2002)).

The parties raised the same arguments both in support of their demands for affirmative relief and in their oppositions to their counterparties' summary judgment motions. They each seek affirmative judgment as a matter of law on their own slates of competing claims.

III.

The basic law applicable to this dispute was stated in the Court's previous opinion on the motion to dismiss. As the Court discussed there, the Commerce Clause states that "Congress shall have Power . . . [t]o regulate Commerce . . . among the several States. . . ." U.S. Const. art. I, § 8, cl. 3. "While the Commerce Clause gives Congress authority to regulate interstate commerce, the converse is that states cannot impede Congress's power by 'unjustifiably . . . discriminat[ing] against or burden[ing] the interstate flow of articles of commerce.'" *Byrd v. Tennessee Wine and Spirits Retailers Ass'n*, 883 F.3d 608, 623 (6th Cir. 2018) (quoting *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 99 (1994)). Thus, the "Clause, by negative implication, restricts the States' ability to regulate interstate commerce." *Am. Beverage Ass'n v. Snyder*, 735 F.3d 362, 369 (6th Cir. 2013) (quoting *Huish Detergents, Inc. v. Warren Cnty., Ky.*, 214 F.3d 707, 712 (6th Cir. 2000)). This "negative" aspect, commonly referred to as the dormant Commerce Clause, "is driven by concern about 'economic protectionism — that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'" *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337-38 (2008) (quoting *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273-74 (1988)).

Under this doctrine, states are free to enact laws regulating "matters of local state concern, even though [these laws] in some measure affect[] commerce, provided [they] do[] not materially restrict the free flow of commerce across state lines, or interfere with it in matters with respect to which uniformity of regulation is of predominant national concern." *S. Pac. Co. v. State of Arizona*

*ex rel. Sullivan*, 325 U.S. 761, 770 (1945).  The dormant Commerce Clause prohibits States from "build[ing] up [their] domestic commerce by means of unequal and oppressive burdens upon the industry and business of other States."  *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 272-73 (1984) (cleaned up) (striking down as unconstitutional a Hawaii excise tax that exempted beverages produced within the State).

The Sixth Circuit has adopted a two-step analysis for evaluating dormant Commerce Clause challenges.  *Snyder*, 735 F.3d at 369-70 (citing *Int'l Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 644 (6th Cir. 2010)).  First, the Court asks "whether the statute discriminates against interstate commerce, either by discriminating on its face, by having a discriminatory purpose, or by discriminating in practical effect."  *Cherry Hill Vineyards*, 553 F.3d at 431-32 (citing *E. Ky. Res. v. Fiscal Ct.*, 127 F.3d 532, 540 (6th Cir. 1997)).  "If the statute is discriminatory, . . . it is virtually *per se* invalid, unless the state can demonstrate that it 'advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.'" *Id*. at 432 (quoting *Granholm v. Heald*, 544 U.S. 460, 489 (2005)).  But if the state regulation is not discriminatory, then the Court still must weigh the burdens imposed on interstate commerce against the local benefits produced by the regulation under the balancing test established in *Pike*, 397 U.S. at 142. *See Snyder*, 735 F.3d at 368.

A.

Relying on *General Motors Corp. v. Tracy*, the defendants first argue that alternative electricity suppliers are not similarly situated to in-state public utilities, as they must be for the local clearing requirement to discriminate against them.  *See* 519 U.S. 278, 310 (1997) ("[A]ny notion of discrimination assumes a comparison of similarly-situated entities."); *LensCrafters, Inc. v. Robinson*, 403 F.3d 798, 804 (6th Cir. 2005) (finding that in-state optometrists are not similarly

situated to out-of-state optical companies). *Tracy* involved state regulation of a retail natural gas market. The questions were whether competing entities provided the same products in the same market, and if removing an allegedly discriminatory tax exemption would increase competition among them. *Tracy*, 519 U.S. at 299-300. The Court determined that removing the differential treatment would not increase competition in the market for captive small residential customers where local natural gas distribution companies and alternative gas suppliers did not compete. *Id.* at 300-04. Thus, even though the gas suppliers did compete for larger customers, the Court found that the entities were not similarly situated for constitutional purposes. *Ibid.*

The same reasoning does not apply here because AESs provide the same commodity in the same markets as other LSEs. They even use the same transmission system. *See* Dauphinias Reply Aff., ¶¶ 7-10, ECF No. 69-2, PageID.3194-96. AESs contend that the regulations affect them differently because of where they would prefer to obtain the electricity they want to sell to their customers. However, that does not make them dissimilarly situated with other LSEs, even if they serve a smaller market statutorily capped at 10%. *Tracy* does not provide a governing rule in this case.

