UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ENERGY MICHIGAN, INC., and
ASSOCIATION OF BUSINESSES
ADVOCATING TARIFF EQUITY,

       Plaintiffs,

v.

DANIEL C. SCRIPPS, KATHERINE
L. PERETICK, and TREMAINE L.
PHILLIPS,

       Defendants,

CONSUMERS ENERGY
COMPANY,

       Intervening defendant.

No. 2:20-cv-12521-DML-APP

HON. DAVID M. LAWSON

**DEFENDANTS' PROPOSED
FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

---

Brion B. Doyle (P67870)
Attorney for Plaintiff
Energy Michigan, Inc.
Varnum, Riddering,
Bridgewater Place
P.O. Box 352
Grand Rapids, MI 49501
(616) 336-6000
bbdoyle@varnumlaw.com

Michael J. Pattwell (P72419)
Zachary C. Larsen (P72189)
Clark Hill, PLC
Attorneys for Plaintiff
Association of Businesses
Advocating Tariff Equity
212 E. Cesar E. Chavez Ave.
Lansing, MI 48906
(517) 318-3043
mpattwell@clarkhill.com
zlarsen@clarkhill.com

---

Spencer A. Sattler (P70524)
Nicholas Q. Taylor (P81020)
Benjamin J. Holwerda (P82110)

Kelly M. Hall (P48083)
Attorney for Intervenor
Consumers Energy Company

Assistant Attorneys General
Attorneys for Defendants
Public Service Division
7109 W. Saginaw, 3rd Floor
Lansing, MI 48917
(517) 284-8140
sattlers@michigan.gov
taylorn10@michigan.gov
holwerdab@michigan.gov

One Energy Plaza
Jackson, MI 49201
(517) 513-1959
Kelly.Hall@cmsenergy.com

_____/

**MICHIGAN PUBLIC SERVICE COMMISSIONERS
AND CONSUMERS ENERGY COMPANY'S
PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Spencer A. Sattler (P70524)
Nicholas Q. Taylor (P81020)
Benjamin J. Holwerda (P82110)
Assistant Attorneys General
Attorneys for Defendants
Public Service Division
7109 West Saginaw Highway
Lansing, MI 48917
(517) 284-8140
SattlerS@Michigan.gov
TaylorN10@Michigan.gov
HolwerdaB@Michigan.gov

Kelly M. Hall (P48083)
Lawrence T. García (P54890)
Sydney Johnson (P85655)
Attorneys for Intervenor
Defendant
Consumers Energy Company
One Energy Plaza
Jackson, MI 49201

517-513-1959
kelly.hall@cmsenergy.com
Garcia@millercanfield.com
JohnsonS@millercanfield.com

Dated: August 1, 2022

# TABLE OF CONTENTS

Page

Proposed Findings of Fact and Conclusions of Law .................................. 1

I.   The Parties ..................................................................................... 1

II.  Regulatory Background ................................................................. 4

III. Proposed Findings of Fact ............................................................. 8

    A.  The individual local clearing requirement equitably
        promotes electric reliability in Michigan while
        accounting for transmission constraints that prevent
        unlimited imports ................................................................. 9

    B.  Alternative electric suppliers and public utilities are
        not similarly situated, and eliminating the local
        clearing requirement would not necessarily increase
        competition. ........................................................................ 14

    C.  There is no evidence of discriminatory effect. ...................... 16

        1.  The local clearing requirement and SRM charge
            do not favor local economic actors. ........................... 16

        2.  The local clearing requirement and SRM charge
            do not burden out-of-state economic actors. .............. 18

    D.  The local clearing requirement's benefits far exceed
        any incidental burden the requirement may have on
        interstate commerce. ........................................................... 20

        1.  The MPSC's individual local clearing requirement
            provides at least two important benefits. .................... 20

        2.  Any incidental burden of the local clearing
            requirement is slight. ................................................. 23

    E.  The local clearing requirement serves a legitimate and
        compelling government interest, and there are no less
        discriminatory alternatives. ................................................ 25

IV.   Proposed Conclusions of Law ............................................. 30

    A.   The individual local clearing requirement equitably promotes electric reliability in Michigan, which benefits the health and safety of its residents. ................... 32

    B.   Public utilities and alternative electric suppliers are not similarly situated for dormant Commerce Clause purposes ................................................................ 34

    C.   The local clearing requirement does not discriminate on its face and does not purposefully discriminate. ............ 35

    D.   The local clearing requirement does not discriminate in effect. ............................................................... 37

    E.   The local clearing requirement survives the *Pike* balancing test. ...................................................... 40

    F.   The local clearing requirement could be upheld even if it discriminates because it advances a legitimate local purpose that cannot be adequately served by nondiscriminatory alternatives. ................................. 42

    G.   Because the state could eliminate retail open access completely, it can place reasonable restrictions on alternative electric suppliers' participation in that market. .................................................................. 43

Conclusion ............................................................................. 44

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

On September 14, 2020, the Association of Businesses Advocating Tariff Equity, or ABATE, and Energy Michigan, Inc. filed a joint complaint for declaratory and injunctive relief.  Among other things, the Plaintiffs asked this Court to 1) declare the individual local clearing requirement, or LCR, imposed by the Michigan Public Service Commission, or MPSC, unconstitutional in violation of the dormant Commerce Clause of the United States Constitution and 2) enter a permanent injunction preventing Defendant Commissioners from implementing the individual local clearing requirement.  This Court has set the case for trial on August 8, 2022 and directed the parties to file proposed findings of fact and conclusions of law one week before trial. Consistent with this Court's directions, Defendants Commissioners and Consumers Energy Company submit these proposed findings of fact and conclusions of law.

## I.   The Parties

1.    ABATE is an unincorporated association of large industrial and manufacturing concerns located in Michigan that purchase substantial amounts of electric energy and capacity from investor-

1

owned electric utilities, municipally owned electric utilities, and alternative electric suppliers, or AESs, for use at facilities in Michigan. (ECF No. 85, Pg ID 3391, Final Joint Pretrial Order ¶ 1.)

2.     Energy Michigan is a Michigan non-profit corporation that represents the interests of licensed alternative electric suppliers in Michigan.  These suppliers compete with investor-owned electric utilities in 10% of Michigan's energy market for the ability to sell energy and capacity to retail customers, primarily commercial and industrial customers.  (ECF No. 85, Pg ID 3391–92, Final Joint Pretrial Order ¶ 2; Proposed Ex. 231, Supplemental Report of Timothy J. Sparks at 3.)  Energy Michigan also represents customers who purchase energy and capacity from alternative electric suppliers.  Several of Energy Michigan's members own substantial capacity resources in many locations nationwide.

