UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ENERGY MICHIGAN, INC., a
Michigan Corporation; and                    Case No. 2:20-cv-12521
ASSOCIATION OF BUSINESSES
ADVOCATING TARIFF EQUITY, an
unincorporated Michigan association,         Honorable David M. Lawson

       Plaintiffs,

v.

DANIEL C. SCRIPPS, in his official capacity
as Chair of the Michigan Public Service
Commission; and TREMAINE L.
PHILLIPS and KATHERINE PERETICK,
in their official capacities as Commissioners
of the Michigan Public Service Commission,

       Defendants.

CONSUMERS ENERGY,

       Intervening Defendant.
_____/

## PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs, Energy Michigan, Inc. ("Energy Michigan"), and Association of Businesses Advocating Tariff Equity ("ABATE"), through their undersigned counsel, hereby file their joint proposed findings of fact and conclusions of law pursuant to the Joint Final Pretrial Order ("JFPTO") (ECF # 85):

## PROPOSED FINDINGS OF FACT

## I.   THE PARTIES

1.     Plaintiff ABATE is an unincorporated association of large industrial and manufacturing concerns located in Michigan that purchase substantial amounts of electric energy/capacity from investor-owned electric utilities (including Consumers Energy Company and DTE Electric Company), municipally owned electric utilities, and alternative electric suppliers ("AESs") for use at facilities in Michigan. (See JFPTO Stipulations of Fact, ECF #85, PageID 3391 ⁋ 1.)

2.     ABATE's members include: AK Steel Corporation; Cargill, Inc.; The Dow Chemical Company; DW-National Standard-Niles LLC; Eastman Chemical Company; Eaton Corporation; Edw. C. Levy Co.; Enbridge Energy, Limited Partnership; FCA US LLC; General Motors LLC; Gerdau MacSteel INC.; Graphic Packaging International, Inc.; Hemlock Semiconductor Operations LLC; J. Rettenmaier USA LP; Marathon Petroleum Corporation; Martin Marietta Magnesia Specialties LLC; Metal Technologies, Inc.; MPI Research; Occidental Chemical Corporation; OX Paperboard Michigan, LLC; Pfizer Inc.; Praxair, Inc.; United States Gypsum Corporation; United States Steel Corporation; WestRock California, Inc.; and Zoetis LLC. (*Id.*)

3.      At least one ABATE member purchases electric energy/capacity from both an investor-owned electric utility and AES for industrial use at the same facility/location in Michigan. (*Id.*)

4.      Plaintiff Energy Michigan is a Michigan non-profit corporation that represents the interests of licensed AESs in Michigan that compete with investor-owned electric utilities for the ability to sell electric energy/capacity to retail customers. Energy Michigan also represents customers who purchase electric energy/capacity from AESs. (*Id.* ⁋ 2.)

5.      Several of Energy Michigan's AES-members own substantial capacity resources in many locations nationwide, including: Calpine Energy Solutions – an affiliate of Calpine; Constellation New Energy; Direct Energy Business – an affiliate of NRG; and Wolverine Power Marketing – an affiliate of Wolverine Power Cooperative. (*Id.*)

6.      The Michigan Public Service Commission ("MPSC") is an autonomous regulatory agency and political subdivision of the State of Michigan responsible for implementing, administering, and enforcing Michigan's energy laws including Section 6w of Public Act 341, Mich. Comp. Laws § 460.6w, and the government entity that imposed the individual local clearing requirement ("ILCR") by way of the MPSC's September 15, 2017 Order in Case No. U-18197 and June 28, 2018

Order in Case No. U-18444 (the "MPSC Orders"). (*Id.* ¶ 3 (citing Pls' Exs. 2 and 3.))

7.      As a state regulatory agency, the MPSC is subject to the limitations imposed on the State of Michigan by the Constitution of the United States, including those imposed by the dormant Commerce Clause. (*Id.*)

8.      Defendant Commissioners Daniel C. Scripps, Tremaine L. Phillips, and Katherine Peretick (collectively the "Commissioners"), named in their official capacities only, are the government officials responsible for carrying out the duties of the MPSC and the public officials now responsible for the MPSC's ILCR. (*Id.* ¶ 4.)

9.      Intervening-Defendant Consumers Energy Company ("Consumers") is an investor-owned electric utility headquartered in Michigan that sells both electric energy/capacity and electric distribution services to retail customers located within its franchised service territories pursuant to rates and terms set by the MPSC. (*Id.* ¶ 5.)

## II.      <u>THE ELECTRIC MARKET</u>

10.     In broad terms, the electric market in the United States is comprised of the federal wholesale electric energy and transmission market, and the state retail electric energy and distribution markets. (*Id.* ¶ 6.)

ClarkHill\07411\406274\268074916.v1-8/1/22

11.    Electric "capacity" is the total amount of electricity (through owned or contracted for electric generation resources) a provider can deliver to its load (i.e., customers) at peak demand. Electric "energy" is the amount of electricity produced over a specific period of time. (*Id.* ¶ 7.)

### A.    The Federal Wholesale Electric Market

12.    The Federal Power Act ("FPA") authorizes the Federal Energy Regulatory Commission ("FERC") to regulate "the sale of electric energy at wholesale in interstate commerce" but leaves to the states the authority to regulate retail sales of electricity in intrastate commerce. (*Id.* ¶ 8 (citing 16 USC §§ 824(b), 824d(a), 824e(a)).)

13.    Over twenty years ago, FERC conferred authority on institutions known as Regional Transmission Organizations ("RTOs") which operate regional electric transmission grids (*i.e.*, high-voltage electric transmission systems) and administer the wholesale markets in which electric energy and capacity resources are bought and sold through competitive auctions.  (*Id.* ¶ 9.)

14.    RTOs are comprised of public and non-public utilities, state officials, and certain interest groups, and, although participation is voluntary, the organizations address operational and reliability issues.  (*Id.*)

15.    The RTOs' auctions allow electric generators to sell their power to load serving entities ("LSEs"), often regulated electric utilities or AESs, who then resell

that power to end-customers. The price of the energy and capacity resources sold in these auctions is based on the price of the marginal unit and mostly a function of supply, demand, and location. (*Id.*)

16.     The primary RTO that oversees the wholesale electricity market in the Midwest is the Midcontinent Independent System Operator, Inc., or "MISO," established in 2001. (*Id.* ⁋ 10.)

17.     MISO functionally controls the interstate electric transmission systems owned by American Transmission Company ("ATC"), International Transmission Company ("ITC") and Michigan Electric Transmission Company ("METC") in Michigan as well as those owned by transmission owners located in 14 additional states. (*Id.* ⁋ 11.)

18.     MISO administers a FERC-regulated tariff (the "MISO Tariff") that provides for unbundled transmission service. (*Id.* ⁋ 12.)

19.     Unbundled transmission service is electric transmission service that is provided and priced separate and apart from the other elements of electric service (i.e., electric energy and capacity, distribution service, etc.). In contrast, bundled transmission service is provided together with the other elements of electric service under a single electric service rate. (Pls' Ex. 124, July 21, 2022 Supplemental Expert Report of James Dauphinais at 5 n2.)

20.     The MISO Tariff also provides for the operation of interstate wholesale markets for electric energy, operating reserves, and capacity within the MISO footprint. (See JFPTO Stipulations of Fact, ECF #85, PageID 3391 ⫿ 12.)

21.     Under these federal tariff provisions, MISO operates an hourly day-ahead energy, real-time energy and operating reserve market, as well as a voluntary annual capacity auction known as the Planning Resource Auction ("PRA") which serves as a mechanism for LSEs to buy and sell capacity in the near term. MISO's capacity auction is for the upcoming Planning Year. (*Id.* ⫿ 13.)

22.     Each year, MISO establishes the Planning Reserve Margin Requirement ("PRMR"), which represents the amount of overall capacity each LSE must acquire to reliably serve the peak demand of its retail customers. The PRMR for each LSE is determined as the forecasted demand of that LSE at the time of the MISO system peak grossed up by MISO's Planning Reserve Margin ("PRM") percentage and the applicable transmission losses percentage. (*Id.* ⫿ 14 (citing Pls' Ex. 63, MISO Tariff Module E-1 §§ 68A.7).)

23.     MISO determines its PRM percentage annually by performing a loss of load expectation study with the objective to maintain a probabilistic MISO-wide loss of load expectation of no greater than one day in 10 years prior to considering any transmission constraints internal to MISO. A loss of load expectation of no more than one day in 10 years means that there is an expectation that firm customer load

of any amount will not need to be curtailed within MISO during actual operations due to insufficient capacity more than one day in 10 years. (*Id.* ¶ 15.)

24.    Each year, MISO also establishes a Local Clearing Requirement ("LCR"), which represents the minimum amount of capacity that must be physically located within a Local Resource Zone ("Zone") in order for the entire Zone to meet federal reliability requirements. (*Id.* ¶ 16 (citing Pls' Ex. 63, MISO Tariff, Module E-1 §§ 68A and 69A).)

25.    The LCR for a Zone is: (*i*) the total amount of capacity that would be needed in that Zone if it were an electrical island to maintain a loss of load expectation of no greater than one day in 10 years (known as the "Local Reliability Requirement" or "LRR"); (*ii*) <u>less</u> the amount of capacity that can be imported into that Zone (the "Capacity Import Limit" or "CIL"); and (*iii*) <u>less</u> any MW of MISO-controllable exports of capacity from the Zone to markets outside of MISO. (*Id.* (citing Pls' Ex. 63, MISO Tariff, Module E-1 §§ 68A.5 and 68A.6).)

26.    There are (10) different Zones in MISO's footprint. Zone 2 comprises the Upper Peninsula of Michigan along with much of Wisconsin. Zone 7 comprises most of Michigan's lower peninsula except for a small portion of the southwest portion of the Lower Peninsula, which falls under the authority of the PJM Interconnection LLC. (*Id.* ¶ 17 (citing MISO Tariff at Attachment VV).)

27.     The vast majority of Michigan's electric load is within MISO. This means the vast majority of Michigan's load serving entities, which operate under MISO's resource adequacy construct, have capacity obligations at the RTO that extend one year into the future. (*Id.* ¶ 18.)

28.     The MISO Tariff permits individual states to establish an alternative PRM percentage that applies to the portion of MISO within that state. However, the MISO Tariff does not grant similar authority to the states with respect to the determination of LCR values or any of the values that are utilized by MISO in the determination of LCR values. Thus, the MISO Tariff does not expressly allow states to increase or decrease the LCR value determined by MISO for the MISO Local Resource Zones that fall within their boundaries. (See Pls.' Ex. 124, July 21, 2022 Supplemental Expert Report of James Dauphinais, at 7 n6 (citing Pls.' Ex. 63, MISO Tariff, Module E-1 §§ 68A.7).)