### B.

A state law can be found to discriminate against interstate commerce if it endorses "differential treatment of instate and out-of-state economic interests." *Snyder*, 735 F.3d at 370 (quoting *United Haulers Ass'n, Inc. v. Oneida–Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007)). The Court looks to the language of the challenged statute or regulation to determine whether it "purposefully discriminates." *Id.* at 731. "[T]he magnitude and scope of the discrimination has no bearing on the determinative question whether discrimination has occurred." *Assoc. Indus. of Missouri v. Lohman*, 511 U.S. 641, 650 (1994).

- 18 -

In their briefs on the motion to dismiss, the parties agreed that Act 341 by itself does not offend the Commerce Clause, since it does not explicitly mandate that each electricity provider source at least some of its electric capacity locally. *See* Mich. Comp. Laws § 460.6w(12)(d) (which uses MISO's "zone" terminology in defining "local clearing requirement"). Rather, the plaintiffs target the MPSC's regulation that mandates an individualized local clearing requirement on all LSEs, contending that it discriminates against out-of-state commercial interests by establishing a quota for how much electricity sold by each AES must be generated within Zone 7. *See* MPSC Order No. U-18197, ECF No. 64-5, PageID.2473 (concluding that the "Commission has the authority under Section 6w to apply a local clearing requirement to individual electric providers."); August 2018 Staff Memorandum, ECF No. 1-2, PageID.153 (setting the "locational requirement [for Zone 7] [at] 2.7% for planning year 2022 and 5.3% for planning year 2023.").

The articulated goals of the MPSC's local clearing requirement are to implement the State's SRM, which in turn is intended "to ensure reliability of the electric grid in this state," Mich. Comp. Laws § 480.6w(12)(h), not to effect "simple protectionism," *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 471 (1981). This is evidenced by the fact that the requirement does not "overtly block[] the flow of interstate commerce at [the] State's borders." *Hughes v. Oklahoma*, 441 U.S. 322, 337 (1979) (quoting *City of Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978)). Nor do the regulations impose a "protective tariff or customs duty, which taxes goods imported from other States." *W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 193 (1994). Instead, they set forth resource capacity planning requirements that address the supply of electric power. Absent "concrete evidence from the statutory language" that the local clearing requirement is purposefully discriminatory, the "[p]laintiff[s] cannot prevail" on their claim that the statute has a discriminatory purpose. *Snyder*, 735 F.3d at 372.

The plaintiffs argue that this case is squarely governed by *Wyoming v. Oklahoma*, which they contend stands for the proposition that it is purposefully discriminatory to require a certain percentage of the commodities used to generate the power sold in a state to come from within that state. In that case, the State of Wyoming challenged Oklahoma state legislation that required coal-fired electric generating plants producing power for local sale to burn a mixture containing at least 10% Oklahoma-mined coal. 502 U.S. 437, 440-41 (1992). But *Wyoming* is distinguishable in several respects. First, the MPSC's local clearing requirement says nothing about the geographic source of the *resources* used to generate electricity; it focuses on the physical necessity of some portion of electricity sold in MISO's zones being generated close to where it is consumed. Second, Michigan does not overtly discriminate based on state lines; rather, it relies on MISO's local resource zones for geographic-based planning. Mich. Comp. Laws Ann. § 460.6w(12)(d). Third, MISO already effectively requires a certain percentage of capacity to be located within Michigan's lower peninsula (i.e., MISO Zone 7) through its own local capacity requirement. MISO does not require individual electricity providers to contribute to that percentage; it requires that *all of them* do so. The dispute here is over how that responsibility is allocated.

C.

Does the individualized local clearing requirement effectively discriminate against out-of-state electricity suppliers? The answer is not so simple. AESs retain nearly all the options for complying with the individualized LCR that MISO allows, including the submission of a FRAP. When considered along with the SRM charge, these options undermine the plaintiffs' "Buy Local Power" theory; instead, the individualized LCR is more like a "Buy or Build" mandate. That still may favor local economic actors, like incumbent utilities that have already invested in local power generation, especially if the SRM charge paid to local utilities exceeds MISO's calculation of

CONE, as the plaintiffs' expert witness speculates it could.  *See Snyder*, 735 F.3d at 372 (quoting *Int'l Dairy*, 622 F.3d at 648); *see also E. Kentucky Res. v. Fiscal Ct. of Magoffin Cnty.*, 127 F.3d 532, 543 (6th Cir. 1997).  But it also may do no more than level the playing field by equitably allocating the responsibility of satisfying MISO's aggregate LCR and not allowing AESs to avoid the legitimate costs of production that incumbent utility customers pay through the state's rate structure.