3.     The MPSC is an autonomous regulatory agency of the State of Michigan responsible for implementing, administering, and enforcing Michigan's energy laws, including Section 6w of Public Act 341, Mich. Comp. Laws § 460.6w.  (ECF No. 85, Pg ID 3392, Final Joint Pretrial Order ¶ 3.)  The MPSC's mission is to serve the public by ensuring safe,

reliable, and accessible energy and telecommunications services at reasonable rates. (Anticipated Test. of Roger Doherty.) The MPSC is a distinct entity from its Staff, which intervenes as an independent party in MPSC proceedings and also serves as advisors (typically different Staff members) in the decision-making process. (Anticipated Test. of Cathy Cole.)

4.      Defendant Commissioners Daniel C. Scripps, Tremaine L. Phillips, and Katherine Peretick, named in their official capacities only, are the government officials responsible for carrying out the duties of the MPSC and the public officials now responsible for the MPSC's individual local clearing requirement. (ECF No. 85, Pg ID 3392, Final Joint Pretrial Order ¶ 4.)

5.      Intervening-defendant Consumers Energy is an investor-owned, public utility headquartered in Michigan that sells both electric energy and capacity, as well as electric distribution services, to retail customers located within its service territory in this state. Its rates and terms of service are regulated by the MPSC. (ECF No. 85, Pg ID 3392, Final Joint Pretrial Order ¶ 5.) Alternative electric suppliers use Consumers Energy's distribution system to serve choice customers who

reside within Consumers Energy's service territory.  (Proposed Ex. 231, Supplemental Report of Timothy J. Sparks at 28–29.)

## II.   **Regulatory Background**

6.     Prior to 2000, Michigan law authorized only public utilities to sell power to retail customers, at rates approved by the MPSC.  *See Consumers Power v Public Serv Comm'n,* 460 Mich 148 (1999).

7.     In 2000, the Michigan Legislature decided to allow alternative electric suppliers to serve retail customers by enacting Public Act 141 of 2000.

8.     In 2008, the state Legislature significantly scaled back that deregulation and limited suppliers' market to 10% of utilities' sales under Public Act 286 of 2008.

9.     Then, in 2016, lawmakers again reformed Michigan's energy laws by establishing reliability requirements for all electric providers, including alternative electric suppliers, through Section 6w of Public Act 341 of 2016.  The 2016 energy law maintained the 10% cap on alternative electric suppliers' market share.

10.     Under Section 6w, electric providers (described to include electric utilities, alternative electric suppliers, cooperative electric

utilities, and municipally-owned electric utilities) must demonstrate to the MPSC that they will own or contract for enough generation in four years to meet capacity obligations set by MISO and the MPSC. Mich. Comp. Laws §§ 460.6w(8)(a), (c), and (12)(c).

11.    An electric provider's capacity obligations consist of a planning reserve margin requirement, which is defined as "the amount of capacity equal to the forecasted coincident peak demand that occurs when . . . [MISO's] peak demand occurs plus a reserve margin that meets an acceptable loss of load expectation," and a local clearing requirement, which is defined as "the amount of capacity resources required to be in the local resource zone in which the electric provider's demand is served to ensure reliability in that zone . . . ." Mich. Comp. Laws §§ 460.6w(8)(c), 460.6w(11)(d), 460.6w(11)(e).

12.    The MPSC used an incremental need approach to calculate the local clearing requirement to be applied to individual electric providers by "determining the future incremental capacity need in a Zone and then allocating that incremental need to LSEs [load serving entities] within the Zone as forward locational requirements." (Proposed Ex 279, Supplemental Report of Roger A. Doherty at 17.)

13.    The incremental need approach was intended to gradually increase the local clearing requirement to allow "ample time to ramp up to the full LCR requirement," which was "far less burdensome on LSEs than many of the proposed methods" offered by other parties in the underlying MPSC proceeding.  (*Id*. at 14.)

14.    MISO's zonal local clearing requirement is critical to understanding how the MPSC calculates and applies the individual local clearing requirement, as the incremental need approach adopted by the MPSC uses MISO data for the prompt year as the starting point from which to project the requirement four years forward.  Indeed, the MPSC's individual requirement is designed to ensure the zone meets MISO's zonal requirement.  (Anticipated Test. of Roger Doherty.)

15.    MISO determines the prompt-year's zonal local clearing requirement by first calculating a local reliability requirement depicting "a hypothetical situation for each LRZ [local resource zone] as if [it is] operated as an island."  (Proposed Ex. 232, Supplemental Report of Thomas P. Clark at 5.)  The local reliability requirement represents "the total amount of resources that would be necessary to serve local peak demand plus reserves, absent the ability to import resources from

6

outside the zone." (*Id.*)  The capacity import limit is then subtracted

from the local reliability requirement to calculate the local clearing

requirement.  (*Id.* at 6.)

16.    The zonal local clearing requirement, therefore, is "the

minimum amount of capacity resources that must be physically located

within the LRZ to achieve the LOLE [loss of load expectation] standard"

and limit the interruption of firm customer demand to one day in ten

years.  (Proposed Ex. 232, Supplemental Report of Thomas P. Clark at

6; *see also* Proposed Ex 279, Supplemental Report of Roger A. Doherty

at 25.)

17.    "The locational requirements represented by LCR have been

established by FERC and MISO as a fundamental component of

promoting resource adequacy by ensuring that sufficient generation is

located locally, taking into account limitations on the transmission

system." (Proposed Ex. 231, Supplemental Report of Timothy J. Sparks

at 11.)

18.    In addition to the local clearing requirement and planning

reserve margin requirement, the MPSC sets a capacity charge, also

known as a state reliability charge or SRM charge, Mich. Comp. Laws. §

7

460.6w(2),(3), which must be paid if a supplier cannot meet its capacity

obligations. Mich. Comp. Laws §§ 460.6w(6), 460.6w(7), 460.6w(8)(c)(i).

19.    The MPSC has not yet imposed the local clearing

requirement because it stayed the effect of its order in recognition of

legal challenges to the requirement in state and federal courts. (Ex.

282, MPSC Case No. U-18444, 9/13/2018 Order at 13.) The MPSC also

has yet to impose the SRM charge on any alternative electric supplier or

its customers. (ECF No. 85, Pg ID 3402, Final Joint Pretrial Order ¶

42.)

## III.  **Proposed Findings of Fact**

20.    The MPSC's incremental need approach uses MISO's zonal

local clearing requirement for the prompt year and, as the first step in

determining an individual local clearing requirement, projects the

requirement for "each MISO Local Resource Zone (LRZ or Zone) in

Michigan for a selected future year." (Proposed Ex 279, Supplemental

Report of Roger A. Doherty at 17.)