29.     As described in MISO's Resource Adequacy Business Practice Manual, BPM-011-R24, marked as Plaintiffs' Exhibit 72, each LSE within MISO must choose one (or more) of four options to meet MISO's resource adequacy requirements. An LSE can:

A.     Participate in the PRA to acquire capacity, in the form of Zonal Resource Credits ("ZRCs") to count toward their capacity requirements.

B.     Self-Schedule by bidding owned or contracted resources into the PRA at $0, which guarantees they will clear the PRA.

C.   Submit a Fixed Resource Adequacy Plan ("FRAP") wherein an LSE identifies resources it has ownership or contractual rights to that it will rely upon to meet its PRMR while also conforming to the LCR. A FRAP effectively removes both the requirements and resources from the planning resource auction, but technically resources included within a FRAP are cleared in the planning resource auction process.

*or*

D.   Pay a Capacity Deficiency Charge wherein LSEs are allowed to opt out of all or a portion of their PRMR from participating in the auction by paying the Capacity Deficiency Charge. The Capacity Deficiency Charge is currently greater than the Cost of New Entry ("CONE"). (See JFPTO Stipulations of Fact, ECF #85, PageID 3391 ⁋ 19.)

30.   ZRCs can come from a wide variety of sources, including MISO-registered Generation Resources, External Resources (essentially, generation resources located outside of the MISO footprint), Behind-the-Meter Generation, Demand Resources (interruptible load), Demand Response Resources and Energy Efficiency. (*Id.* ⁋ 20 (citing Pls.' Ex. 63, MISO Tariff, Module E-1 §§ 69A.3.1, 69A3.2, 69A3.3, 69A.4, and 69A.5).)

31.   To the extent an LSE chooses to self-supply or bilaterally purchase ZRCs to meet its PRMR for a given MISO Planning Year, it must do so before MISO conducts its annual PRA for that MISO Planning Year. The PRA is conducted each April to set the price of capacity for the immediately following MISO Planning Year that runs from June 1st through May 31st. (*Id.* ⁋ 21.)

32.    MISO does not place any geographic limitation on individual LSEs with respect to their use of ZRCs to meet their PRMR except to the extent an LSE chooses to use a FRAP to meet its PRMR. (*Id.* ⸿ 22.)

33.    A FRAP is a voluntary option available to LSEs who would like to entirely remove themselves from the PRA. (Subject to certain *de minimis* exceptions, LSEs not fulfilling their PRMR by means of a FRAP must offer all the ZRCs they own or bilaterally purchase ahead of the annual PRA into the PRA.) (*Id.* ⸿ 23.)

34.    When using a FRAP, LSEs directly specify to MISO the ZRCs they would like to use to meet their PRMR. If an LSE uses a FRAP, it may not specify ZRCs located outside of the Zone of its PRMR in excess of its load ratio share of the effective import capability into that Zone. The effective import capability of a zone is the difference between the sum of the PRMR of each LSE with respect to that Zone and the LCR for that Zone. (*Id.* ⸿ 23 (citing Pls.' Ex. 63, MISO Tariff, Module E-1 §§ 69A.9. 53).)

35.    No LSE is required to use a FRAP. LSEs who are providing ZRCs through self-supply or bilateral contracts can either use the FRAP or "self-schedule" their ZRCs into the PRA. Under self-scheduling, the ZRCs are offered into the PRA at an offer price of zero, which guarantees they will clear in the PRA and cover the LSE's PRMR. (*Id.* ⸿ 24 (citing Pls' Ex. 63, MISO Tariff, Module E-1 § 69A.7.8).)

36.     Except for LSEs utilizing a FRAP, MISO does not impose the LCR upon individual LSEs in a Zone. Rather, MISO imposes the LCR on a Zone as a whole, where the zonal capacity auction prices at the annual PRA serve as the mechanism to address situations where the zonal LCR is not met. (*Id.* ⸿ 25 (citing Pls.' Ex. 63, MISO Tariff, Module E-1 §§ 69A and 69A.7).)

37.     If the LCR for a Zone is not met, the result is a higher auction clearing price in the PRA for ZRCs in that Zone as compared to what the auction clearing price would have been had the Zone met the LCR, and also likely higher than other Zones within the MISO footprint that met their LCRs. Specifically, the result of a Zone not meeting its LCR is that the auction for the Zone clears at CONE and the Zone's risk of loss of load is incrementally higher than the 1-day-in-10-years target. (*Id.* ⸿ 26.)

38.     If an LSE in the Zone, which is short on capacity, used ZRCs from another Zone to meet its PRMR, it is either implicitly or explicitly subject to a transmission congestion charge in the capacity market called the Zonal Deliverability Charge ("ZDC"). (*Id.* ⸿ 27.)

39.     The ZDC is equal to the difference between the Auction Clearing Price of the LSE's PRMR Zone and that of the Zone where its ZRCs are located, multiplied by the number of out-of-zone ZRCs used by the LSE to meet its PRMR. (*Id.* ⸿ 27 (citing Pls.' Ex. 63, MISO Tariff, Module E-1 §§ 69A.7.6 and 69A.7.8).)

40.     This charge could be as high as the MISO CONE price, which for the 2021–2022 planning year was $259.73 per MW-day for MISO Zone 7 and which for the 2022-2023 planning year is $236.66 per MW-Day for MISO Zone 7. (*Id.* ⁋ 27; see also Pls' Ex. 124, July 21, 2022 Supplemental Expert Report of James Dauphinais at 8 (citing Pls.' Ex. 68, MISO 2021/2022 Planning Resource Auction Results, April 15, 2021 at Slide 9 and Pls.' Ex. 75, MISO 2022/2023 Planning Resource Auction Results, April 14, 2022 at Slide 4).)

41.     LSEs using a FRAP are explicitly subject to a ZDC under the MISO Tariff. (*Id.* ⁋ 28 (citing Pls.' Ex. 63, MISO Tariff, Module E-1 § 69A.7.6).)

42.     LSEs who self-schedule ZRCs into the PRA are implicitly subject to a ZDC in that MISO charges them the Auction Clearing Price of the Zone where their PRMR is located and credits them the Auction Clearing Price of the Zone where their ZRCs are located, in each case on a per-ZRC basis. (*Id.* ⁋ 28.)

43.     As a result, when self-scheduling ZRCs, an LSE on a net basis is responsible for paying MISO the Auction Clearing Price for the Zone where its ZRCs are physically located, multiplied by the number of ZRCs. The resulting net payment is the same as the ZDC between the two Zones when the PRMR Zone has a higher Auction Clearing Price than the ZRC Zone.  (*Id.* ⁋ 28.)

44.     To illustrate further, if an LSE's ZRCs are located in the same Zone as its PRMR, or if the Auction Clearing Prices are the same between those Zones, then the net payment to MISO would be zero. (*Id.* ¶ 28.)

45.     Notably, on November 1, 2016, MISO filed for approval of its Competitive Retail Solution ("CRS"), which, if approved, would have revised the MISO Tariff to establish a voluntary three-year Forward Resource Auction ("FRA") whereby LSEs could procure capacity in order to meet new CRS Resource Adequacy Requirements. (Pls.' Ex. 114, Midcontinent Indep Sys Operator, Inc, 158 FERC ¶ 61128 (Feb 2, 2017).)

46.     The scope of the CRS was limited to Zones with competitive retail demand like Michigan's Zone 7. (*Id.*) The CRS proposal also included an optional Prevailing State Compensation Mechanism ("PSCM") that certain states could chose to adopt in lieu of the three-year forward capacity auction. (*Id.*) If adopted, the PSCM would have required LSEs to either: (*i*) submit a Forward Fixed Resource Adequacy Plan ("FFRAP") satisfying their PRMR and a proportional share of the LCR; or (*ii*) pay a capacity charge set by the state. (*Id.*)

47.     On February 2, 2017, FERC rejected MISO's CRS proposal in its entirety because it had "not been shown to be just and reasonable, and not unduly discriminatory or preferential." (*Id.*)

48. FERC found that MISO's proposed bifurcation of the capacity market could have "uncertain, and potentially adverse, impacts on price formation, in both the Forward Auction and the Prompt Auction," and would "likely result in clearing prices and capacity resource selections that lack the desirable properties associated with a single market-wide clearing process." (*Id.*)

49. FERC also found that MISO's CRS proposal could (*i*) "lead to improper or inefficient allocations" of transmission capability; (*ii*) "result in price separation in the Forward Auction that does not truly reflect the physical limitations of the system or the locational need for capacity"; or (*iii*) "prevent load serving entities in the Prompt Auction from procuring lower-cost capacity." (*Id.*)

## B. Michigan's Retail Electric Market

50. Michigan's retail electric generation market is unique and considered a "hybrid" market because it is largely regulated (approximately 90%), but partially unregulated (approximately 10%). (See JFPTO Stipulations of Fact, ECF #85, PageID #3391 ⁋ 29.)

51. The MPSC still regulates some aspects of the approximate 10% of the market that is not rate regulated such as AES licensing and, now, the capacity obligations discussed below. (*Id.* ⁋ 29.)

### 1. Types of Retail Electric Suppliers

ClarkHill\07411\406274\268074916.v1-8/1/22

52. Currently, there are four categories of retail electric suppliers, sometimes referred to as LSEs and referred to as "electric providers" in 2016 Michigan Public Act 341, Mich. Comp. Laws § 460.6w(12)(d), that sell electric energy/capacity to Michigan's retail customers: (a) investor-owned electric utilities; (b) municipally owned electric utilities; (c) cooperatively owned electric utilities; and (d) AESs. (*Id.* ¶ 30.)

53. Investor-owned electric utilities (e.g., Consumers and DTE Electric Company ("DTE")) sell both electric energy/capacity and distribution services to retail customers located within their franchised service territories pursuant to rates and terms set by the MPSC. (*Id.* ¶ 31.)

54. Nearly all of the electric energy/capacity sold to Michigan retail customers by Michigan's investor-owned utilities (e.g., Consumers and DTE) is generated in Michigan. (*Id.* ¶ 31.)

55. Moreover, the two largest public utilities in Michigan, Consumers and DTE, which are both headquartered in Michigan, either own or have contracted for over 80% of MISO Zone 7's local capacity for the 2024/25 planning year. (*Id.* ¶ 31.)

56. Municipally owned electric utilities (e.g., Lansing Board of Water and Light and Traverse City Light and Power) sell electric energy/capacity and distribution services to retail customers within their local boundaries under rates and terms set by their own governing boards. (*Id.* ¶ 32.)