It is true that new generation plants cannot be built overnight, and so AESs may have to purchase more capacity from in-state electricity suppliers, who will benefit from making such sales.  But the record here establishes some doubt over the incumbent utilities' capacity to satisfy that demand.  And the four-year forward planning requirement established by the MPSC gives all LSEs time to meet the LCR.  The parties do not dispute that there is a need to require that at least some of the total load to be generated within MISO's zones; or at least the plaintiffs acknowledge that MISO believes that to be the case.  The plaintiffs do not challenge MISO's LCR.  Although the record can support an inference that the MPSC's individual LCR may have the practical effect of discriminating against AESs that source their electrical capacity outside of Zone 7, it also can support the contrary inference: that it does nothing more than equitably allocate MISO's capacity requirements among similarly-situated LSEs.  Regulations that impose the same burdens on in-state and out-of-state entities do not discriminate under the Commerce Clause.  *Am. Beverage Ass'n*, 735 F.3d at 373 (holding that a plaintiff challenging a state regulation under the Commerce Clause must "'show both how local economic actors are favored by the legislation, and how out-of-state actors are burdened by the legislation'") (quoting *Int'l Dairy*, 622 F.3d at 648).

There are material fact questions whether the MPSC's LCR discriminates against out-of-state actors in practical effect.

D.

If the plaintiffs are able to demonstrate in fact that the individualized LCR has discriminatory effects, the burden would fall on the defendants to demonstrate that it "advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *Cherry Hill Vineyards*, 553 F.3d at 432 (quoting *Granholm*, 544 U.S. at 489); *see also Hughes v. Oklahoma*, 441 U.S. at 336.  Material fact issues preclude answering that question as a matter of law as well.

The defendants have shown that the statute advances a legitimate local purpose.  The state has a compelling interest in long-term grid reliability.  *See Arkansas Elec. Co-op. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 377 (1983) ("[T]he regulation of utilities is one of the most important of the functions traditionally associated with the police power of the States.").  Local resource adequacy is necessary to ensure sufficient capacity, particularly in Michigan, where geographic realities create transmission restraints.  *In Re Reliability Plans*, 505 Mich. at 110, 949 N.W. 2d at 81; MPSC Order No. U-18197, ECF No. 64-5, PageID.2460; MPSC Order No. U-18444, ECF No. 1-1, PageID.130-31.  This is demonstrated by the fact that Michigan is losing capacity despite MISO's requirements, which only provide for short-term resource planning.  *Ibid.*; Sparks Rep., ECF No. 50-6, PageID.1739-49.  Therefore, the Michigan state legislature authorized the MPSC to impose an individualized, four-year local clearing requirement.  *In re Reliability Plans*, 505 Mich. at 120, 949 N.W.2d at 86-87.  The requirement advances the state's legitimate local purpose of ensuring long-term, reliable electricity service for the health and safety of the state's residents.

The defendants also assert that long-term grid reliability cannot be achieved through other means that would relieve individual LSEs, including AESs, from satisfying the MPSC's capacity requirements for local generation.   The defendants have offered expert opinions plausibly

suggesting that MISO's one-year-forward, aggregate zonal capacity requirement is insufficient to incentivize new generation. *See* Defs. Resp., ECF No. 63, PageID.2311 (explaining why relying on MISO's existing regime is inadequate to ensure grid reliability).

The defendants also must show that sufficient local capacity cannot be guaranteed "without discriminating between in- and out-of-state" LSEs. *Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dep't of Nat. Res.*, 504 U.S. 353, 367 (1992) (finding that it was not necessary for counties to discriminate between in- and out-of-state waste in order to make adequate plans for safe, future disposal). Again, they have pointed to the recent shortfall of in-zone capacity under MISO's aggregate LCR for Zone 7 as evidence of the need for requiring all LSEs to meet in-zone capacity obligations. But the plaintiffs have asserted plausibly that the recent shortfall is an anomaly, and they assert that equitably spreading the obligation to satisfy the aggregate in-zone capacity requirement is not necessary to maintain grid reliability. There may be other ways, for example, to incentivize in-zone power generation than imposing the SRM charge on LSE's that do not satisfy the LCR.