21.    The second step focuses on generation resources that are

expected to retire within the next four years by "determin[ing] expected

changes in the existing planning resources in each Zone between a

8

starting date, in this instance the effective date of Public Act 341 of 2016 (PA 341), and the selected future year"—the planning year four years from the date of the analysis. (*Id.*)

22.    "The third step is to determine the incremental need in the selected future year by calculating the difference between the projected LCR in the Zone and the projected amount of existing resources in the Zone." (*Id.*)

23.    "The fourth step is to allocate the incremental need to LSEs in the Zone as forward locational capacity obligations." (*Id.*)

24.    The whole process would be repeated, and perhaps changed, every two years when "the incremental need and forward locational capacity obligations would be re-evaluated." (Proposed Ex 279, Supplemental Report of Roger A. Doherty at 17–18, 23.)

A.    **The individual local clearing requirement equitably promotes electric reliability in Michigan while accounting for transmission constraints that prevent unlimited imports.**

25.    MISO Zone 2 includes most of the Upper Peninsula, while MISO Zone 7 consists of most of Michigan's Lower Peninsula. (Proposed Ex 279, Supplemental Report of Roger A. Doherty at 6.)

26.   In 2018, the MPSC determined that no individual local clearing requirement was needed for MISO Zone 2 for the 2022 planning year and beyond until reevaluated in a future case.  (Ex. 274, MPSC Case No. U-18444, 6/28/2018 Order at 115.)

27.   In the same order, concerning Zone 7, the MPSC adopted Staff's incremental need approach, but it did not adopt Staff's recommended requirement for the 2022-2023 or 2023-2024 planning years.  Instead, the MPSC directed Staff to update its figures to reflect publicly announced retirements of two generating units.  (*Id.* at 131.)

28.   Ultimately, the MPSC adopted a 2.7% local clearing requirement for the 2022–2023 planning year and 5.3% for the 2023–2024 planning year—representing the percent of peak demand that MISO Zone 7 load serving entities must obtain from local sources for those years. (Proposed Ex 279, Supplemental Report of Roger A. Doherty at 15, 20.)

29.   The MPSC's incremental need approach was far less burdensome on alternative electric suppliers in Zone 7 than demanding that they immediately meet their pro-rata share of MISO's local

clearing requirement for the Zone, as some parties recommended in proceedings below.  (Proposed Ex 279, Supplemental Report of Roger A. Doherty at 14, 25.)

30.    Compelling suppliers to immediately meet their pro-rata share of MISO's local clearing requirement for the Zone would have required that almost all of the suppliers' capacity be located in the Zone. This is because "[o]ver the last several years (and projected to continue in the foreseeable future) MISO Zone 7's LCR has ranged between 91.8% and 99.6% . . . of the Zone's planning reserve margin requirement."  (*Id*. at 25–26.)

31.    Although gradually imposed, the local clearing requirement promotes reliability by helping to ensure there are enough local resources to serve demand after accounting for capacity import limits. (Proposed Ex. 232, Supplemental Report of Thomas P. Clark at 6; Proposed Ex. 207, MISO Tariff 68A.6.)

32.    When the local clearing requirement is met, no more capacity is imported into the region than the transmission infrastructure can tolerate.  (Anticipated Test. of Roger Doherty.)

33.     The local clearing requirement does not prevent "the import of power across zones," but it does "establish[ ] a standard for the amount of capacity that should be located within the Zone to meet reliability standards."  (Proposed Ex. 232, Supplemental Report of Thomas P. Clark at 7.)

34.     If a zone falls short of its resource adequacy requirements, it can considerably increase the likelihood of power outages.  For example, MISO "assess[ed] the increased risk of shedding firm load that Zones 1-7 will face due to being just over 1% short of the resource requirement and found that the loss of load expectation was 1 day in 5.6 years or nearly twice the standard of 1 day in 10 years."  (Proposed Ex 279, Supplemental Report of Roger A. Doherty at 29.)

35.  Substantial shortfalls in the local clearing requirement would result in "[s]ignificant reliability issues"—ultimately risking interruptions to customers' electric service.  (Proposed Ex. 231, Supplemental Report of Timothy J. Sparks at 16.)

36.     "There is no way to predict which customers would be curtailed.  Thus, the customers of LSEs who had met their load-ratio

share of LCR could have their retail loads curtailed as a result of other LSEs' failure to meet their load-ratio share of LCR." (*Id*.)

37.   "Rolling blackouts and other reliability failures in states like California and Texas demonstrate the need to have sufficient local capacity resources." (*Id*. at 10.)

38.   For example, "In the middle of February 2021, Texas was hit with several winter storms that left more than 4.5 million houses without power." (Proposed Ex 294, The MPSC Staff's March 26, 2021 Report on Capacity Demonstration Results for 2024/25 Planning Year at 17.)   "[A]t its worst point, nearly half of the power available to the grid went offline due to fuel supply shortages and/or freezing issues at various plants." (*Id*.)

39.   Insufficient local generation and import capacity was not the sole cause of the Texas tragedy; nonetheless, the situation serves as a lesson in the reliability and resilience of the grid.   (*Id*.)

40.   The North American Electric Reliability Corporation, or NERC, has recently cautioned that "[a] capacity shortfall in the [MISO] North and Central areas poses high risk of energy emergencies during

peak summer conditions.  The shortfall is largely driven by a peak

demand increase of 1.7% percent and 3,200 MW less generation

capacity than summer 2021."  (Proposed Ex. 213, NERC 2022 Summer

Reliability Assessment and Infographic.)

B.   **Alternative electric suppliers and public utilities are not similarly situated, and eliminating the local clearing requirement would not necessarily increase competition.**

41.   In a fully deregulated market, all customers have "the option

to purchase their electric generation service from a licensed AES [at

unregulated rates] while continuing to receive their distribution service

from the public utility."  (Proposed Ex. 231, Supplemental Report of

Timothy J. Sparks at 3.)

42.   Michigan has a partially deregulated market in which

electric choice is capped at 10%, with limited exceptions, so that no

more than 10% of an electric utility's average retail sales load may take

service from alternative electric suppliers at any time.  (*Id*. at 4–5;

Proposed Ex 279, Supplemental Report of Roger A. Doherty at 6.)

43.   The remaining customers (90% of Michigan's load) receive

bundled service from regulated utilities, meaning that they receive both

distribution and generation services from the utility.  (Proposed Ex. 231, Supplemental Report of Timothy J. Sparks at 5.)  This is different than the unbundled, unregulated generation service that alternative electric suppliers provide.