16

57.     Cooperatively owned electric utilities sell electric energy/capacity and distribution services to their members under rates approved either by the MPSC or by their member-elected boards. (*Id.* ⁋ 33.)

58.     AESs sell electric energy/capacity to a limited and capped segment (i.e., 10%) of the state's retail electric customers at competitive rates (*i.e.*, rates set by the free market as opposed to the MPSC). (*Id.* ⁋ 34.)

59.     AESs are not public utilities and do not provide electric distribution service. Rather, when it comes to distribution, their customers pay incumbent electric utilities at rates and terms set by the MPSC and included in the applicable utility's tariff to deliver the electricity AESs sell. (*Id.* ⁋ 34.)

60.     There are 24 AESs licensed in Michigan, with eight of those currently serving customers under the 10% market cap. (*Id.* ⁋ 34.)

61.     The Michigan Legislature has determined that AESs are free to obtain the electricity they sell to their customers from any source that is allowed under MISO's resource adequacy requirements and consequently is deliverable to the zone. (*Id.* ⁋ 34 (citing Pls' Ex. 1, Michigan Public Act 341 of 2016; Mich. Comp. Laws § 460.6w(8)(b), (c) & (d)).)

62.     Some AESs own resources in the Zone while others do not. (*Id.* ⁋ 34.)

63.     In addition to owning resources in the Zone, AESs may contract for resources inside or outside of the Zone to supply their customers, and the amount of

such in-zone or out-of-zone purchases may vary from year to year depending on market conditions or other factors. (*Id.* ¶ 34.)

64.    In all cases since resource adequacy reviews by the Commission were required, beginning in 2018, all generation capacity serving AES load is reviewed confidentially by MPSC Staff four years in advance before delivery to forecast whether adequate supplies are being made available to serve load in the zone. (*Id.* ¶ 34 (citing https://www.michigan.gov/mpsc/commission/workgroups/2016-energy-legislation/capacity-demonstration).)

65.    All electric providers (including AESs) serving load within MISO's footprint (including Zone 7 in Michigan) are subject to MISO's one-year forward capacity requirement (i.e., the electric provider's individual PRMR) unless they pay MISO's capacity deficiency charge. (*Id.* ¶ 35.)

66.    If a MISO zone does not meet its LCR, all electric providers serving load within that Zone would pay increased capacity prices for capacity purchased in the PRA. (*Id.* ¶ 35.)

### 2.    The Electric Capacity Sold by AESs and Investor-Owned Utilities is the Same Product

67.    The electric capacity and energy provided by AESs and sold to their Michigan customers through Michigan's electric retail choice market is the same product as the electric capacity and energy that is produced by investor-owned

18

utilities in Michigan and sold to their Michigan customers. (Pls.' Ex. 124, July 21, 2022 Supplemental Expert Report of James Dauphinais at 25.)

68.  In each case, a customer receives from an LSE the same electric power that it needs, and the method of transmission is immaterial to the character of the end product, provided it is within the bounds MISO places on that transmission. (*Id.* at 25–26.)

69.  Notwithstanding the Michigan statutory limitation on total AES sales being no greater than 10% of investor-owned utility load, AESs and public utilities provide the same product (electric power supply service) to the same customers within the same interstate wholesale electric market under the same wholesale market rules and using the inter-state electric transmission system. (*Id.* at 26.)

70.  Neither the state legislative cap limiting competition between AESs and investor-owned utilities nor the fact that public utility distribution system infrastructure is used to provide the delivery of electric power supply service to both AES and public utility customers changes this fact. (*Id.* at 26.)

71.  Retail electric customers in Michigan receiving electric service in Michigan receive two distinct services: (*i*) power supply service and (*ii*) delivery service. (*Id.*)

72.  Power supply service consists of electric capacity, electric energy and electric transmission and ancillary services. Power supply service can be taken from,

19

and is provided from, both AESs and public utilities, up to the 10% statutory cap. (*Id.*)

73.    Delivery service consists of the electric distribution service that is necessary to transport electric capacity, energy and ancillary services from the electric transmission system to the retail customer's electric meter. Public utilities exclusively provide delivery service in their role as electric distribution companies. (*Id.*)

74.    However, delivery service is distinct and unrelated to the public utility's provision of power supply service and each public utility is required by the MPSC to maintain separate, unbundled regulated rates for this service. (*Id.*)

75.    Both AESs and public utilities can source the electric capacity and energy they provide to their respective retail customers in Michigan from generation resources located anywhere on the inter-state electric transmission system within the constraints of that system. (*Id.* at 27.)

76.    The resource adequacy requirements of MISO's Tariff incorporate those system constraints. (*Id.*)

77.    Both AESs and electric utilities may obtain their needed capacity and energy through construction of their own generation resources, through the acquisition of generation resources, through bilateral contracts with third parties

and/or through purchases from the centralized capacity and energy markets operated by MISO. (*Id.*)

78.     There is no fungible difference between the electric capacity and energy provided to retail customers in Michigan by AESs versus that provided by public utilities. (*Id.*)

79.     There is also no fungible difference between the universe of generation resources that AESs can utilize within the bounds of transmission constraints to provide this capacity and energy versus public utilities. Finally, there is no fungible difference with respect to how AESs and public utilities may obtain capacity and energy to serve their retail customers. (*Id.*)

80.     Both AESs and public utilities must obtain the electric transmission and ancillary services they need to serve their retail customers from MISO pursuant to the MISO's FERC-regulated Open Access Transmission, Energy and Operating Reserve Markets Tariff, which is commonly known as the MISO Tariff. (*Id.*)

81.     Both AESs and public utilities are subject to the same transmission limitations imposed by MISO on the transmission of capacity and energy to retail customers in Michigan. (*Id.*)

82.     Both AESs and public utilities are subject to the same market rules under the MISO Tariff and MISO Business Practice Manuals for the provision of capacity and energy to retail customers. (*Id.*)

83.    Within the bounds of electric transmission constraints, both AESs and public utilities can sell excess capacity and energy from their owned or contracted generation resources either through bilateral contracts to third-parties or into the centralized capacity and energy markets operated by MISO. (*Id.* at 28.)

84.    Within the bounds of electric transmission constraints, both AESs and public utilities can sell generation-related ancillary services from their owned or contracted generation resources to MISO pursuant to the provisions of the MISO Tariff. (*Id.*)

85.    While Michigan law limits AESs to serving only up to 10% of investor-owned utility load, until the 10% cap is reached, AESs can compete with the public utilities for all retail customers that are eligible to competitively purchase power supply service. (*Id.*)

86.    Furthermore, there is significant pent-up customer demand to take power supply service from AESs as is evident from the customer waiting lists for such service for both Consumers and DTE, the two largest public utilities within the portion of Lower Michigan within MISO Zone 7. (*Id.* (citing Pls.' Exs. 85 & 86).)

### 3.    Michigan Energy Law

87.    Before 2000, retail electric customers in Michigan were limited to purchasing their electric energy/capacity almost exclusively from incumbent electric utilities. (*Id.* ¶ 36.)

22

88.     In 2000, the Michigan Legislature passed 2000 PA 141 ("Act 141") which "restructured," or partially deregulated, the sale of electric energy/capacity to retail customers. Act 141 permitted retail customers the choice to buy electric energy/capacity from AESs instead of being limited to only purchasing electric energy/capacity from incumbent electric utilities. (*Id.* ⁋ 37.)

89.     In 2008, by way of Public Act 286, the Michigan Legislature maintained retail electric choice, but capped such retail open access ("ROA") customer participation at ten percent (10%) of an incumbent electric utility's customer load. (*Id.* ⁋ 38 (citing Mich. Comp. Laws § 460.10a(1)).)

90.     In 2016, the Michigan Legislature again passed new energy laws, including Public Act 341 of 2016 ("Act 341"), which maintained the 10% retail electric choice cap but added new resource adequacy requirements in Section 6w, Mich. Comp. Laws § 460.6w ("Section 6w"), which, according to the Michigan Supreme Court, allows the MPSC to impose certain four-year forward capacity obligations and local clearing requirements on individual Michigan LSEs. (*Id.* ⁋ 39 citing *In re Reliability Plans of Electric Utilities for 2017–2021*, 949 N.W.2d 73 (Mich. 2020).)

91.     According to the text of Act 341, since FERC rejected MISO's CRS proposal, Section 6w(2) of Act 341 directed the MPSC, in that scenario, to "establish a state reliability mechanism . . . for a minimum of 4 consecutive planning years

23

beginning in the upcoming planning year." (Pls' Ex. 1, Mich. Comp. Laws § 460.6w(2).)

92.    Section 6w(12) defines a "state reliability mechanism" as "a plan adopted by the [MPSC]. . . to ensure reliability of the electric grid in this state consistent with subsection (8)" (*Id.*, Mich. Comp. Laws § 460.6w(12).)

93.    Section 6w(8)(a) and (8)(b) of Act 341 direct the MPSC to require all electric providers to "demonstrate to the [MPSC], in a format determined by the [MPSC], that for the planning year beginning 4 years after the beginning of the current planning year, [each electric provider] owns or has contractual rights to sufficient capacity to meet its capacity obligations as set by the appropriate independent system operator, or [MPSC], as applicable." (*Id.*, Mich. Comp. Laws § 460.6w(8)(a),(b). Section 6w(12)(a) defines the "appropriate independent system operator" as MISO. (*Id.*, Mich. Comp. Laws § 460.6w(12)(a).)

94.    The first sentence of Section 6w(8)(c) generally requires the MPSC to collaborate with MISO in setting the applicable capacity obligations for a particular year. (*Id.,* Mich. Comp. Laws § 460.6w(8)(c).) It states that the MPSC shall, "[i]n order to determine the capacity obligations, request that [MISO] provide technical assistance in determining the [LCR] and [PRMR]." (*Id.*) "If [MISO] declines, or has not made a determination by October 1 of that year," the second sentence of Section 6w(8)(c) provides that the MPSC "shall set any required [LCR] and [PRMR],

24

consistent with federal reliability requirements." (*Id.*) The phrase "federal reliability requirements" means the "Resource Adequacy Requirements" set forth in MISO Tariff, Module E-1. (*Id.*)

95.    The LCR is defined as "the amount of capacity resources required to be in the local resource zone in which the electric provider's demand is served to ensure reliability in that zone as determined by [MISO] for the local resource zone in which the electric provider's demand is served and by the [MPSC] under subsection (8)." (*Id.*, Mich. Comp. Laws § 460.6w(12)(d).)