The defendants argue that Act 341 is a rare statute that should survive strict scrutiny in any case, as in *Maine v. Taylor*, 477 U.S. 131, 144-47 (1986). That case involved a Commerce Clause challenge to a Maine statute that prohibited the importation of bait fish. At an evidentiary hearing in the district court, the State of Maine submitted extensive expert testimony that it had to forbid the importation of such fish because they were invasive species or carried parasites and would damage the state's ecology. *Ibid.* The challenger submitted contrary testimony, but the district court resolved the question in favor of the state.

Similarly, in this case, the defendants have offered expert testimony through affidavits that MISO's zonal capacity requirements cannot be satisfied without requiring all LSEs to meet an

individual LCR.  The plaintiffs contest this point, arguing that there should be no limit on the importation of electricity imposed by the laws of man.  Dauphinias Aff., ¶¶ 126-27, ECF No. 55-4, PageID.2121; *see Am. Lung Ass'n v. Env't Prot. Agency*, 985 F.3d 914, 932 (D.C. Cir. 2021) ("A watt of electricity is a watt of electricity, no matter who makes it, how they make it, or where it is purchased."); *see also Fort Gratiot Sanitary Landfill*, 504 U.S. at  367 (finding that Michigan waste disposal rules did not survive strict scrutiny because there was "no valid health and safety reason" for discriminating against out-of-state waste).  That argument appears to question the need not only for the state's individual LCR, but also MISO's aggregate LCR as well.

This fact dispute cannot be resolved by the competing affidavits of the parties' respective experts.  Neither side can prevail on this issue at the summary judgment stage of the case.

E.

Even if the individualized local clearing requirement "regulates [commerce] even-handedly to effectuate a legitimate local public interest" with only "incidental" effects on interstate commerce, then the plaintiffs must show that "the burden imposed on such commerce [by the regulation] is clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142 (citing *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 443 (1960)).  However, neither the burdens nor the benefits of the regulation are clearly stated in the record.  As to the burdens, the defendants argue that they would be small because the MPSC's local clearing requirement is modest.  Defs. MSJ, ECF No. 51, PageID.1872.  But material questions of fact remain as to whether the individualized local clearing requirement will increase in future years and by how much.  The defendants concede that the requirement will grow under the MPSC's current methodology but insist that said methodology will change and the requirement will remain modest for years to come.  *Id.* at PageID.1873; Roger Doherty Rep., ECF No. 51-2, PageID.1903-05.  They

- 24 -

also argue that the requirement will never force electricity providers to supply excess capacity. *Ibid*.  The plaintiffs argue the opposite, insisting that the local clearing requirement will increase to more than 80% and require electricity providers to supply excess capacity; and that the SRM charge will increase dramatically over the CONE established by MISO through the PRA. However, the expert who lodged this estimate assumed that the methodology would never change — despite the MPSC's commitment to review it every two years — and advanced his own methodology in a footnote.   Dauphinias Rep., ECF No. 55-4, PageID.2147-48.   Applying conflicting assumptions, the parties thus reach vastly different conclusions about the future scope of the local clearing requirement.  An 80% local clearing requirement imposes significantly greater burdens than a 5.8% requirement.

The ambiguity created by the competing opinions over the burdens that the LCR imposes on interstate commerce frustrates any attempt to weigh them against the putative benefits. Contrary to the plaintiffs' assertions, *see* Pls. MSJ, ECF No. 55, PageID.2075, those benefits are almost certainly greater than zero.  The MPSC's local clearing requirement both creates greater incentives for electricity providers to build capacity in Zone 7 and provides the state with the information necessary to ensure adequate resource capacity in coming years.  *See* Sparks Rep., ECF No. 50-3, PageID.1566-67; MPSC Order No. U-18197, ECF No. 64-5, PageID.2473.  These ends are related to the health and welfare of Michigan residents, an important and legitimate interest.  *E. Kentucky Res.*, 127 F.3d at 545.  Application of the *Pike* balancing test requires resolution of numerous questions of material fact regarding the associated benefits and burdens of the regulations and makes summary judgment inappropriate for any party.

IV.

Fact questions preclude summary judgment for either side on the plaintiffs' Commerce Challenge to the MPSC's local clearing rule.

Accordingly, it is **ORDERED** that the motions for summary judgment (ECF No. 50, 51, 55) are **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   February 23, 2022