44.    Moreover, if the 10% choice cap is reached, alternative electric suppliers cannot compete for the remaining 90% of load.  (*Id*.)  This 90% of the market is served exclusively by public utilities without competition from alternative electric suppliers.

45.    While a public utility has an obligation to provide generation service to any customer within its service territory, alternative electric suppliers have no such obligation, outside of any contractual commitments.  This allows them to market to some customers and not others.  (*Id*. at 3–4; Anticipated Test. of Timothy Sparks.)

46.    Historically, "Electric Choice participation [has been] almost entirely comprised of commercial and industrial customers; residential participation was essentially non-existent."  (Proposed Ex. 231, Supplemental Report of Timothy J. Sparks at 3.)  This continues to be true.  (Anticipated Test. of Timothy Sparks.)

15

47.    It is unclear whether eliminating the local clearing requirement and SRM charge would increase competition within the 10% of the market subject to choice because the MPSC has yet to apply its local clearing requirement or SRM charge to individual suppliers. (*See*, *supra*, ¶ 19.)

C.    **There is no evidence of discriminatory effect.**

48.    There is no evidence that the local clearing requirement or SRM charge favors local electric providers while imposing an unequal burden on out-of-state providers.  (*See*, *infra*, ¶¶ 49–60.)

1.    **The local clearing requirement and SRM charge do not favor local economic actors.**

49.    Public utilities, who are local economic actors, own most of the in-state electric generation resources, although certain alternative electric suppliers also own in-state generation.  (ECF No. 85, Pg ID 3400, Final Joint Pretrial Order ¶ 34.)

50.    Plaintiffs argue that most "local generation is either owned by or contracted to the rate-regulated utilities" who would have little incentive to sell this capacity "unless it is sold at a very high price." (Ex. 280, Pls.' Resp. to Def. Comm'rs' Interrog. No. 2(a).)

51.    Plaintiffs are partially wrong.  Public utilities would benefit from the sale of their local capacity ***only if*** they have excess capacity to sell ***and if*** alternative electric suppliers purchase this capacity at a high price.  (Anticipated Test. of Timothy Sparks.)

52.    Public utilities have little, if any, excess capacity to sell to alternative electric suppliers at this time.  Consumers' Vice President of Electric Supply, Timothy Sparks, advises that "the Company does not have excess capacity to sell to AESs."  (Proposed Ex. 231, Supplemental Report of Timothy J. Sparks at 32.)

53.    Alternative electric suppliers have other options for meeting a local clearing requirement besides purchasing capacity from public utilities, including building generation, purchasing power from third-party developers, or offering an interruptible rate option as a demand response resource.  (Proposed Ex. 207, MISO Tariff 69A.3.1.)

54.    Under MISO's Tariff, the following resources are eligible to become a capacity resource: "[A] Generation Resource, External Resource, Demand Response Resource - Type I, Demand Response Resource - Type II, Intermittent Generation, Dispatchable Intermittent

Resource, Stored Energy Resource – Type II, Electric Storage Resource,

Hybrid Resource or Distributed Energy Aggregated Resource . . . ."

(Proposed Ex. 207, MISO Tariff 69A.3.1.)

55.    The local clearing requirement is designed to give suppliers

enough time to exercise any of these options, even building new

generation.  (Proposed Ex. 231, Supplemental Report of Timothy J.

Sparks at 21.)  During proceedings in 2017 in Case No. U-18197, a

representative of Wolverine Power Supply Cooperative noted that it had

constructed a gas combustion generating plant in approximately 18

months, (*id.* at 32), which is far less than the four years built into the

capacity demonstration process.

### 2.    The local clearing requirement and SRM charge do not burden out-of-state economic actors.

56.    The MPSC's individual local clearing requirement is

designed to ensure that MISO's zonal requirement is met.  Under the

current method, the individual requirement would ultimately reach "the

projected pro-rata share of the Zone's local clearing requirement as

compared to the Zone's peak demand."  (Proposed Ex 279, Supplemental

Report of Roger A. Doherty at 23–24.)  The individual requirement

18

"would only result in more resources in the Zone than are necessary to meet MISO's zonal LCR *if* some LSEs voluntarily exceed their individual local capacity requirements." (*Id.* at 24.)

57.    A history of the SRM capacity charges that the MPSC has set, which are revisited in each public utility's rate case or other case initiated to establish the charge, is included in the Joint Final Pretrial Order. (ECF No. 85, Pg ID 3401, Final Joint Pretrial Order ¶ 41.)

58.    The MPSC-approved SRM charge has exceeded CONE in the past, but it has never been imposed on an alternative electric supplier or its customers. (*Id.* at Pg ID 3401–02.)

59.    An alternative electric supplier or its customers pays an SRM charge to another electric provider to provide capacity only if an alternative electric supplier fails to demonstrate that it will meet, or actually fails to meet, its capacity obligations. (Proposed Ex. 231, Supplemental Report of Timothy J. Sparks at 22, 25.)

60.    Whether an alternative electric supplier meets the local clearing requirement and whether an SRM charge is required, therefore, is within the supplier's control to the extent it prepares its

own capacity demonstrations and effectively manages its generation

planning to meet commitments.  (Anticipated Test. of Roger Doherty.)

    D.   **The local clearing requirement's benefits far exceed any incidental burden the requirement may have on interstate commerce.**

        1.   **The MPSC's individual local clearing requirement provides at least two important benefits.**

61.    The requirement benefits customers by 1) promoting

reliability by requiring providers to have a long-term plan to meet

demand that includes at least some necessary local resources and 2)

promoting fairness by ensuring that *all* electric providers are

contributing local capacity to the zone.  (*See, infra*, ¶¶ 62–70.)

62.    It is undisputed that MISO's resource adequacy

requirements look only one year into the future, while the MPSC's

requirements look four years into the future.  (Proposed Ex. 119,

7/21/2022 Updated Report of Pls.' Expert at 5–6, 10; Proposed Ex. 231,

Supplemental Report of Timothy J. Sparks at 13.)

63.    A four-year forward location requirement applied to

individual electric providers benefits their customers by requiring long-

term, local generation planning that does not currently exist in MISO's construct. "If the State is not able to implement the LCR, on all AESs, over 1,400 MW of capacity could be excluded from the State's long-term planning requirement of being sited within Michigan, which would significantly increase reliability risk. That amount of capacity translates to over 300,000 customers in Michigan whose power is served by resources that are potentially located nowhere close to where it's needed to be delivered." (Proposed Ex. 231, Supplemental Report of Timothy J. Sparks at 31.)