96.    The PRMR is defined as "the amount of capacity equal to the forecasted coincident peak demand that occurs when the [MISO] footprint peak demand occurs plus a reserve margin that meets an acceptable loss of load expectation as set by the [MPSC] or [MISO] under subsection (8)." (*Id.*, Mich. Comp. Laws § 460.6w(12)(e).)

97.    Section 6w(8)(b)(*i*)–(*iii*) provides remedies when an electric provider is unable to demonstrate it procured adequate capacity to cover its capacity obligations. (*Id.*, Mich. Comp. Laws § 460.6w(8)(b)(*i*)–(*iii*).)

98.    With respect to situations where the MPSC has determined that an AES has failed to demonstrate compliance with its capacity obligation, the MPSC must require the "alternative electric load" to pay a capacity charge (determined by the MPSC) to the applicable investor-owned electric utility that is required to "provide

capacity to meet the capacity obligation for the portion of that load taking service from an [AES]." (*Id.*, Mich. Comp. Laws § 460.6w(7), (8)(b)(*i*).)

99. The phrase "alternative electric load" means the customers of the AES. (*Id.*)

100. However, Section 6w(6) of Act 341, which is specific to AESs, provides that: "A capacity charge shall not be assessed for any portion of capacity obligations for each planning year for which an [AES] can demonstrate that it can meet its capacity obligations through owned or contractual rights to any resource that [MISO] allows to meet the capacity obligation of the electric provider. The preceding sentence shall not be applied in any way that conflicts with a federal resource adequacy tariff, when applicable." (*Id.*, Mich. Comp. Laws § 460.6w(6).)

101. In sum, Section 6w of Act 341 as interpreted by the Michigan Supreme Court requires that Michigan AESs demonstrate to the MPSC for the planning year beginning four years after the beginning of the current planning year the AES owns or has contractual rights to sufficient capacity to meet its capacity obligations as set by MISO, or the MPSC, as applicable. (Pls.' Ex. 124, July 21, 2022 Supplemental Expert Report of James Dauphinais at 10 (citing Mich. Comp. Laws § 460.6w(8)(b) and Mich. Comp. Laws § 460.6w(12)(a)).)

102. These four-year forward individual capacity obligations authorized under Section 6w of Act 341 are in addition to MISO's annual or prompt-year capacity requirements. (*Id.* at 9.)

103. To illustrate the four-year forward nature of the capacity obligations under Section 6w of Act 341, during the MISO 2022–2023 Planning Year, the LSE would have to make its demonstration for the MISO 2026–2027 Planning Year. (*Id.* at 10, n.11.)

104. To the extent an AES does not make the required capacity demonstration, its customers are subject to pay the regulated power supply capacity charges of its electric utility, often Consumers or DTE, the two largest electric utilities in the portion of MISO that is within Michigan. (*Id.* at 10 (citing Mich. Comp. Laws § 460.6w(8)(b)(*i*)); see also JFPTO Stipulations of Fact, ECF #85, PageID #3391 ¶ 40 (citing Pls.' Ex. 1, Michigan Public Act 341 of 2016; Mich. Comp. Laws § 460.6w(3)).)

105. This capacity charge is commonly referred to as the SRM Capacity Charge. (*Id.* at 10.)

106. The SRM Capacity Charge is based on the embedded fixed generation costs of the electric utility of the AES's customers less certain sales margins. (See JFPTO Stipulations of Fact, ECF #85, PageID #3391 ¶ 40 (citing Pls.' Ex. 1, Michigan Public Act 341 of 2016; Mich. Comp. Laws § 460.6w(3)).)

107.   The stipulated chart below shows a summary of recent SRM capacity charge amounts—proposed and approved—for Consumers and DTE, (*id.* ¶ 41 (internal citations omitted):

| Utility | Case | Filed | Filing Date | Ordered | Order Date |
|---|---|---|---|---|---|
| Consumers Energy Company | U-20697 | $441.71 | 2/27/2020 | $374.95 | 12/17/2020 |
| | U-20963 | $509.22 | 3/1/2021 | $328.26 | 12/22/21 3/17/22 |
| | U-21224 | $245.97 | 4/28/2022 | TBD | TBD |
| | | | | | |
| DTE Electric Company | U-20561 | $ 347.71 | 7/8/2019 | $330.21 | 5/8/2020 |
| | U-21028 | $330.21 | 3/31/2021 | $330.21 | 9/24/2021 |
| | U-20836 | $ 355.93 | 1/21/22 | TBD | TBD |

108.   If an AES fails to satisfy its capacity demonstration obligations to the MPSC (including the ILCR), its customers located in either Consumers or DTE's territory must buy capacity from their incumbent electric supplier, currently at the applicable price above, or from an AES that accepts that load. (*Id.* ¶ 42 (citing Pls.' Ex. 1, Michigan Public Act 341 of 2016; Mich. Comp. Laws § 460.6w(7)).)

109.   As reflected in the above stipulated chart, for Consumers, the basis of the SRM capacity charge is currently approximately $328.26 per MW-day, and, for DTE, the basis is currently approximately $330.21 per MW-day. Both of these values are in excess of the current MISO CONE price of $236.66 per MW-day. Thus, if an alternative electric supplier fails to make its Michigan SRM capacity demonstration, its customers must buy capacity from their incumbent electric supplier at a price that is in excess of both the wholesale market price for capacity

and the MISO CONE price – the highest wholesale market price for capacity that can result in the MISO PRA. (Pls.' Ex. 124, July 21, 2022 Supplemental Expert Report of James Dauphinais at 10–11 (internal citations omitted).)

## III.   THE MPSC ORDERS

110.   In its September 15, 2017 Order in Case No. U-18197, the MPSC determined that, pursuant to Section 6w of Act 341, as part of the four-year forward capacity demonstration requirements, it could additionally require each AES on an individual basis to meet a four-year forward local clearing requirement or ILCR. (*Id.* at 11; see also Pls.' Ex. 2.)

111.   In other words, the MPSC found that it could require some portion of each AES's capacity demonstration be sourced from capacity located in the same MISO Zone as the AES's electric load is located within even though MISO does not impose such a mandatory requirement on individual electric suppliers. (*Id.* at 11; see also Pls.' Ex. 2.)

112.   Because MISO Zone 7 only encompasses the portion of MISO located in Lower Michigan, the practical implication of the MPSC's decision in Case No. U-18197 was to impose a requirement that all Michigan AESs serving load in the MISO portion of Lower Michigan (*i.e.*, Zone 7) source some portion of their Michigan four-year forward capacity demonstration from capacity located within

the Lower Michigan portion of MISO (*i.e.*, Zone 7) despite MISO imposing no similar federal requirement on the AESs. (*Id.* at 11.)

113.   In its June 28, 2018 Order in Case No. U-18444, the MPSC established the methodology by which the ILCR would be determined and then imposed the initial ILCR, as calculated by MPSC Staff, on all electric providers. (See JFPTO Stipulations of Fact, ECF #85, PageID #3391 ⁋ 43 (citing Pls.' Ex. 3).)

114.   With respect to the methodology for calculating the ILCR, the MPSC's June 28, 2018 Order adopted the incremental-need method that had been proposed by MPSC Staff but rejected the portion of Staff's recommendation to cap the ILCR at 47.5%. (Pls.' Ex. 3 at 10–12, 117, 122–131, Ex. S-25; see also Pls.' Ex. 11, Direct Testimony of Cathy Cole, MPSC Case No. U-18444, Doc No. 11 at 22–28 (cautioning that setting an ILCR over 47.5% would result in a "costly oversupply" of capacity "saddling Michigan customers with additional, potentially unnecessary, costs").

115.   As explained in the June 28, 2018 Order, the adopted "incremental need" methodology starts with the total amount of capacity resources located in each MISO Zone in Michigan at the time Act 341 went into effect (as evidenced by LSE capacity demonstrations filed with the MPSC in Case U-18197 on or prior to April 20, 2017) and then adjusts that figure by removing any double-counted units, behind-the-meter generation, ZRC purchases, and reported retirements. (Pls.' Ex. 3 at 117,

122–131, Ex. S-25; see also Pls.' Ex. 124, July 21, 2022 Supplemental Expert Report of James Dauphinais at 12–13.)

116.   This adjusted level of total local capacity resources in the Zone is then subtracted from the applicable Zonal LCR value determined by MISO for that Zone to produce an "incremental" need estimate for additional local capacity resources. (*Id.*; see also Pls.' Ex. 124, July 21, 2022 Supplemental Expert Report of James Dauphinais at 12–13.)

117.   This "incremental" need estimate for local capacity in the MISO Zone is then allocated to all Michigan electric providers in the MISO Zone on a load-ratio share basis. (*Id.*; see also Pls.' Ex. 124, July 21, 2022 Supplemental Expert Report of James Dauphinais at 12–13.)

118.   The Order further provides that the calculation of the ILCR and allocation of the ILCR to electric providers is to be updated every two years (i.e., biennial reassessment) using the adopted incremental need methodology. (*Id.*; see also Pls.' Ex. 124, July 21, 2022 Supplemental Expert Report of James Dauphinais at 12–13.)

119.   When reassessed, the calculation of the ILCR again starts with the total amount of capacity resources located in each MISO Zone in Michigan as of April 2017 and then <u>subtracts</u> all newly reported retirements of local generation resources.

(*Id.*; see also Pls.' Ex. 124, July 21, 2022 Supplemental Expert Report of James Dauphinais at 12–13.)

120.   The reassessment, however, does not <u>add</u> any new and planned capacity resources beyond those identified to the MPSC on or prior to April 2017. (*Id.*) Those new local generation resources, despite being active and producing local capacity, are not factored into the equation for determining the overall incremental need to be allocated to LSEs. (*Id.*; see also Pls.' Ex. 124, July 21, 2022 Supplemental Expert Report of James Dauphinais at 12–13.)

121.   Moreover, investments in existing generational resources made to continue its operation are treated as if those resources were planned to be retired and replaced with new resources. Thus, such investments in generation resources cause the resources to be considered retired and treated as new resources that are not counted for purposes of estimating future incremental need. (*Id.*)

122.   The initial ILCR percentages were set on August 1, 2018: 2.7% of the LSEs' PRMR for 2022/2023 and 5.3% of the LSEs' PRMR for 2023/2024. (JFPTO Stipulations of Fact, ECF #85, PageID #3391 ¶ 43 (citing Pls' Ex. 19, *Memorandum to MPSC and Resource Adequacy Stakeholders*, from Roger Doherty, Engineer, Resource Adequacy and Retail Choice, re: Updated Capacity Demonstration Process (Exhibit S-25), per Case No. U-18444, June 28, 2018 order," dated August 1, 2018).)