64.     Even a small amount of local capacity added in the next four years would help offset the capacity shortfall in the MISO North region. NERC recently warned that, given these capacity shortfalls, "[s]ystem operators in MISO are more likely to need operating mitigations, such as load modifying resources or non-firm imports, to meet reserve requirements under normal peak summer conditions. More extreme temperatures, higher generation outages, or low wind conditions expose the MISO North and Central areas to higher risk of temporary operator-initiated load shedding to maintain system reliability." (Ex. 213, NERC 2022 Summer Reliability Assessment and Infographic at 4.)

65.    While Plaintiffs do not dispute the long-term aspect of the MPSC's capacity planning construct, they do oppose including the local clearing requirement in that construct.  (*See generally* Complaint.)

66.    Without a local generation component, there is nothing to ensure, over the long term, that there are enough resources near the load being served to meet the demand.  (Proposed Ex 279, Supplemental Report of Roger A. Doherty at 27.)

67.    The potential consequences of insufficient local generation include rolling blackouts, load shedding, and other reliability issues. (*See, supra*, ¶¶ 34–38.)

68.    Besides promoting reliability, the MPSC's incremental approach promotes equality and fairness by ensuring that MISO's zonal local clearing requirement obligation does not fall on just some providers' customers in Zone 7 "while a few electric providers who do not contribute local resources to the Zone [and their customers] . . . get a free ride."  (Proposed Ex 279, Supplemental Report of Roger Doherty at 25.)

69.    Some suppliers' customers presently pay nothing for the benefit of local resources, as some alternative electric suppliers do not own any local capacity.  (ECF No. 85, Pg ID 3400, Final Joint Pretrial Order ¶ 34.)  At the same time, other suppliers' customers pay for local resources that provide reliability benefits to everyone.  (Proposed Ex. 232, Supplemental Report of Thomas P. Clark at 7.)

70.    Public utility customers are not alone in disproportionately funding these local resources; there is also inequity among alternative electric supplier customers since some suppliers own local capacity and others do not.  (ECF No. 85, Pg ID 3400, Final Joint Pretrial Order ¶ 34.)

### 2.    Any incidental burden of the local clearing requirement is slight.

71.    The local clearing requirement that the Commission approved in Case No. U-18444 constituted 2.7% of a supplier's planning reserve margin requirement for the 2022–2023 planning year and 5.3% for 2023–2024.  (Proposed Ex 279, Supplemental Report of Roger A. Doherty at 15, 20.)

72.   Plaintiffs' expert James Dauphinais characterized these values as "fairly mild."  (Proposed Ex. 119, 4/30/2021 Updated Report of Pls.' Expert at 13.)

73.   Defendant Commissioners' expert Roger Doherty agreed that the requirement represents a small percentage of each providers total capacity obligation and that "this will continue to be the case for the next several years."  (Proposed Ex 279, Supplemental Report of Roger A. Doherty at 21.)

74.   Mr. Dauphinais opined that the burden will *eventually* reach 80% of alternative electric suppliers' load in the state, (Proposed Ex. 119, 4/30/2021 Report of Pls.' Expert at 11–13, 21), and "will cause Michigan electric suppliers in aggregate to acquire or contract for much more local capacity than is necessary to meet MISO's LCR for their Zone."  (*Id.* at 12.)

75.   Again, however, Mr. Doherty countered that the small incremental local clearing requirement that was approved is likely to remain small for several years, (*id.* at 29), and using the most recently available data, Mr. Doherty calculated what the local clearing

requirement would be for the 2025–2026 planning year if the incremental need approach were used again. (*Id*. at 22.) The updated figure is still under 10% of the Zone's peak demand. (*Id*.)

76.     Other than speculating that the burden will *eventually* reach 80% of alternative electric suppliers' load in the state, Plaintiffs have been unable to quantify the burden, (Ex. 280, Pls.' Resp. to Def. Comm'rs' Interrog. No. 2(b)), making it impossible for Plaintiffs to satisfy their burden under the *Pike* balancing test. (*See*, *infra*, ¶ 116–117.)

E.     **The local clearing requirement serves a legitimate and compelling government interest, and there are no less discriminatory alternatives.**

77.     Even if the individual local clearing requirement discriminated against interstate commerce, which it does not, it would still serve a legitimate public interest in long-term generation planning that promotes electric reliability. Individual local clearing requirements, as part of "[t]he SRM capacity demonstrations made four years in advance[,] are for *capacity planning* purposes and are intended to ensure enough resources are planned and developed and placed into

25

service to be available in Michigan to serve expected load." (Proposed Ex. 232, Supplemental Report of Thomas P. Clark at 5.)

78.    If an alternative electric supplier cannot or does not meet the local clearing requirement, an SRM capacity charge must be paid to another electric provider to provide the capacity.  The SRM charge "ensures that the AES customer pays their share of all capacity resources [the electric provider] uses to serve all capacity obligations." (Supplemental Report of Timothy J. Sparks at 23.)

79.  To reimburse an electric provider who furnishes capacity for a supplier that fails to meet its capacity obligations, the SRM charge is set at the electric provider's embedded cost of capacity, minus a credit for market sales revenues.  This ensures an electric provider's full-service customers do not "pay more for capacity than the customers of an AES" that fails to meet its capacity obligations.  (*Id.*)

80.    "One major purpose of the SRM is to make it clear where there will be a shortfall in meeting AES load so that the utility can plan in advance to meet it if needed and be compensated through the SRM capacity charge."  (Supplemental Report of Timothy J. Sparks at 18.)

81.    The planning reserve margin requirement, or PRMR, although critical to reliability, is not a substitute for the local clearing requirement.  "A modest shortfall in LCR can be covered by enough PRMR without significant reliability consequences, but this is not the intended purpose of the PRMR.  Rather, the PRMR is intended to ensure resources sufficient to cover unexpected changes in supply or demand associated with weather changes, forecast variances, transmission contingencies, and unexpected generation unit outages, etc." (Proposed Ex. 231, Supplemental Report of Timothy J. Sparks at 15–16.)

82.    "The PRMR ensures a sufficient reserve margin exists to meet peak demand plus unexpected demand due to extreme weather, unexpected generator outages, or other factors." (Proposed Ex. 231, Supplemental Report of Timothy J. Sparks at 11.)  The local clearing requirement, although different, is a necessary corollary, ensuring "a sufficient amount of generation is physically located close to electric load, to account for the constraints of the transmission system." (*Id*. at 11–12.)  Given their different purposes, both the "PRMR and LCR are key components of ensuring local reliability." (*Id*.)

27

83.    MISO's resource adequacy construct is likewise not a viable alternative to the individual local clearing requirement.  MISO's construct is intended to be an incentive for electric providers to add local capacity "in order to reduce the risk of a loss of load event occurring," (*id*.), ***but*** MISO's construct has historically not resulted in new generation being built.  (Proposed Ex. 231, Supplemental Report of Timothy J. Sparks at 15–18.)