123.   The ILCR percentages established in MPSC Case No. U-18444 have not been adjusted or reset since they were originally set. On September 13, 2018, the MPSC issued an order granting a stay of the June 28, 2018 Order. The MPSC has voluntarily continued the stay of its Order during the pendency of this litigation. (JFPTO Stipulations of Fact, ECF #85, PageID #3391 ⁋ 44.)

124.   Recently, on June 23, 2022, the MPSC issued an order in Case Nos. U-21099, U-20348, U-21032 and U-21225 in which it solicited comments originally to be filed by August 1, 2022, on two issues relevant to this proceeding. First, the MPSC sought comment on "whether it should consider setting a four-year forward capacity obligation under Section 6w of Act 341 that is higher than MISO's prompt year PRMR to encourage the development of additional capacity resources with the aim of protecting the future resource adequacy and reliability of service for Michigan retail electric customers." Second, the MPSC sought comment on "whether it should lift the stay in Case No. U-18444 and take further action to set an LCR for Michigan LSEs pursuant to Section 6w for future [Planning Years]." Plaintiffs have filed for an extension of the comment period from August 1, 2022, to at least August 18, 2022, and Intervening Defendant Consumers has filed for an extension of the comment period to September 1, 2022. On July 7, 2022, in response to these requests, the Commission extended the deadline for comments to September 1, 2022. (*Id.* ⁋ 45.)

## IV.   CONSEQUENCES OF THE MPSC ORDERS

### A.   The Incremental-Need Methodology's Failure to Account for New Generation Resources Guarantees an Inflated and Burdensome ILCR Overtime

125.   Because the MPSC's incremental methodology subtracts from the baseline resource total of the ILCR calculation all local generation resources officially scheduled for retirement after April 2017 but does not add any new local generation placed in service after April 2017, the MPSC's ILCR is guaranteed to adjust upward at the pace of the retirement of existing local generation resources. (Pls.' Ex. 124, July 21, 2022 Supplemental Expert Report of James Dauphinais at 12–13.)

126.   "In other words, once a locational requirement is established, it would never go down. Each year, a new floor would be set if additional new resources are needed in the zone to meet reliability requirements. Ultimately, over time, the locational requirement would eventually reach a full load ratio share of the LCR for all LSEs." (Pls.' Ex. 6, Staff Report and Recommendations for Capacity Demonstrations, MPSC Case No. U-18197, Doc. 100 (August 1, 2017) at 16.)

127.   The MPSC's ILCR will increase regardless of the amount new local generation placed in service and will eventually result in AESs being subject to a full-load ratio share of the MPSC ILCR. (Pls.' Ex. 124, July 21, 2022 Supplemental Expert Report of James Dauphinais at 13.)

34

128.   A full load-ratio share of the MISO LCR value for MISO Zone 7 would be a very high percentage of an LSE's total PRMR. For example, if a full load-ratio share of the MISO LCR value for MISO Zone 7 had been used as the MPSC ILCR for the capacity demonstrations for the MISO 2024/2025 Planning Year, 99.5% of the supplier's total PRMR for 2024/2025 in its capacity demonstration to the MPSC would have had to be sourced from capacity resources located within the Lower Michigan portion of MISO since the MISO LCR value for the Zone was 21,340 MW and the total PRMR for the Zone was 21,439 MW. (*Id.* (citing Pls.' Ex. 37, Staff Report Capacity Demonstration Results, Planning Year 2024/25, MPSC Case No. U-20886 (March 26, 2021) at 5).)

129.   With the retirement and replacement of the coal-fired generation resources by the investor-owned utilities that is currently underway in Lower Michigan, the initially low MPSC ILCR will rise significantly even though actual need for additional local generation would remain small due to the replacement generation that is planned to be added by the investor-owned utilities. (*Id.* at 14.)

130.   Since this replacement generation is not counted in the update of the "incremental need" for the calculation of the MPSC's ILCR, the "incremental need" methodology will cause Michigan electric suppliers in aggregate to acquire or contract for much more local capacity than is necessary to meet MISO's LCR for their Zone. (*Id.*)

131.  Credible expert testimony estimates that a present-day update of MPSC's ILCR using the MPSC's incremental-need methodology for the 2026/2027 planning year would approximate an immediate ILCR of 17.2%. (*Id.* at 14–17.)

132.  This estimated increase to the MPSC's ILCR is due to a substantial increase in MISO's Local Reliability Requirement ("LRR") percentage and the now-approved integrated resource plan of Consumers, as set forth in the settlement in Case No. U-21090, to accelerate the retirement of, at least, 1,435MW of installed generation capacity by May 31, 2025, which currently provides approximately 1,296 MW of ZRCs to MISO Zone 7. (*Id.* (citing Pls.' Ex. 66, MISO's 2021-2022 Loss of Load Expectation Study Report (Nov 2020) at 6, 29; Pls.' Ex. 54., Settlement Agreement, MPSC Case No. U-21090).)

133.  Credible expert testimony also estimates that an update of MPSC's ILCR using the MPSC's incremental methodology for the 2026/2027 planning year could be as high as an immediate ILCR of 35.6% if DTE accelerates the retirement of its remaining coal-fired generating units (*i.e.*, 4,100 MW or 3,714 MW of ZRCs to MISO Zone 7) to May 31, 2025. (*Id.* at 14-17 (citing Pls.' Ex. 28, DTE's Integrated Resource Plan, MPSC Case No. U-20471 at Ex. A-3 p. 53; Pls.' Ex. 66, MISO's 2021-2022 Loss of Load Expectation Study Report (Nov 2020) at 18–19).)

134.  This amount could be even higher if Consumers accelerated the retirement of Karn Units 3 and 4 to May 31, 2025, which is possible and not

precluded by the Settlement Agreement in MPSC Case No. U-21090. (*Id.* (citing Pls.' Ex. 54., Settlement Agreement, MPSC Case No. U-21090).)

### B. The Adverse Effect of the MPSC's ILCR on AESs

135. Once the MPSC's ILCR has fully transitioned to a full load-ratio share allocation to individual electric providers, AESs serving load in the Lower Michigan portion of MISO will be required to acquire a very high percentage of their capacity from capacity located in the Lower Michigan portion of MISO. (*Id.* at 17–19.)

136. Based on the available information from MISO, credible expert testimony estimates this percentage to be over 80%. (*Id.* (citing Pls.' Ex. 69, MISO Presentation, "Michigan Capacity Import/Export Limit Expansion Study: Scenario 3 Alternate Project Proposals/Study Draft Report," April 29, 2021 at Slides 9–11; Pls.' Ex. 70, MISO Michigan Capacity Import/Export Limit Expansion Study Draft Report, April 29, 2021 at pages 8–13).)

137. Consequently, the MPSC's ILCR will eventually require such AESs to buy over 80% of their capacity within the State of Michigan even though MISO has no such requirement. (*Id.*)

138. Such a high ILCR will adversely impact AESs in two respects:

A. First, it will significantly reduce the ability of AESs to utilize capacity they have acquired or contracted that is located within the MISO footprint—but outside of Lower Michigan—to meet their Michigan SRM capacity demonstration requirement. Ultimately that restriction will limit their use of such capacity resources to no more than 20% of their Michigan SRM capacity requirement. In other words, a maximum

37

of 20% of their Michigan SRM capacity requirement will be allowed to be generated outside of the State of Michigan.

B.    Second, the MPSC ILCR will significantly expand the amount of capacity AESs must acquire or contract from capacity located within the MISO footprint within Lower Michigan and ultimately require them to acquire or contract for 80% or more of their total Michigan SRM capacity requirement from capacity located within the MISO footprint within Lower Michigan. (*Id.*)

139.    Thus, the MPSC's ILCR will impose a significant restraint on the ability of AESs to utilize their existing capacity located outside of Michigan to meet the capacity demonstration required for their load in Michigan, and over time, it will mandate that an increasing amount of capacity is obtained within Michigan, regardless of where an AES's existing capacity resources are located. (*Id.*)

140.    These impacts harm the affected AESs and their customers because those AESs and their customers will be required to forgo the use of any lower cost out-of-state capacity that may be available and require them to acquire or contract for higher cost capacity located within the Lower Michigan portion of MISO even though MISO places no similar restriction on these AESs with respect to the self-supply or purchase of ZRCs. (*Id.*)

141.    The MPSC's ILCR will also cause the total aggregate local capacity acquired and contracted by individual electric suppliers in the Zone to exceed the MISO LCR value for the Zone since the MPSC's "incremental need" methodology does not include any post-April 2017 new and planned capacity resources when the

"incremental need" LCR value is updated by the MPSC even though it includes newly reported retirements. (*Id.* at 19–22.)

142.   The foregoing has the effect of unduly reducing the competitiveness of the affected AESs versus investor-owned utilities who have ownership or control of the capacity located in the Lower Michigan portion of MISO. (*Id.*)

143.   This problem is exacerbated by the fact that two of the major electric suppliers with in-state capacity resources, the two largest electric utilities, Consumers and DTE, own or otherwise control the vast majority of the capacity resources located in the MISO portion of Lower Michigan. (*Id.*)

144.   Indeed, credible expert testimony has estimated that Consumers and DTE own at least 84% of total Lower Michigan ZRCs that are anticipated to be available for the MISO 2024/2025 Planning Year. (*Id.* (citing Pls.' Ex. 37 MPSC Staff's report "Capacity Demonstration Results Planning Year 2024/25," MPSC Case No. U-20806 (March 26, 2021) at 5; Pls.' Ex. 35, Consumers' December 1, 2020 capacity demonstration filing for the 2024/2025 Planning Year, MPSC Case No. U-20886, at Ex. No. 2 of 11, Column (e); Pls.' Ex. 34, DTE's Power Supply Cost Recovery Plan filing for 2021, MPSC Case No. U-20826 (September 30, 2020) at Ex. A-13;  Pls.' Ex. 66, MISO Planning Year 2021–2022 Loss of Load Expectation Study Report (November 2020) at pages 18–19; Pls.' Ex. 67, MISO

Planning Year 2021-2022 Wind & Solar Capacity Credit, January 2021 at pages 4–5).)