84.    Under MISO's construct, if a zone does not meet its local clearing requirement or its planning reserve margin requirement in the prompt year, capacity in the planning resource auction for the zone is bought and sold at the cost of new entry, or CONE, which is more than capacity would otherwise cost.  (Proposed Ex 279, Supplemental Report of Roger A. Doherty at 27.)

85.    As an example of why MISO's construct is an inadequate substitute for the individual local clearing requirement, consider that the CONE "financial incentive already existed . . . prior to the creation of the SRM, yet the MPSC still recognized in 2017 (after the passage of Act 341 but prior to the MPSC putting the SRM into effect) that LRZ 7

faced a likely shortfall against meeting its LCR." (Proposed Ex. 231, Supplemental Report of Timothy J. Sparks at 15.)

86.    As a further example, when MISO's planning resource auction "did clear at CONE in 2020, this did not incentivize the building of any new generation capacity in Zone 7.  No simple-cycle gas combustion turbines, even though CONE theoretically represents the capacity price of these generating units, were constructed." (*Id*. at 16.)

87.    The CONE incentive failed to prompt the construction of new generation for at least two reasons:  The planning resource auction "(a) only sets a price six weeks in advance, not enough time to quickly build anything, and (b) only sets a price for one year, too short a period to give a generation builder (any prudent investor) certainty of long-term cost recovery." (*Id*.)

88.    "Assuming that merchant generators will show up to build needed resources before a real shortage is risky, because the MISO PRA is not designed to send price signals on a forward basis that could incentivize that building, even when the clearing price is CONE." (*Id*. at 17.)

29

IV.   **Proposed Conclusions of Law**

89.   In considering dormant Commerce Clause claims, courts must "chart a narrow course between 'rebuff]ing] attempts of states to advance their own commercial interests by curtailing the movement of articles of commerce . . . [and] generally supporting their right to impose even burdensome regulations in the interest of local health and safety." *Colon Health Centers of Am., LLC v Hazel*, 813 F.3d 145, 151–152 (4th Cir. 2016) (citation omitted).

90.   Where a state regulates evenhandedly to accomplish a local public interest—not to further economic protectionism of in-state interests—and its effects on interstate commerce are incidental to the state's legitimate public purpose, the state regulation will be upheld unless the burden imposed on interstate commerce is clearly excessive in relation to the local benefits.  *S. Union Co. v Missouri Pub. Serv. Comm'n*, 289 F.3d 503, 507 (8th Cir. 2002)

91.   A state statute or regulation does not discriminate on its face or in effect unless the relevant entities are similarly situated for constitutional purposes.  *Gen. Motors Corp. v. Tracy,* 519 U.S. 278, 298 (1997) (holding that the regulated sellers and independent marketers

being compared were not "considered 'similarly situated' for purposes of *a claim of facial discrimination* under the Commerce Clause") (emphasis added); *LensCrafters, Inc. v. Robinson*, 403 F.3d 798, 805 (6th Cir. 2005) (rejecting arguments that a regulation *discriminated in effect* because the relevant entities were "not similarly situated for Commerce Clause purposes") (emphasis added).

92.   If the relevant entities are similarly situated, courts evaluate whether the plaintiff has met its burden of showing that challenged statute or regulation facially discriminates against out-of-state entities, has a discriminatory purpose, or discriminates in effect. *Am. Beverage Ass'n v. Snyder*, 735 F.3d 362, 370–373 (6th Cir. 2013).

93.   If the challenged state statute or regulation does not discriminate and is not extraterritorial (controlling commerce occurring wholly outside a state), then courts apply the balancing test established in *Pike v Bruce Church, Inc.*, 397 U.S. 137 (1970) to determine if the regulation's burdens substantially outweigh its local benefits.  *Int'l Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 648 (6th Cir. 2010).

94.     If a plaintiff shows discrimination, the state regulation nevertheless survives if it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives. *Hughes v Oklahoma*, 441 U.S. 322, 336 (1979).

95.     The "strict scrutiny" or "per se" rule of invalidity under the dormant Commerce Clause **only** applies if the challenged law "is basically a protectionist measure." *City of Philadelphia v New Jersey*, 437 U.S. 617, 624 (1978).

A.    **The individual local clearing requirement equitably promotes electric reliability in Michigan, which benefits the health and safety of its residents.**

96.     The United States Supreme Court has said that the "regulation of utilities is one of the most important of the functions traditionally associated with the police power of the States." *Arkansas Elec. Co-op. Corp. v Arkansas Pub. Serv. Comm'n.,* 461 U.S. 375, 377, (1983).  And lower courts have likewise held that a state's interest in assuring reliable energy for its citizens is particularly powerful. *Southern Union Co. v Missouri Pub Serv Comm,* 289 F.3d 503, 508-509 (8th Cir. 2002).

32

97.     Michigan Act 341 seeks to secure a reliable electric grid by ensuring that all electric providers will have enough generation resources, including local resources, in the future to power their customers' homes and businesses.  To accomplish this goal, the Michigan Legislature and the MPSC recognized that there must be enough overall generation available and enough local generation near load to meet demand and ensure reliability.  *See* Mich. Comp. Laws §§ 460.6w(8)(c) (describing capacity obligations as including both a planning reserve margin requirement and local clearing requirement) and 460.6w(12)(d),(e) (defining these terms).

98.     A reliable electric grid serves resident's health and safety by protecting against outages, particularly when electricity use peaks, which is often in hot summer months.  (Proposed Ex. 213, NERC 2022 Summer Reliability Assessment and Infographic.)  If generation resources and transmission facilities cannot produce and transmit the power that is needed, electric customers could find themselves suffering through the heat without air conditioning or electricity.

B.    **Public utilities and alternative electric suppliers are not similarly situated for dormant Commerce Clause purposes.**

99.    To determine whether entities are similarly situated, courts consider three factors: (1) whether the allegedly competing entities provide different products; (2) whether there is a market that only one set of these entities serves, in which removing the differential treatment would not increase competition; and (3) whether there is another market in which the two sets of entities compete against each other, and in which removing the differential treatment could increase competition.  *Tracy*, 519 U.S. at 298–303; *Allco Financial Limited v. Klee*, 861 F.3d 82, 105–106 (2d Cir. 2017).

100.  Public utilities and alternative electric suppliers are not similarly situated under the *Tracy* analysis because, first, they provide different services, (*See*, *supra*, ¶ 43); second, public utilities serve 90% of the market that alternative electric suppliers cannot serve, so any differential treatment in that market would have no impact, (*See*, *supra*, ¶ 44); and, third, while there is a market where public utilities and alternative electric suppliers compete, it is unclear whether eliminating the local clearing requirement would increase competition

34

in this market.  The MPSC has yet to apply its local clearing

requirement to individual suppliers.  (*See*, *supra*, ¶ 19.)