145.   Thus, when the MPSC ILCR for electric suppliers in MISO Zone 7 transitions to a full load ratio share allocation of MISO's LCR for the Zone as a whole, both Consumers and DTE have a good likelihood of gaining sufficient market power to potentially require AESs without local capacity to pay up to each utility's respective SRM capacity charge amount in order to contract for capacity to meet the MPSC ILCR. (*Id.*)

146.   Consumers and DTE each have SRM capacity charges that are well in excess of the MISO CONE price, the highest wholesale market price for capacity that can result in MISO's PRA. (*Id.*)

147.   Credible expert testimony has thus opined that the likely effect of the MPSC ILCR will be to force AESs and their customers to abandon their lower-cost out-of-state capacity generation options within MISO and instead purchase ZRCs at a significantly higher cost from those with existing in-state capacity—the vast majority of which belongs to either Consumers or DTE. (*Id.*)

148.   While AESs could in theory instead construct, or contract for the construction of, new generation in Zone 7 to provide the mandated local capacity, AESs are at an immense disadvantage to the investor-owned utilities because, unlike investor-owned utilities, AESs do not generally within Michigan have:   (*i*)

economies of scale; (*ii*) control of "Brownfield" generation sites; and/or (*iii*) access to regulated rate relief for constructing new generation facilities. (*Id.*)

### C.   The Adverse Effect of the MPSC's ILCR on the Interstate Wholesale Power Market

149.   As it transitions to a full load ratio share allocation to individual electric providers, the MPSC's ILCR will have an adverse effect on the interstate wholesale power market. (*Id.* at 22–23.)

150.   First, with all else held equal, it will have some degree of price suppression effect in the MISO PRA and bilateral capacity markets outside of Michigan by reducing the demand for capacity in the portion of MISO that is not located within the MISO Zones within Michigan. (*Id.*)

151.   Second, more profoundly, it will artificially create a demand for new capacity in the MISO Zones within Michigan that exceeds that necessary to meet the MISO LCR value for each of those Zones. (*Id.*)

152.   It does so because the "incremental need" methodology adopted by the MPSC fails to include, in its "incremental need" LCR value updates, any post-April 2017 new or planned capacity resources that offset the new or planned capacity resource retirements that are being included in the updates. (*Id.*)

153.   As a result, the inherently flawed methodology that is being used by the MPSC will cause the aggregate of the local capacity that individual suppliers within

a given Zone acquire or contract to exceed the MISO LCR value for the Zone as a whole. (*Id.*)

154.   This will cause the MPSC LCR to inefficiently distort the interstate wholesale market by increasing the need to locate new capacity resources in the MISO Zones within Michigan to a level that is in excess of that necessary to meet the MISO LCR value for those Zones. (*Id.*)

155.   By way of example, if the MPSC's ILCR value determined for 2023/2024 in Case No. U-18444 was updated for the 2026/2027 Planning Year to reflect Consumers' approved retirements and MISO's latest projections for the 2026/2027 Planning Year, it would increase the MPSC's incremental LCR value from its 1,137 MW value for the 2023/2024 Planning Year to a value of 3,473 MW for the 2026/2027 Planning Year. (*Id.*)

156.   However, the MPSC's incremental need method does not consider the fact that Consumers' approved retirement of approximately 1,296 MW of unforced capacity in Zone 7 will not cause an incremental need for an additional 1,296 MW of capacity in Zone 7 because Consumers has also proposed in Case No. U-21090 to replace all of that retired capacity with newly acquired or contracted capacity that either will be located within Zone 7 or will be moved to within Zone 7. (*Id.* (citing Pls.' Ex. 54., Settlement Agreement, MPSC Case No. U-21090).)

157.   For this reason, the updated MPSC ILCR value of 3,473 MW for the 2026/2027 Planning Year overstates the true incremental need for local capacity in Zone 7 by 1,296 MW. (*Id.*)

158.   As a result, it would require Zone 7 suppliers in aggregate to acquire 1,296 MW more capacity than is necessary to meet MISO's projected LCR value for the 2026/2027 Planning Year. (*Id.*)

## V.   STATE BOUNDARIES DO NOT INHIBIT THE TRANSMISSION OF POWER

159.   Generally, electric power can be transmitted over the interstate electric transmission system for distances of hundreds, or even thousands, of miles. (Pls.' Ex. 124, July 21, 2022 Supplemental Expert Report of James Dauphinais at 24.)

160.   The limiting factors for the long-distance transmission of electric power are the electric energy losses incurred over the transmission facilities being utilized and transmission constraints. (*Id.*)

161.   The electric energy losses incurred over the transmission system (i.e., transmission losses) have the effect of causing the amount of energy being delivered at the ultimate point of delivery to be less by some percentage than the amount of energy that was originally injected into the transmission system to be transmitted to that ultimate point of delivery. (*Id.*)

162.   This percentage is referred to as a transmission loss factor. Both MISO and the Michigan SRM capture the impact of transmission losses through the

ClarkHill\07411\406274\268074916.v1-8/1/22

transmission loss adjustment that is included in PRMR values. As a result, transmission losses do not contribute to locational capacity requirements under the MISO Tariff or the Michigan SRM. (*Id.*)

163. Any loss of electric capacity due to the distance required for transmitting electricity from generating units to the end-users is already accounted for by MISO so that it is not necessary to mandate additional local capacity as part of the Michigan SRM on account of such losses. (*Id.*)

164. Transmission constraints are a different matter. Transmission constraints are caused by:  (*i*) limitations to the electric current carrying capability of the individual facilities that make up the transmission system; (*ii*) voltage limitations; or (*iii*) stability limitations. (*Id*.)

165.  In all three cases, the amount of electric power that can be transmitted from one part of the electric transmission system to another part of the electric transmission system is limited when such a constraint is encountered. (*Id.*)

166.  Under the MISO Tariff, these transmission constraints are captured by the LCR, CIL and CEL values for each of the MISO Zones as well as the sub-regional transmission constraint that MISO uses to limit how much capacity can be moved in and out of the MISO South subregion.  (*Id.* at 24–25.)

167.  MISO incorporates these constraints into its PRA. When one or more of these constraints binds in MISO's PRA, its causes the auction clearing prices to

be different in each of the MISO Zones depending on the location of the constraint in relation to each Zone. (*Id.* at 25.)

168.   The Michigan SRM does not consider CIL, CEL or sub-regional constraints at all. (*Id.*)

169.   State boundaries do not inhibit the flow of electric power over the interstate electric transmission system in any way as the flow of electric power over the transmission system is controlled by the laws of physics, not the laws of man. (*Id.*)

170.   State boundaries only come into play when a state introduces its own requirements on participants in the interstate wholesale power market that distort existing federal requirements. (*Id.*)

171.   Because the incremental need methodology does not account for new generation resources in service after April 2017, the MPSC ILCR will cause such distortion by requiring Michigan electric suppliers in aggregate to acquire or contract for more local capacity in their Zone than is necessary to meet the MISO ILCR value for the Zone. (*Id.*)

## VI.   THE MPSC'S ILCR IS NOT NEEDED TO ENSURE A RELIABLE GRID IN MICHIGAN

172.   The MPSC ILCR is not needed to provide a reliable grid in Michigan. (*Id.* at 29–32.)

173. MISO's Tariff already imposes requirements and price signals to sufficiently ensure that, within reasonable bounds, sufficient capacity will be present to ensure resource adequacy on both a global and Zonal basis throughout the MISO footprint. (*Id.*)

174. Specifically, at the Zonal level, AESs must regularly consider their risk of implicit or explicit ZDC charges that could potentially be as a high as the MISO CONE price if they rely on capacity within MISO, but located outside of Michigan, to meet their PRMR in Michigan. (*Id.*)

175. This risk is real given that MISO Zone 7 cleared at the then current MISO CONE price of $257.53 per MW-day in MISO's 2020–2021 PRA. (*Id.* (citing Pls.' Ex. 64, MISO Presentation "2020/2021 Planning Resource Auction (PRA) Results," April 14, 2020 at Slides 2, 5 and 7; Pls.' Ex. 65, MISO Presentation "Zone 7 Loss of Load Expectation ("LOLE") Sensitivities," MISO Resource Adequacy Subcommittee (June 10, 2020)).)

176. As a result, AESs must constantly consider the state of supply and demand in the Michigan MISO Zones and adjust their capacity acquisition and contracting choices between in-state and out-of-state capacity resources to address their risk of a MISO CONE result in the MISO PRA. (*Id.*)

177. There is not a reliability need for the MPSC's ILCR particularly given that the MPSC's ILCR will over time require electric suppliers in a Zone in Michigan

in aggregate to acquire or contract for more local capacity than will be needed to meet MISO LCR value for that Zone. (*Id.*)

178.   There are other ways the MPSC could ensure local capacity needs are met within MISO Zone 7 besides imposing a requirement that individual suppliers each meet a load ratio share of MPSC's ILCR value. (*Id.*)

179.   One example of such an alternative would be for the MPSC to modify its U-18444 incremental-need calculation to include not just capacity resource retirements, but also capacity resource additions, and then to impose the ILCR on those suppliers who are short of meeting a load-ratio share of the MISO LCR value for Zone 7 and only in proportion to their shortfall. (*Id.*)

180.   This approach would ensure the MPSC's ILCR value would not cause suppliers in aggregate to acquire or contract for capacity in a zone in excess of the MISO LCR value for the zone. (*Id.*)

181.   In addition, it would not be unduly discriminatory in that it would only assign a proportionate share of the ILCR value to those suppliers that are contributing to the shortfall of local capacity and then only in proportion to their contribution to that shortfall. (*Id.*)

## PROPOSED CONCLUSIONS OF LAW

**I.** **The ILCR Unlawfully Discriminates Against Interstate Commerce in Violation of The Dormant Commerce Clause.**

1.     The Commerce Clause in Article I, Section 8, of the United States Constitution grants Congress the power to regulate interstate commerce. U.S. Const. art. I, § 8, cl. 3.

2.     In addition to granting the commerce power to Congress, the Commerce Clause has long been understood to have a "negative" aspect that "prohibits state laws that unduly restrict interstate commerce." *Tennessee Wine and Spirits Retailers Ass'n v. Thomas*, __ U.S. __, 139 S. Ct. 2449, 2459 (2019) (internal quotations and citations omitted).

3.     "This 'negative' aspect of the Commerce Clause prevents the States from adopting protectionist measures and thus preserves a national market for goods and services." *Tennessee Wine*, 139 S. Ct. at 2459.

4.     The dormant Commerce Clause aims to avoid economic Balkanization, *Hughes v. Oklahoma*, 441 U.S. 322, 325–26 (1979), under the notion that "our economic unit is the nation" and "the states are not separable economic units." *H.P. Hood & Sons, Inc. v. DuMond*, 336 U.S. 525, 537–83 (1949).

**A.** **States May Not Unjustifiably Discriminate Against Interstate Commerce.**

48

5.     The dormant Commerce Clause "denies the States the power unjustifiably to discriminate against or burden the flow of articles of commerce." *Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 98 (1994).