101.  Although this Court's February 23, 2022 Order denying

motions for summary judgment held that *Tracy* does not apply to this

case "because AESs provide the same commodity in the same markets

as other [load serving entities] LSEs" and "they even use the same

transmission system," (ECF 70, Pg Id 3263, 2/23/2022 Order Den. Mot.

for Summ. J. at 18), these same factors also existed in *Tracy*.  (*See*

Pretrial Br. at 9.)

## C.  The local clearing requirement does not discriminate on its face and does not purposefully discriminate.

102.  This Court has held that "[t]he record presented by the

parties shows that the MPSC's local clearing rule does not discriminate

against interstate commerce on its face, and its purpose is not to benefit

in-state economic interests at the expense of out-of-state commercial

actors."  (ECF No. 70, Pg ID 3247, 2/23/2022 Order Den. Mot. for

Summ. J. at 2.)

103.  To decide whether a law facially discriminates, courts must

evaluate a statute's terms rather than its effects.  *Brown* & *Williamson*

*Tobacco Corp. v. Pataki,* 320 F.3d 200, 211 (2d Cir. 2003). And a statute's terms do not discriminate if they draw a neutral distinction independent of where an entity is located. *LSP Transmission Holdings, LLC v. Sieben,* 954 F.3d 1018, 1027–1028 (8th Cir. 2020).

104.  Under Act 341's terms, the local clearing requirement applies to both in-state and out-of-state electric providers selling electricity to retail customers in Michigan, Mich. Comp. Laws §§ 460.6w(12)(c)(i), so there is no facial discrimination as long as the law's terms remain the same.

105.  Nor is there " 'concrete evidence from the statutory language' that the local clearing requirement is purposefully discriminatory," absent which "the '[p]laintiff[s] cannot prevail' on their claim that the statute has a discriminatory purpose." (ECF No. 70, Pg ID 3264, 2/23/2022 Order Den. Mot. for Summ. J. at 19, alteration in original, citation omitted.)

106.  On the contrary, "The articulated goals of the MPSC's local clearing requirement are to implement the State's SRM, which in turn is intended 'to ensure reliability of the electric grid in this state,' Mich.

36

Comp. Laws § 480.6w(12)(h), not to effect 'simple protectionism.' " (*Id.*, citation omitted.)

### D. The local clearing requirement does not discriminate in effect.

107. "A statute may be discriminatory in effect if 'the claimant [can] show both how local economic actors are favored by the legislation, and how out-of-state actors are burdened by the legislation.' " *Am. Beverage Ass 'n,* 735 F.3d at 372 (alteration in original) (citation omitted).

108. The local clearing requirement in Act 341 does not favor local economic actors. (*See*, *supra*, ¶¶ 49–55.)

109. Although an alternative electric supplier or its customers could pay another electric provider an SRM charge exceeding CONE— to serve load the supplier has not demonstrated it will be able serve— there are three reasons why this possibility does not control whether the local clearing requirement favors local economic actors:

> 1. The SRM charge is based on the utility's embedded costs of capacity, less a credit for market sales. The CONE is calculated based on the projected annual cost of a new simple cycle natural gas combustion turbine plant. These charges are

designed to achieve different purposes (recovery of costs of capacity and incentivizing the construction of new peaking capacity when the Zone fails to meet MISO's requirements), and are not analogous or directly comparable. The SRM capacity charge reflects a utility's entire generation portfolio (baseload and peaking plants), which is used holistically to meet capacity needs. The grid cannot be supported solely with the simple-cycle natural gas combustion peaking turbines that CONE reflects, even if those turbines are relatively low cost to build. (Proposed Ex. 231, Supplemental Report of Timothy J. Sparks at 18.)

2.    Plaintiffs have not demonstrated that the SRM charge will exceed CONE, and any attempt to demonstrate this would be speculative because the SRM charge is revisited in each incumbent utility's rate case or other case initiated for that purpose.  (Anticipated Test. of Roger Doherty.)

3.    An SRM charge would be paid to an incumbent utility only if an alternative electric supplier fails to meet the local clearing requirement, which is within its control.  Suppliers can build generation, purchase power from third-party developers, or offer an interruptible rate option as a demand response resource. (*See*, *supra*, ¶¶ 53–54.)

110.  The local clearing requirement in Act 341 does not burden out-of-state actors.  (*See*, *supra*, ¶¶ 56–60.)

111.  Plaintiffs argue that they do not need to quantify the burden on alternative electric suppliers because "where discrimination is patent . . . neither a widespread advantage to in-state interests nor a widespread disadvantage to out-of-state competitors need be shown."

(ECF No. 64, Pg ID 2356–57, Pls.' Resp. to Comm'rs' Mot. for Summ. J. at 15–16, quoting *Wyoming v. Oklahoma*, 502 U.S. 437, 456 (1992).)

112.   In this case, however, there is no "patent" discrimination where the local clearing requirement applies equally to in-state and out-of-state electric providers.  As this Court recognized, when discussing discriminatory effect, "Regulations that impose the same burdens on in-state and out-of-state entities do not discriminate under the Commerce Clause."  (ECF No. 70, Pg ID 3247, 2/23/2022 Order Den. Mot. for Summ. J. at 21.)

113.   This Court also noted that the local clearing requirement "may do no more than level the playing field by equitably allocating the responsibility of satisfying MISO's aggregate LCR and not allowing AESs to avoid the legitimate costs of production that incumbent utility customers pay through the state's rate structure."  (*Id.* at 21.) Similarly, the local clearing requirement can support an inference that "it does nothing more than equitably allocate MISO's capacity requirements among similarly-situated LSEs."  (*Id.*)

114.   The individual local clearing requirement does just that by ensuring that MISO's zonal local clearing requirement obligation does not fall on certain providers' customers in Zone 7 "while a few electric providers who do not contribute local resources to the Zone [and their customers] . . . get a free ride."  (*Supra*, ¶¶ 68–70.)

E.   **The local clearing requirement survives the *Pike* balancing test.**

115.   In the absence of discrimination, a law will survive scrutiny under the dormant Commerce Clause, even if it incidentally burdens interstate commerce, unless its burden substantially outweighs its local benefit. *Pike,* 397 US at 146.