6.     "Discrimination," for dormant Commerce Clause purposes, "simply means differential treatment of in-state and out-of-state economic interests that benefit the former and burden the latter." *Id.* at 99.

7.     "The magnitude and scope of the discrimination has no bearing on the determinative question" of "whether discrimination has occurred." *Assoc. Indus. of Missouri v. Lohman*, 511 U.S. 641, 650 (1994).

8.     "The volume of commerce affected measures only the *extent* of the discrimination; it is of no relevance to the determination whether a State has discriminated against interstate commerce." *Wyoming v. Oklahoma*, 502 U.S. 437, 455 (1992); *see also Fulton Corp. v. Faulkner*, 516 U.S. 325, 333 n. 3 (1996) ("Simply put, there is no '*de minimis*' defense under the dormant Interstate Commerce Clause.").

9.     "When a state statute clearly discriminates against interstate commerce, it will be struck down." *Wyoming*, 502 U.S. at 454.

10.     A statute discriminates against interstate commerce if it is discriminatory on its <u>face</u>, in its <u>purpose</u>, or through its <u>practical effects</u>. *Cherry Hill Vineyards, LLC v. Lilly*, 553 F.3d 423, 431–432 (6th Cir. 2008) (emphasis added).

11.     When a law restricts access to an interstate market but does not have the same effect on the *intra*state market in the same product, it discriminates in effect against products in interstate commerce. *SDDS, Inc. v. State of S.D.*, 47 F.3d 263, 270–71 (8th Cir. 1995). This is true even if there is no purpose to discriminate. "[E]ven if a state law responds to legitimate local concerns and is not discriminatory either in its purpose or on its face, the law could discriminate arbitrarily against interstate commerce, that is, it could have a discriminatory effect." *South Dakota Farm Bureau, Inc. v. Hazeltine*, 340 F.3d 583, 593 (8th Cir. 2003) (citing *Maine v. Taylor*, 477 U.S. 131, 148 n. 19 (1986)).

12.     Under the dormant Commerce Clause, a state may not require a certain percentage of the wholesale commodities contributing to goods and services sold at retail in the state to come from within that state. *See Wyoming*, 502 U.S. at 455–456; *Alexis Bailly Vineyard v. Harrington*, 482 F. Supp. 3d 820, 824, 826–27 (D. Minn. 2020).

13.     Thus, state regulations ostensibly targeting retail products within a state's jurisdiction that operate at the wholesale level to restrict the use of the interstate wholesale market violate the dormant Commerce Clause.  *See id.*; *see also Hughes v. Talen*, 578 U.S. 150, 164 (2016) ("States may not seek to achieve ends, however legitimate, through regulatory means that intrude on FERC's authority over interstate wholesale rates.").

14.     The dormant Commerce Clause has previously been used to strike down discriminatory laws in the energy sector. For example, the Supreme Court has invalidated a statute requiring 10% of coal consumed by Oklahoma power companies to be sourced from in-state mines. *Wyoming*, 502 U.S. at 458–59. It has barred states from according a preferential right to in-state customers for natural gas produced in the state. *Pennsylvania v. West Virginia*, 262 U.S. 553 (1923). And it has prohibited states from restricting the exportation of hydroelectric power. *New England Power Co. v New Hampshire*, 455 U.S. 331 (1982).

**B.     The Individual Local Clearing Requirement Unconstitutionally Discriminates Against Interstate Commerce Because It Restricts Michigan Load Serving Entities' Participation in the Wholesale Capacity Market.**

15.     Defendants' individual local clearing requirement ("ILCR"), which they describe as a "forward locational requirement," though directly applicable to retail load serving entities ("LSEs") in Michigan, operates on the wholesale level to restrict the use of the interstate wholesale electricity market and thereby access to electrical generation resources located outside of MISO Zone 7 in Michigan.  By requiring LSEs to own or purchase a certain percentage of power they sell to retail customers in Michigan to come from generation resources located within Michigan, it discriminates facially and in practical effect in favor of electrical capacity (generation) that is "made in Michigan" at the expense of "foreign" electrical capacity (generation).

51

16.     This local power ingredient mandate is similar to the law invalidated in *Wyoming v. Oklahoma*, 502 U.S. at 458–59. There, Oklahoma law required the state's utilities to use a blend of at least 10% Oklahoma-mined coal in their coal-fired power plants. *Id.* at 443–44. Doing so established a "preference for coal from domestic sources," that "exclude[d] coal mined in other States solely on its origin." *Id.* at 455. The Court struck it down.

17.     Similarly, the ILCR mandates that LSEs acquire a portion of their required capacity from within the State of Michigan. A substantial number of Michigan's licensed AESs are owners of electric generation resources or are affiliates of owners of electric generation resources outside Zone 7. Nonetheless, the ILCR mandates that electric capacity that could otherwise be provided from those resources located outside of the State of Michigan must now instead be provided from other resources located within Michigan, by either acquiring or constructing generation or other capacity resources within the State of Michigan or purchasing capacity from others, like the incumbent utilities, who have an abundance of in-state capacity.

18.     This mandate to use Michigan-generated power is based solely on its location. Thus, it is "discriminatory" as defined by *Oregon Waste Systems, Inc.* 511 U.S. at 99. And it also effectively restricts the importation of out-of-state power contrary to Commerce Clause principles. *See, e.g., New England Power Co. v New*

*Hampshire*, 455 U.S. 331 (1982) (striking down a ban on exporting hydroelectric power).

19.     The ILCR's practical effect thus favors generated-in-Michigan power over "foreign" power. The restrictions imposed by the ILCR on out-of-state generation resources are therefore just like the restrictions on the importation of coal in *Wyoming* and are discriminatory under the Commerce Clause. *See also Alexis Bailly Vineyard v. Harrington*, 482 F. Supp. 3d 820, 826–27 (D. Minn. 2020) (striking down a mandate that winemakers use a certain percentage of Minnesota-based ingredients as discriminatory in violation of the Commerce Clause). The Commissioners must therefore justify the ILCR under strict scrutiny.

### i.     The ILCR Discriminates Facially by Distinguishing Between In-State or Out-of-State Generation Resources Based on Location.

20.     The ILCR facially discriminates in both of the challenged orders by requiring Michigan LSEs to prove that they own a percentage of Michigan-based generation resources as a condition to serving Michigan retail customers. The Commissioners' September 15, 2017 Order imposed a "forward *locational* requirement" and applied that locational requirement "to individual load serving entities as part of a demonstration that capacity obligations have been met . . . ." Case No. U-18197, Doc. 18197-0125, at 34–40, 49, Ex. D (emphasis added). The

ClarkHill\07411\406274\268074916.v1-8/1/22

Commissioners further defined that requirement in their June 28, 2018 Order in Case No. U-18444, stating:

> The Commission agrees with the Staff that owned generation, demand response, capacity contracts, and forward ZRC contracts should count toward meeting Michigan's forward locational requirement **provided those resources _are in-zone_**. . . . Regarding the kind of evidence that the Commission will accept to show that a resource qualifies to meet the forward locational requirement, the Commission agrees with the Staff that **the LSE must provide the _zonal location_ of that resource or documentation from MISO that the resource counts toward MISO's zonal LCR.**

Case No. U-18444, Doc. 18444-0135, at 125–26 (June 28, 2018) (Ex. G) (emphasis added). The Orders therefore facially discriminate by mandating a certain amount of Michigan-based resources in capacity demonstrations.

### ii. **The ILCR Discriminates in Practical Effect by Requiring a Certain Percentage of Power Sold at Retail in Michigan to Come from In-State Generation Resources.**

21. The ILCR also discriminates in effect by requiring a percentage of power sold by each LSE to come from in-state purchases. This local power ingredient mandate is exactly like the law invalidated in _Wyoming_, 502 U.S. at 458–59. The ILCR requires LSEs "to acquire a portion of their required capacity from within the State of Michigan." _Id_., ¶ 70. This mandate to use Michigan-generated power is based solely on its location. And its effect is to "inherently favor" in-state generation, and also to "force [AESs] and their customers to abandon their lower-cost out-of-state generation options within MISO and instead purchase ZRCs at a

significantly higher cost from those with the existing in-state capacity . . . ." Dauph. Aff., ¶ 108.

> ### iii. The ILCR Impermissibly Discriminates Against Interstate Commerce Because It Intrudes on Federal Authority Over Interstate Wholesale Electricity Rates.

22. The ILCR distorts the wholesale capacity market (in violation of *Hughes*) by artificially inflating the cost of wholesale electrical capacity in the lower Peninsula of Michigan (MISO Zone 7) and depressing the cost of out-of-state wholesale electrical capacity.

> ### iv. The ILCR Impermissibly Discriminates Against Interstate Commerce Because It Unconstitutionally Benefits In-State Electric Generation Resources and Burdens Out-of-State Electric Generation.

23. By artificially inflating the cost of wholesale electrical capacity in the lower Peninsula of Michigan and depressing the cost of out-of-state wholesale electrical capacity, the ILCR unconstitutionally benefits in-state interests and burdens out-of-state interests. *See Oregon Waste Sys.*, 511 U.S. at 99 (1994).

24. Additionally, just as a state may not prevent the export of electric generation consistently with the dormant Commerce Clause, it may not prevent its import. A state's attempt to "prevent privately owned articles of trade from being shipped and sold in interstate commerce on the ground that they are required to satisfy local demands or because they are needed by the people of the State"—in other words, "[t]he order of the New Hampshire Commission[] prohibiting New

England Power from selling its hydroelectric energy outside the State of New Hampshire"—represents "precisely the sort of protectionist regulation that the Commerce Clause declares off-limits to the states," *New England Power Co. v. New Hampshire*, 455 U.S. 331, 338–339 (1982).

25.     The ILCR is simply the mirror image of the New Hampshire rule that sought to prevent power exports. And if a state may not "prevent privately owned articles of trade from being shipped and sold in interstate commerce" (*i.e.*, it may not prevent *exports*), it may not attempt to prevent the *importation* of privately owned articles of trade shipped and sold in interstate commerce without violating the dormant Commerce Clause. In both cases, the state agency attempted to restrict access to the interstate market in an effort to force wholesale procurement of, and subsequent retail use of, locally generated power. That express favoritism of local economic interests is forbidden. *C & A Carbone*, 511 U.S. at 392.