116.   To invalidate a law or regulation under the *Pike* balancing test, Plaintiffs must provide concrete evidence that the burden substantially outweighs the benefit.  As the Sixth Circuit Court of Appeals has held, "*Pike* balancing is already a difficult exercise," and this "[d]ifficulty becomes unworkability when courts are forced to speculate about the extent of a hypothetical burden without concrete proof."  *Garber v. Menendez*, 888 F.3d 839, 845 (6th Cir. 2018).  The

Sixth Circuit Court "has not invalidated a law under *Pike* balancing in three decades." *Id*.

117.   Plaintiffs have not quantified the burden that the local clearing requirement imposes on them, (Ex. 280, Pls.' Resp. to Def. Comm'rs' Interrog. No. 2(b)), turning the difficulty of the *Pike* balancing test into unworkability.  *Garber*, 888 F.3d at 845.

118.   Any incidental burden that the local clearing requirement imposes on out-of-state suppliers is slight—less than 10% of a supplier's planning reserve margin requirement being provided from local resources.  (*See*, *supra*, ¶¶ 71–75.)

119.   The requirement's benefits, by contrast, are substantial.  In light of recent warnings of a capacity shortfall in MISO North— shortfalls that increase the risk of energy emergencies during peak summer conditions—every MW of local capacity that is added in response to the individual local clearing requirement reduces the risk of an energy emergency. (*See*, *supra*, ¶¶ 40, 64, 98.)

120.   Given its slight burden and significant benefits, the local clearing requirement easily survives the *Pike* balancing test.  And, in

any case, Plaintiffs have not presented concrete evidence that the

burden substantially outweighs the benefits.

F. **The local clearing requirement could be upheld even if it discriminates because it advances a legitimate local purpose that cannot be adequately served by nondiscriminatory alternatives.**

121.  If a plaintiff satisfies its burden to show discrimination, a

state regulation nevertheless survives *if* it advances a legitimate local

purpose that cannot be adequately served by nondiscriminatory

alternatives. *Hughes v Oklahoma*, 441 U.S. 322, 336 (1979).

122.  This Court has already confirmed that the LCR serves a

"legitimate local purpose of ensuring long-term, reliable electricity

service for the health and safety of the state's residents."  (ECF No. 70,

Pg ID 3267, 2/23/2022 Order Den. Mot. for Summ. J. at 22.)

123.  There are no alternatives that serve the same purpose or

promote the same interests as the individual local clearing requirement.

(*See, supra*, ¶¶ 81–88.)  Plaintiffs' suggestion that it would be adequate

for Michigan to rely on MISO's single-year resource adequacy process is

false and would risk the health and safety of Michigan's homes and

businesses. MISO's short-term planning process has failed to incent the

42

construction of any new merchant plant generation since 2004 for

alternative electric suppliers, even though Zone 7 failed to meet MISO's

resource adequacy requirements in 2020 (the Zone as a whole did not

meet MISO's LCR) and 2022 (the Zone did not meet MISO's PRMR).

(Proposed Ex. 231, Supplemental Report of Timothy J. Sparks at 15-18.)

124.   The MISO single-year resource adequacy construct is

insufficient to incent the development of sufficient local capacity, which

is necessary to ensure reliability requirements are satisfied. (*Id.*)

Neither the MISO Planning Reserve Auction nor the MISO CONE

charge incents the building or maintenance of baseload generation

necessary to ensure grid reliability. (*Id.* at 18.)

125.   The MPSC's incremental need approach is a reasonable and

narrowly tailored way to encourage long-term local generation planning

and responsible market participation.  (*See*, *supra*, ¶¶ 13, 20–24.)

G.   **Because the state could eliminate retail open access
     completely, it can place reasonable restrictions on
     alternative electric suppliers' participation in that
     market.**

126.   Without Michigan's law authorizing alternative electric

suppliers to serve Michigan's homes and businesses (subject to the 10%

cap), they would not be able to do so.  *See Consumers Power Co.*, 596

N.W.2d at 137 (1999) (concluding that the PSC lacked statutory

authority, prior to Public Act 141 of 2000 creating retail open access, to

"order a utility to transmit a third-party provider's electricity through

its system to a customer.").

127.  Because suppliers' authority to sell power to retail customers

in Michigan is dependent on state law, the state could choose to

eliminate that market access completely, returning the state to the pre-

2000 fully regulated market.

128.  The state can certainly place reliability requirements on

alternative electric suppliers' retail electric service comparable to those

which apply to other electric providers.

## CONCLUSION

Defendants have shown, through their expert reports and

proposed exhibits, and will continue to demonstrate at trial that the

individual local clearing requirement equitably promotes electric

reliability in Michigan by allocating the cost of local reliability to all

customers.  The MPSC-approved requirement does not discriminate

against interstate commerce but treats in-state and out-of-state electric providers the same regardless of where they are headquartered. This is true even for electric providers who are not similarly situated, though they are not entitled to dormant Commerce Clause protection.

The requirement also survives the *Pike* balancing test because its local benefits are not substantially outweighed by its incidental burden. Quite the contrary, its benefits far outweigh its burden, promoting a compelling public interest in electric reliability that, when coupled with the absence of other nondiscriminatory alternatives, would allow it to survive strict scrutiny if it were applied.

Respectfully Submitted,

By:  /s/Kelly M. Hall
    Kelly M. Hall (P48083)
    CONSUMERS ENERGY
    COMPANY
    Attorney for Intervening
    Defendant One Energy Plaza
    Jackson, MI 49201
    517-513-1959
    kelly.hall@cmsenergy.com

    Lawrence T. García (P54890)
    Sydney G. Johnson (P85655)

By:  /s/Spencer A. Sattler
    Spencer A. Sattler (P70524)
    Nicholas Q. Taylor (P81020)
    Benjamin J. Holwerda
    (P82110)
    Assistant Attorneys General
    MICHIGAN DEPARTMENT
    OF ATTORNEY GENERAL
    Public Service Division
    Attorneys for Defendants
    7109 West Saginaw Hwy
    Lansing, MI 48917
    Sattlers@Michigan.gov
    TaylorN10@Michigan.gov
    HolwerdaB@Michigan.gov

MILLER, CANFIELD,
PADDOCK AND STONE,
PLLC
Attorneys for Intervening
Defendant
150 W. Jefferson Ave., Suite
2500
Detroit, MI  48226
(313) 963-6420
garcia@millercanfield.com


Dated:  August 1, 2022

**CERTIFICATE OF SERVICE (E-FILE)**

I hereby certify that on August 1, 2022, I electronically filed the above

document(s) with the Clerk of the Court using the ECF System, which will provide

electronic copies to counsel of record.

<u>/s/ Spencer A. Sattler (P70524)</u>
Assistant Attorney General
Attorney for Defendants
Public Service Division
7109 W. Saginaw Hwy., 3rd Fl.
(517) 284-8140
sattlers@michigan.gov
P70524