### C.     Discriminatory State Laws Are Subject to "the Strictest Scrutiny."

26.     If a statute overtly discriminates, it is subject to "the strictest scrutiny" and "will be struck down unless the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism." *Wyoming*, 502 U.S. at 454, 456. In other words, it "is *per se* invalid" unless the state "can demonstrate, under rigorous scrutiny, that **it has no other means** to advance a legitimate [state] interest." *C & A Carbone*, 511 U.S. at 393.

ClarkHill\07411\406274\268074916.v1-8/1/22

27.     "Rigorous scrutiny" under the dormant Commerce Clause "demand[s] more than mere speculation to support discrimination against out-of-state goods. The burden is on the State to show that the discrimination is demonstrably justified. The Court has upheld state regulations that discriminate against interstate commerce only after finding, based on concrete record evidence, that a State's nondiscriminatory alternatives will prove unworkable." *Granholm v. Heald*, 544 U.S. 460, 492–93 (2005) (emphasis added). "The only way that discriminatory state action can withstand this level of scrutiny is if the state demonstrates that the out-of-state articles are more dangerous than are in-state articles." *SDDS, Inc.* 47 F.3d at 268, n. 8.

**D.    The ILCR Cannot Survive Strict Scrutiny Because There are Nondiscriminatory Means of Ensuring Electric Resource Adequacy.**

28.     Because Plaintiffs have demonstrated that the ILCR discriminates against interstate commerce, the burden shifts and Defendants must meet the virtually impossible task of showing that the law does not violate the dormant Commerce Clause. *Wyoming*, 502 U.S. at 456. Strict scrutiny here:

> demand[s] more than mere speculation to support discrimination against out-of-state goods. The burden is on the State to show that the discrimination is demonstrably justified. **The Court has upheld state regulations that discriminate against interstate commerce only after finding, based on concrete record evidence, that a State's nondiscriminatory alternatives will prove unworkable.**

*Granholm v. Heald*, 544 U.S. 460, 492–93 (2005) (emphasis added).

29.     The *only* case where the Supreme Court has *ever* found the government to overcome this "strictest scrutiny" was *Maine v. Taylor*, 477 U.S. 131, 140–51 (1986). There, Maine submitted extensive expert testimony substantiating its claim that it had to forbid the importation of out-of-state bait fish because the imported fish would carry parasites, or be invasive species, that would damage the State's ecology. *See, e.g., SDDS, Inc.,* 47 F.3d at 268, n. 8 ("The only way that discriminatory state action can withstand this level of scrutiny is if the state demonstrates that the out-of-state articles are more dangerous than are in-state articles.").

30.     Unlike in *Maine*, Defendants cannot show that out-of-state power is "more dangerous" than in-state power or that there is any other sufficient justification for Michigan's discrimination. Simply stated, "the electric capacity and energy provided by AESs and sold to their Michigan customers through Michigan's electric retail choice market is ***the same product*** as the electric capacity and energy that is produced by incumbent utilities in Michigan and sold to their Michigan customers." Ex. C, ¶ 129 (emphasis added). There is, quite simply, no basis on which to differentiate between the two except for their geographical source.

31.     Defendants cannot show that the state has no other, nondiscriminatory means of ensuring electric resource adequacy. *See United Haulers Ass'n, Inc. v.*

*Oneida-Herkimer Solid Waste Mgmt. Auth.,* 550 U.S. 330, 338 (2007); *see also C & A Carbone*, 511 U.S. at 393. Indeed, Defendants have several.

32.    First, they may rely on MISO's FERC-approved tariff, which is sufficient to protect state interests in resource adequacy. *See, e.g.*, *Midcontinent Independent Sys Operator, Inc*, 162 FERC ¶ 61176 (Feb 28, 2018) (finding that MISO's construct "is sufficient to ensure resource adequacy over the long-term."). To the extent that Defendants do not believe that the current FERC-approved tariff is sufficient, the forums in which to air their concerns are MISO and FERC.

33.    Second, they may simply continue to implement Section 6w's four-year forward capacity demonstration requirement without an ILCR, as they have since the Commission granted a stay in Case No. U-18444 on September 13, 2018. Indeed, this has, according to MISO, caused Michigan and Zone 7 in particular to be a "bright spot" within MISO for the coming planning year.  *See* Pls' Ex. 126, Gongwer, "MISO Says Even With Energy Shortfalls, Michigan Is In Good Shape," dated June 8, 2022.

34.    "States may not enact laws that burden out-of-state producers or shippers simply to give a competitive advantage to in-state businesses . . . ." *Granholm v. Heald*, 544 U.S. 460, 472 (2005). Therefore, "fairness"  is not a "legitimate [state] interest," *see C & A Carbone*, 511 U.S. at 393, that may justify

discrimination against out-of-state wholesale producers of goods and services in favor of in-state wholesale producers of goods and services.

## II. Even if the ILCR Were Not Discriminatory, the Burdens it Imposes on Interstate Commerce Are Clearly Excessive in Relation to its Putative Local Benefits.

35. Laws that are not overtly discriminatory may still violate the dormant Commerce Clause under *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970), if "the burden imposed on [interstate] commerce is clearly excessive in relationship to the putative local benefits."

36. The burdens imposed by the ILCR are clearly excessive to the non-existent reliability and fairness "benefits" claimed by Defendants.

37. In *Pike*, which established the "*Pike* balancing test," the court found that an Arizona statute that required cantaloupes being exported from the state to be first packed "in containers in a manner and of a kind approved" by the state was unconstitutional as imposing costs in excess of local benefits, even though it was not overtly discriminatory. *Id.* at 139. There, the putative local benefit was the enhancement of the reputation of Arizona cantaloupe growers, which was deemed outweighed by the $200,000 investment (equal to approximately $1.4M in 2021, *see* https://www.bls.gov/data/inflation_calculator.htm) that Bruce Church, Inc. would have had to invest to locate a packing facility in Arizona. *Id.* at 145. Significantly, the Court noted that "the Court has viewed with particular suspicion state statutes

60

requiring business operations to be performed in the home State that could more efficiently be performed elsewhere." *Id.*

38.    Here, Defendants claim that the ILCR provides a local reliability benefit. But reliability is more than sufficiently assured by the existing resource adequacy construct in MISO's tariff, which applies an aggregate, zonal LCR rather than an individual LCR.  Moreover, the ILCR will not add to local reliability because (1) the economics of building generation plants in Michigan will never allow for Michigan's AESs to build in-state capacity generation; (2) Michigan's utilities claim that they only have enough capacity to serve their customers; and (3) because Michigan's utilities are incentivized to build generation locally—and have claimed that any reliability solution is simply to build generation locally rather than increase transmission capacity—it is unlikely that Michigan's utilities will make use of their load-share ratio allocation of the zonal capacity import limit under the ILCR. The practical effect of the ILCR will therefore simply be to decrease the amount of imported capacity that Michigan LSEs may make use of without meaningfully increasing the amount of available in-state capacity.

39.    Furthermore, Defendants have not established that there are any present reliability concerns with electric supply in Michigan that require the imposition of the ILCR to remedy.

ClarkHill\07411\406274\268074916.v1-8/1/22

40.   The second local benefit that Defendants have asserted is one of "fairness." Yet, ironically, the Defendants' "fairness" rationale explicitly acknowledges that their purpose in imposing the ILCR is to benefit Michigan-based power producers at the expense of power producers whose generation resources are located out-of-state. Defendants apparently have a perception that in-state power producers are somehow disadvantaged in the retail market in the absence of the protectionist ILCR's restrictions on wholesale energy purchases from the interstate market. The MPSC's protectionist rationale is thus no legitimate local "benefit" but merely an impermissible motive.

41.   Against the backdrop of these illusory and impermissible "local benefits," the costs that would be imposed on Plaintiffs to comply with the ILCR are extraordinary. The MPSC recognized this in granting a stay of their decision to impose the ILCR during the pendency of Plaintiffs' state-level appeals. There, it explained:

> . . . the Commission agrees with Energy Michigan that AESs that become contractually bound to those generating in-state electricity <u>will pass on those costs to their customers and that, in aggregate, these costs could amount to several millions of dollars.</u> . . . [B]efore the Commission's June 28 order, Michigan has never required electric providers to source a percentage of their peak demand from within Zone 7, and that this new standard represents a new individual forward locational requirement that all electric providers, including AESs, must meet. The Commission is also aware of the fact that, to meet the new capacity demonstration requirements, AESs may be required to enter into four-year-forward contracts for in-zone capacity when the legal question of

62

the Commission's statutory authority to impose an individual forward locational requirement on AESs is a pending judicial matter that remains unsettled. **The costs of contracting for in-zone capacity** . . . **are real costs that are neither "speculative nor conjectural.**" MPSC Case No. U-18444, Filing # U-18444-0156 at p. 9 (Order dated September 13, 2018) (emphasis added).

42.     These costs, which result from a state commission requirement that business operations be performed in Michigan that are more efficiently performed elsewhere, *see Pike*, 397 U.S. at 145, erect a significant economic barrier to AESs' ability to supply energy to Michigan customers, and they therefore limit the retail electric choice market in Michigan. Under *Pike*, courts "view[] with particular suspicion state statutes requiring business operations to be performed in the home State that could more efficiently be performed elsewhere." *Pike*, 397 U.S. at 145.

43.     Under the ILCR, in order to sell wholesale capacity to Michigan LSEs beyond a certain Commission-determined percentage of their retail load (which is likely to fall to less than 20%), generators of that capacity must physically locate their power plants in the State of Michigan rather than rely on existing plants located outside of Michigan. The ILCR thus clearly requires "business operations to be performed in the home State that could [be and indeed are] more efficiently . . . performed elsewhere." *Id.* The ILCR thus effectively closes off Michigan's wholesale electric capacity market to thousands of megawatts of out-of-state capacity resources that would otherwise be able to participate in the wholesale capacity market under MISO's FERC-approved rules.

44.     For those reasons, even if it were not also discriminatory, the ILCR runs

afoul of the *Pike* balancing test under the Commerce Clause.

Respectfully Submitted,

By: */s/  Zachary C. Larsen*
Michael J. Pattwell (P72419)
Zachary C. Larsen (P72189)
Clark Hill, PLC
212 East Cesar E. Chavez Ave.
Lansing, MI 48906
(517) 318-3100
mpattwell@clarkhill.com
zlarsen@clarkhill.com
Counsel for ABATE

By: */s/  Brion B. Doyle*
Brion B. Doyle (P67870)
Varnum LLP
Bridgewater Place
P.O. Box 352
Grand Rapids, MI 49501
bbdoyle@varnumlaw.com
Counsel for Energy Michigan

Dated: August 1, 2022

4855-8046-4940, v. 2

ClarkHill\07411\406274\268074916.v1-8/1/22