UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ENERGY MICHIGAN, INC., and
ASSOCIATION OF BUSINESSES
ADVOCATING TARIFF EQUITY,

                  Plaintiffs,                            Case Number 20-12521
v.                                              Honorable David M. Lawson

DANIEL C. SCRIPPS, SALLY A. TALBERG,
and TREMAINE L. PHILLIPS,

                  Defendants,

and

CONSUMERS ENERGY COMPANY,

                  Intervening defendant.

_____/

## OPINION AFTER TRIAL

       Plaintiff Energy Michigan, Inc. is an association representing electric power sellers, known as "alternative energy suppliers" (AES); plaintiff Association of Businesses Advocating Tariff Equity (ABATE) represents industrial electricity customers. They challenge the constitutionality of certain orders issued on September 15, 2017 and June 28, 2018 by the Michigan Public Service Commission (MPSC) that implement legislation regulating the amount of electrical generating capacity required of energy suppliers. The legislation, known as Public Act 341 passed in 2016, created a State Reliability Mechanism (SRM) intended to ensure the reliable delivery of electricity to the state's retail consumers. The MPSC's orders establish individual "local clearing requirements" (LCRs), a term that refers to the amount of electricity that a supplier must obtain from sources within certain federally designated geographic zones. The plaintiffs seek a

declaration that those orders violate the Constitution's Commerce Clause, U.S. Const. art. I, § 8 cl. 3.

After motion practice, the case came on for trial on August 8, 2022 before the Court sitting without a jury.  Six witnesses testified and the Court received 225 exhibits, which included by stipulation expert witness reports from individuals who also testified at trial.  Afterward, the parties submitted proposed findings of fact and conclusions of law.  And in lieu of closing arguments, the parties submitted post-trial briefs, which were supplemented with recent authority.

The disputed trial issues are whether the individual local clearing rule discriminates in practical effect against alternative energy suppliers, whether the state's legitimate purpose of ensuring electrical grid health and security can be achieved in a nondiscriminatory way, and whether any of the burden on interstate commerce is "clearly excessive" when measured against the local benefits.

The following constitutes the Court's findings of fact under Federal Rule of Civil Procedure 52(a)(1), based on the record evidence, followed by its application of the governing law.

## I.  Factual Findings

### A.  Background

This case is about regulations that govern the operation of the electrical power grid, a complex system of generation, transmission, and delivery of electricity to residential, commercial, and industrial consumers.  As explained in the earlier opinions, because electricity is a commodity that cannot be stored easily, there must be synchronicity between demand and supply.  An electric grid network is used to deliver electrical energy to consumers in a way that allows generation (supply) to match demand (load) in real time.

The parties agree on many of the basic facts of the case, which have been discussed in some detail in the Court's previous opinions adjudicating the defendants' motion to dismiss, *Energy Michigan, Inc. v. Scripps*, 549 F. Supp. 3d 647, 650-55 (E.D. Mich. 2021), and the cross motions for summary judgment, *Energy Michigan, Inc. v. Scripps*, 587 F. Supp. 3d 581, 584-88 (E.D. Mich. 2022), *motion to certify appeal denied*, No. 20-12521, 2022 WL 910351 (E.D. Mich. Mar. 28, 2022).

Under the Federal Power Act, as amended, 41 Stat. 1063, 16 U.S.C. § 791a *et seq.*, the Federal Energy Resource Commission (FERC) is given the responsibility for regulating wholesale energy and transmission markets, *F.E.R.C. v. Elec. Power Supply Ass'n*, 577 U.S. 260, 264 (2016). States regulate the retail markets within their boundaries. *Ibid.* In Michigan, that responsibility falls to the MPSC. The two agencies work cooperatively to ensure that there is adequate capacity so that energy suppliers will be able to meet commitments to deliver electricity to customers continuously, especially during times of peak demand.

The task of matching demand with instantaneous, reliable supply requires considerable planning. FERC has conferred regulatory authority upon Regional Transmission Organizations (RTO) to plan for resource adequacy in wholesale markets. RTOs are comprised of public and non-public utilities, state officials, and certain interest groups. *Reg'l Transmission Orgs.*, 90 FERC ¶ 61,201, at 1, 4 (2000). The Midcontinent Independent System Operator, Inc., or "MISO," established in 2001, is the RTO that oversees electricity transmission planning for fifteen states in the Midwest and South (and one Canadian province), including nearly all of Michigan.

MISO's plans for resource adequacy focus on successive one-year periods to ensure that the market will have the capacity to deliver a supply of electricity to meet demand when it is at its highest. Its jurisdiction is divided into ten local resource zones. Zone 7 is located in Michigan

and no other state, and it comprises most of Michigan's lower peninsula.  The Upper Peninsula is in Zone 2, along with much of Wisconsin.  *See* MISO, *2020/2021 Planning Res. Auction (PRA) Results* (April 14, 2020), p. 5, available at https://cdn.misoenergy.org/2020-2021%20PRA%20Results442333.pdf (last visited February 18, 2022).  The evidence in this case exclusively concerns Zone 7.

One physical reality incorporated into planning decisions is that electrical energy degrades when it is transmitted over long distances due to energy losses that naturally occur over transmission facilities and "transmission constraints," terms that refer to the current-carrying capability of the facilities in the transmission system.  Ex. 119, Dauphinias Aff., ¶¶ 116-117, 119-120, ECF No. 55-4, PageID.21019-20.  To address those energy losses, MISO implements a local clearing requirement (LCR) as part of its overall planning.  That LCR prescribes the amount of capacity on a percentage basis that suppliers (known as load servicing entities, or LSEs) must obtain from generating facilities within a MISO zone to reduce the risk of blackouts.  *Midcontinent Indep. Sys. Operator, Inc*., 165 FERC ¶ 61,067, at p. 2 (2018).

Each year, electricity suppliers submit to MISO their anticipated electric capacity (the amount of electricity output that a generation unit can produce reliably), so that MISO can ensure short-term reliability.  *In re Reliability Plans of Elec. Utilities for 2017-2021*, 505 Mich. 97, 109, 949 N.W.2d 73, 81 (2020).  MISO also sets a "planning reserve margin requirement" (PRMR) for each provider.  *Ibid.* (citing *Midcontinent Indep. Sys. Operator, Inc*., 165 FERC ¶ 61,067, at p. 2 (2018)).  Under this planning requirement, electricity providers must ensure that a certain amount of electricity is available to meet its customers' demands for the upcoming year.  *Id.* at 101, 949 N.W.2d at 76.  To meet part of that requirement, electricity providers also must demonstrate that they will generate enough capacity locally (the LCR).  *Id.* at 109-10, 949 N.W.2d at 81.

MISO determines the capacity thresholds by ascertaining the amount of electricity resources a zone reasonably could be expected to import during peak demand times (i.e., MISO calculates anticipated transmission constraints on out-of-zone resources). *Id.* at 111, 949 N.W. 2d at 82. Zone 7's local capacity requirement is relatively high due to "the age and reliability of resources within the zone, the geographic nature of the zone (a peninsular state with limited interconnection), and the amount of available transmission import capacity." MPSC Order No. U-18197, ECF No. 64-5, PageID.2460. Accordingly, a certain amount of "geographically based planning" is necessary because reliance on far-off resources can cause congestion and undermine reliability "[g]iven the constraints of the electrical grid in moving power large distances from" zone to zone. *In Re Reliability Plans*, 505 Mich. at 110, 949 N.W. 2d at 81 (citing Borenstein & Bushnell, *Electricity Restructuring: Deregulation or Reregulation?*, 23 Reg. 46, 51 (2000)).

MISO effectuates local capacity demands by requiring electricity providers to have sufficient "Zonal Resource Credits" from within a given MISO zone. *Id.* at 111, 949 N.W. 2d at 82. Electricity providers can accumulate Zonal Resource Credits in three ways. First, they can supply power from plants within their respective zones. Second, they can contract with other providers within the zone to purchase electricity produced locally. And third, if a producer cannot do either of those, it can participate in MISO's single-year Planning Resource Auction (PRA). *Ibid*. The PRA is a process through which any registered provider can buy or sell units of capacity across zones. *Ibid.*

Michigan's Act 341, which created the SRM, established an integrated resource planning (IRP) process to ensure that Michigan LSEs are able to deliver enough energy to service peak loads. In Michigan, LSEs fall into four general categories: (1) public utilities (i.e., investor-owned utilities, like intervening defendant Consumers Energy Company); (2) municipal-owned utilities;

(3) cooperative electric utilities; and (4) AESs. *Id.* at 104, 949 N.W.2d at 78. The first three categories generally generate and deliver their own electricity. AESs provide electricity to retail customers through the existing local infrastructure. They typically do not necessarily generate the electricity they sell, and they frequently obtain some or all of it from sources outside Michigan. AESs began operating in Michigan after 2000 when the state legislature passed the Customer Choice and Electricity Reliability Act, Public Acts 141 and 142 of 2000, Mich. Comp. Laws § 460.10 *et seq.*, which allowed electricity customers the option of purchasing electricity from an alternative electricity supplier. The legislature later capped AESs' market share at 10%. Public Act 286 (2008), Mich. Comp. Laws § 460.10a(1)(a).

Act 341 added new, state-specific capacity obligations alongside those imposed by MISO, while maintaining the 10% cap on supply from AESs. *See* Mich. Comp. Laws § 460.6w. The statute requires "that each alternative electric supplier, cooperative electric utility, or municipally owned electric utility demonstrate to the commission . . . that [it] . . . owns or has contractual rights to sufficient capacity to meet its capacity obligations . . . ." Mich. Comp. Laws § 460.6w(8)(b). The MPSC concluded that the statute compelled it to set a local clearing requirement for each individual electricity provider, requiring that each owns or contracts to acquire a certain amount of locally-generated electricity on a four-year forward basis. *In re Reliability Plans*, 505 Mich. at 116-17, 949 N.W.2d at 85; *see* MPSC Order No. U-18197, ECF No. 64-5, PageID.2456-68. The MPSC issued an order creating the individual local clearing requirement on September 15, 2017, but the Commission determined that it would not enforce it until after the 2021 planning year to ensure fairness and gather more information through a formal hearing process. *Ibid.* The MPSC also ordered that the local clearing requirement be implemented on a gradual basis as preexisting generators are retired. MPSC Order No. U-18444, ECF No. 1-1, PageID.145.

As explained in the Court's earlier writings in this case, Michigan's LCR differs from MISO's in two material respects. These facts are undisputed. First, MISO takes an aggregate approach. If the total capacity from a local resource zone does not satisfy MISO's LCR, energy providers that outsourced their capacity (by purchasing capacity through the Planning Resource Auction) must pay a steep penalty. *In Re Reliability Plans*, 505 Mich. at 112, 949 N.W. 2d at 82 n.10 (the auction rate is set at a cost to build a new combustion turbine in the zone [referred to as the Cost of New Entry, or CONE], which has varied from $1.50 per unit to $260). The CONE price in Zone 7 for the 2020 planning year was $260. Under this regime, an AES could conceivably outsource most (if not all) of its electricity if other in-zone generators supply enough local capacity. But rather than looking at a local resource zone as a whole, Act 341 targets each LSE individually, mandating that they each satisfy a local clearing requirement by either producing or purchasing a certain amount of locally-generated energy. In other words, under Michigan's individual LCR, each AES is responsible for contributing to the reliability of the grid and cannot look to other load servicing entities to satisfy that responsibility. *See* Mich. Comp. Laws § 460.6w(7)-(8). All resources that MISO counts toward meeting its local capacity requirement count toward meeting Michigan's local clearing requirement, as do new and existing resources, and certain long-term out-of-state capacity contracts. MPSC Order No. U-18444, ECF No. 1-1, PageID.139-41.

Second, the enforcement mechanisms are somewhat different. Like MISO, the MPSC uses economic tools to enforce the in-zone generation requirement for a certain amount of the electrical energy that suppliers sell. Under MISO's regulations, an AES that outsources the bulk of its supplied electricity must pay a steep penalty if the applicable zone's aggregate local clearing requirement is not met. *In Re Reliability Plans*, 505 Mich. at 112, 949 N.W. 2d at 82. But it can outsource electricity, nevertheless. In contrast, if an energy supplier, including an AES, does not

comply with Act 341's individual LCR, an incumbent electric utility (like Consumer's Energy) must provide capacity service to the energy suppliers' customers as the designated provider of last resort.  Mich. Comp. Laws § 460.6w(7)-(8).  When that happens, the noncompliant power supplier must pay the utility providing the backup capacity a SRM charge.  *Ibid.*; MPSC Order No. U-18197, ECF No. 64-5, PageID.2436.  The plaintiffs' expert estimates that, at current rates, the charge may be $330 to $375 per megawatt day, higher than the $260 penalty MISO imposed in 2020.  Ex. 119, Dauphinias Aff., ¶¶ 63-64, ECF No. 55-4, PageID.2104-05.

If not for the self-imposed stay for the present litigation, the MPSC would have established the local clearing requirement for Zone 7 beginning in planning years 2022 and 2023 at 2.7% and 5.3%, respectively.  Ex. 19, August 2018 Staff Memorandum, ECF No. 1-2, PageID.153.  The MPSC would have set the local clearing requirement for Zone 2 at 0%, meaning that it determined that there was enough resource capacity within the zone to maintain the reliability of the grid for four years forward.  *Ibid.*  The MPSC expects all electricity providers to meet Michigan's local clearing requirements for the 2024-25 planning year, despite MISO Zone 7's recent capacity shortfall in the 2020 and 2021 planning years.  Ex. 38, MPSC Order No. U-20886, ECF No. 51-9, PageID.2000-03.  To account for changes in load levels, the MPSC will continue to reevaluate its local clearing requirements every two years.  Ex. 3, MPSC Order No. U-18444, ECF No. 1-1, PageID.145.

That brings us to the current contest.  The parties through their respective expert witnesses hotly dispute the purpose, intention, need, and consequences of the individual LCR established by the MPSC.  The plaintiffs' expert, James R. Dauphinais, an electrical engineer and industry consultant for AESs and their customer organizations, including plaintiff ABATE, opined that Michigan's individual LCR is not needed to provide a reliable grid because MISO's zonal capacity

requirement adequately protects state interests, already accounts for electricity capacity lost in transmission from out-of-state generation, and already provides significant incentives for in-state generation, Ex. 119, Dauphinais Aff., ¶¶ 118-21, 133-37, ECF No. 55-4, PageID.2120, 2132-33, although he acknowledges the physical limitations of the electric transmission system, *id.* at ¶¶ 116-117, 119-120, PageID.2119-20.

The defendants and intervening defendant rely on in-house expert witnesses.  Roger A. Doherty, an engineering specialist in the MPSC's Resource Adequacy and Retail Choice Section, explains that Michigan's individual LCR is necessary because it imposes a four-year forward planning requirement, while MISO's Planning Resource Auction and obligations are for the upcoming year only.  Ex. 279, Doherty Supp. Rep., ECF No. 104-2, PageID.4204-05, 4225.  He states that the local clearing requirement "represents a small percentage" of each electricity provider's total capacity obligation, and that this will be the case for "the next several years," e.g., until 2029, because the MPSC desired to limit the burden and allow for a gradual ramp-up.  *Id.* at PageID.4218.  Doherty points out that over the last several years, MISO's own local clearing requirement for Zone 7 was between 91.8% and 99.6% of the Zone's planning reserve margin requirement, and that likely would continue into the foreseeable future.  *Id.* at PageID.4222.  He concludes, therefore, that regardless of the State's LCR, to meet MISO's resource adequacy requirement, "nearly all capacity serving Zone 7 load must be located in Zone 7."  *Ibid.*  He disputes Mr. Dauphinais's opinion that there is excess generation capacity in Zone 7, instead asserting that "nearly all capacity serving Zone 7 load must be located in Zone 7" to meet industry-wide reliability standards.  *Ibid.*

Intervening defendant Consumers Energy relies on the opinions of Thomas P. Clark, its Executive Director of Electric Supply, and Timothy J. Sparks, Consumers's Vice President of

-9-

Electric Grid Integration.  Clark stated that the SRM implemented under the authority of Act 341 was intended to ensure the reliability of the electrical grid in Michigan in cooperation with MISO. Ex. 232, Clark Supp. Rep., at 202399.  He opined that the four-year forward planning requirement for all LSEs complimented MISO's requirement and that the regulations promote equitable contribution to Michigan's resource reliability requirements.  *Ibid.*.

Clark explained that an LSE can demonstrate that it meets its PRMR for MISO's requirement (and avoid the auction and risk of penalties) by, among other methods, submitting a Fixed Resource Adequacy Plan (FRAP) demonstrating that it owns or has secured sufficient resources to meet MISO's requirements.  *Id.* at PageID.1560.  And he points out that the state requirements are defined not by state boundaries but instead with reference to MISO's zones.  *Id.* at PageID.1565.  He suggested that although MISO's PRA, its price-setting formula, or the one-year forward planning requirement were intended to incentivize in-zone generation capacity, they were insufficient to achieve that result.

Timothy Sparks, Vice President of Electric Supply at Consumers Energy, took this concept one step further.  He noted that the PRA is a residual, short-term process that takes place only two months before the delivery year, and he believes that it is not intended to create a comprehensive capacity market. Ex. 231, Timothy Sparks Supp. Rep., ECF No. 104-3, PageID.4246.  Any attempt to make it so undermines grid reliability, Sparks opines, because only weeks remain to remedy any capacity shortfall.  *Id.* at PageID.4246-47.  That is why, he says, the MPSC must plan farther ahead.  Moreover, that Michigan is "geographically and electrically a peninsula" limits how much electricity can be imported.  *Id.* at PageID.4244.

Sparks asserted that MISO's aggregate local capacity requirement is inadequate to ensure grid reliability in Michigan.  He pointed out that in 2017, the MPSC projected that MISO Zone 7

-10-

might not have enough local capacity resources to meet MISO Zone 7's local capacity requirement by 2022, compromising reliability. *Id.* at PageID.4247. And this came to pass even earlier than predicted, with the Zone failing to meet its local capacity requirement in the 2020 planning year. *Ibid.* Sparks predicts that similar shortfalls will soon occur, explaining that Consumers Energy's supply cushion is shrinking and that, as a result, it has not been able to meet its load ratio share since 2018-19. *Id.* at PageID.4264. In other words, he says, AESs cannot indefinitely rely on Consumers Energy to serve as a buffer. *Ibid.* Nor can they rely on unregulated merchant generation owners to fill the gap, as merchant generators have not built new capacity for alternative electricity suppliers since 2004. *Id.* at PageID.4251. Sparks suggests that this dearth of new capacity indicates that MISO's economic tools are insufficient to incentivize new local generation, even when the PRA price approaches CONE. *Id.* at PageID.4249-51.

Sparks states that public utilities are making significant investments to build generating capacity to service their electric customers. That investment is secured through Michigan's IRP process, which, through the MPSC, ensures a rate structure that furnishes certainty for the utility to recover its long-term costs. But that planning does not include capacity to cover AESs' loads. He concluded that "[w]hile utilities plan to meet their own loads, no utility has responsibility for planning to meet AES load, and the PRA, even when clearing at CONE, does not incentivize anyone to plan for the AES load." *Id.* at PageID.4251-52.

### B. Witness Testimony

#### 1. The Plaintiffs

##### a. Cathy Cole

At trial, the plaintiffs offered the testimony of Cathy Cole, the Director of the MPSC's Strategic Operations Division, a position she has held since 2019. Prior to her promotion to that

position, Cole served as the Manager of the MPSC's Resource Adequacy and Retail Choice Section, where her primary duties were implementation of Public Act 341's integrated resource plan and state reliability mechanism.  In that role, Cole oversaw staff who made nonbinding recommendations to the MPSC in relevant proceedings.

Cole testified that, in 2017, as part of MPSC proceeding U-18197, the MPSC asked Resource Adequacy and Retail Choice Section staff to provide comments on the proposed locational capacity requirement.  Staff's initial position was that an individual LCR was not necessary in the short term to ensure reliability in MISO Local Resource Zone 7, for two reasons. The first reason was the choice cap under Michigan law restricting the market share of AESs to only 10% of retail sales.  The second reason was the physical location of Zone 7 utilities' generation resources.  Regulated utilities supply the vast majority of their resources from within Zone 7.  As a result, the amount of capacity that utilities provided in order to meet their planning reserve margin requirement in 2017 came very close to satisfying the entirety of MISO's local clearing requirement.  Staff therefore proposed two options for gradually phasing in an individualized requirement that potentially would improve reliability over the longer term: (1) a phased-in approach, or (2) an incremental approach, reviewed every two years.

Cole elaborated on the concerns driving staff's recommendations, which included the potential that a large portion of Michigan's capacity import limit (CIL) would go unused and the amount of capacity that AESs could import into Michigan necessarily would be limited.  That could impact costs passed on to customers of AESs if the AESs could not meet their four-year-forward individual local clearing requirement

Cole also served as a staff witness in MPSC proceeding U-18444.  She explained that staff was concerned that imposing a pro rata locational requirement would increase costs for Michigan

customers, because it would make the state exceed MISO's minimum local clearing requirement, even if imported power were cheaper than in-state capacity, and remove incentives for local generation to be competitively priced with generation in other MISO zones. However, without a forward locational requirement, Cole testified that AESs do not have any incentive to own local generation.

Staff therefore proposed an incremental need approach that would result in a very low individual LCR that gradually increased over time. The recommendation was motivated by equity, not reliability, concerns: there was a limited amount of local generation available that was not already under long-term contract and a short time before implementation for new physical resources to be added to Zone 7. Staff further recommended a 47.5 percent cap on the pro rata allocation of the individual LCR for the next two planning years (2022 and 2023). However, the MPSC did not adopt the ceiling because it anticipated the incremental need being much lower than 47.5 percent in the immediate term.

Cole testified that staff also recommended not counting new resources toward the individual LCR — that is, resources that are built to go online after the requirement went into effect. Otherwise, staff were concerned that utilities would game the system by retiring old generation and replacing it with new generation even if there were less expensive alternatives available to extend the life or increase the capacity of an existing plant. Cole opined that, if new capacity were included in the incremental need calculation, then it would be the status quo forever and there would be no contributions to local reliability from anyone who was not already contributing. By contrast, if retired generation is excluded and new generation is not included, then all providers would have to ensure that retired resources are replaced by in-zone power. Staff also recommended not including retired resources in the calculation, for similar reasons. Cole

admitted that excluding new and retired generation generally would mean that Zone 7 always would have an incremental need unless capacity import limitations increased, for example due to major new transmission lines being built. The individual LCR thus would gradually increase over time, although no one can say precisely by how much because the MPSC committed to reevaluating the methodology for calculating it every two years.

However, Cole testified that market conditions have changed since staff made its recommendations in 2017. Instead of a surplus of resources, there is now a shortage of all resources in the MISO north and central regions. She agreed that local generation provides a reliability benefit, and that the incremental need approach substantially reduces the burden on AESs as compared to requiring them immediately to meet their whole pro rata load ratio share of MISO's zonal local clearing requirement. The Court finds this conclusion reliable, based on current conditions, and consistent with other testimony from the MPSC witness.

b. Alexander Zakem

The plaintiffs also called Alexander Zakem, a member of plaintiff Energy Michigan who serves on the organization's board of trustees. Prior to becoming an independent consultant, he served as the Vice President of Operations at Quest Energy, an AES, and as Director of Power Sourcing and Reliability at Detroit Edison.

Testifying to the differences between AESs and incumbent utilities, Zakem described the former as offering a more customized array of products to retail customers — that is, supply at fixed rates, at different and flexible delivery times, through different pricing options, with different sharing of financial risk. As a result, AESs can sell power at lower prices. Another reason is that AESs typically do not own their own power products but rather purchase power from the wholesale market. They do not build their own generation resources due the high cost and risk of capital

investment, as there is little guarantee that they would recoup the cost.  Regulated utilities incur substantial construction costs, but they receive an authorized recovery of their approved investments in new generation.

Zakem characterized the zonal resource credits through which AESs purchase power as financial instruments.  Holding a credit means that a supplier has the right to specify the price at which the credit will be offered into the MISO auction, and to receive the payment for the credit in the auction if it clears.  The physical plant that created the zonal resource credit has an obligation to MISO, irrespective of who owns the credit, to inject energy into the MISO grid.  MISO then dispatches all resources to serve all loads.  The electricity is fungible: power generation from one source does not necessarily flow to a particular customer.

Zakem stated that, according to a 2021 MPSC report, there are 24 licensed AESs in Michigan, eight of which did business that year.  Licensed AESs that are members of Energy Michigan include Constellation New Energy, Direct Energy Business, Calpine Energy Solutions, Spartan Renewable Energy, and Wolverine Power Marketing.  Although most of these suppliers do not own their own generation capacity, they are members of affiliate corporations that do own significant generation resources.  However, Zakem does not know whether any of Energy Michigan's members presently own or have capacity under contract in Michigan.  Nor does he know whether any licensed AESs serve residential customers in the state of Michigan at this time.

Despite those obvious differences, Zakem believed that regulated utilities and AESs are similar because both kinds of suppliers pay the same energy prices to MISO, the same capacity prices, the same transmission prices, and the same charges for delivering power to customers over the retail system.  Zakem took issue with characterizing AESs as free riders.  He contended that AESs are not receiving any free benefits from incumbent utilities, because utilities only provide

capacity to serve their own customers, a conclusion that he did not back up with facts, although it is consistent with the opinions of Clark and Sparks. He also asserted that AESs are not receiving a free share of MISO's local clearing requirement because MISO does not impose the requirement on individual entities, which, of course, is one reason the MPSC believed that an individual LCR was necessary to promote grid reliability within the zone. Importantly, however, Zakem acknowledged that if Consumers Energy were to retire generation or switch ownership of units, then the total capacity supply in Zone 7 would fall, and reliability in Zone 7 would be reduced. Thus, Zakem admitted that he criticized Consumers' plan to replace retiring generating capacity with existing natural gas plants, because doing so would not add more resources to the Zone.

Zakem described the purpose of the MISO local clearing requirement as creating an auction price in the Zone that indicates that more resources are needed in the Zone. In other words, the auction establishes a high price when there is scarcity and a low price when there is adequacy. If an individual LCR were imposed, Zakem testified that it would narrow the market — because fewer sellers would have the products customers are looking for — and make it shallower — because sellers may have less capacity to sell. He opted for the imposition of a four-year forward requirement without an individual location requirement, noting that suppliers already contract for capacity two or three years out. The Court understands why Mr. Zakem would prefer this option, as it advances the economic interests of the plaintiffs. But it does not appear to be consistent with the reliability and equity goals set out in Public Act 341.

### c. James Dauphinais

James Dauphinais testified at trial to supplement his reports, Exhibits 119 and 124. He said that, under the current MISO construct, electricity suppliers can obtain capacity from any electrical location. However, if suppliers choose to use capacity located in a different zone, they

risk being charged a zonal deliverability charge — essentially a transmission congestion charge. In addition, if MISO in its planning resource auction cannot obtain enough capacity within a given zone, then it will set the auction clearing price at CONE. That price currently is $236.60 per megawatt day. The MISO auction has twice cleared at the CONE price: once in the 2020/2021 planning year, and the second time in the 2022/2023 planning year. Dauphinais testified that the former was caused by Consumers Energy and DTE having to extend the outage of Michigan's Ludington Unit 3 pump storage facility, and the latter was driven by large shortfalls in other MISO zones. In planning year 2022/2023, Zone 7 itself was just 1.8 percent short, well within the 5 percent that the Commission allows to be purchased out of the PRA under the state reliability mechanism capacity demonstration process. Dauphinais testified that despite resource adequacy challenges in 2006 and 2019, Michigan has not had load curtailments — blackouts, brownouts, power rationing — due to resource adequacy in the last 20 years.

Dauphinais described MPSC's individual LCR as effectively barring suppliers from using capacity located outside of Zone 7 for the portion of the requirement that they are assigned. That is so, he said, even though incumbent utilities and AESs provide the same electric power service and the same distribution service, and the same electrical power can be obtained from out-of-state resources as in-state resources. He opined that MPSC's incremental need methodology will cause the individual local clearing requirement — which the MPSC estimated would be 2.7 percent in the 2022/2023 planning year — to grow over time until it eventually reaches the full load ratio share of the MISO Zone 7 local clearing requirement. That would mean an 80 percent requirement by Dauphinais's estimate. But those estimates were speculative and not tied to past experience. The Court does not find Dauphinais's projections to be based on sound reasoning, particularly

since he did not account for the MPSC's commitment to reevaluate its local clearing requirements every two years.

Dauphinais acknowledges that his estimates differ from Roger Doherty's estimates because the two experts used different projected data. To estimate the 2026/2027 requirement, Dauphinais used MISO's loss-of-load expectation study conducted in 2021/2022, while Doherty used the same number from the 2022/2023 study, a more current database. Dauphinais justified his decision to use the earlier numbers by noting that MISO's Zone 7 local clearing requirement jumps around quite a bit causing a lot of uncertainty about what the future individual LCR will be. The Court finds that justification unpersuasive. Either way, Dauphinais does not believe that there will be an actual incremental need for local capacity in Zone 7 due to new generation resources coming online, which will not be counted as available capacity under the proposed methodology.

Nonetheless, Dauphinais testified that in his opinion the individual LCR is not necessary for grid reliability because MISO's existing adequacy structure already can send a strong price signal, particularly when there is evidence that high prices can be sustained. But according to nearly all of the other witnesses, MISO's planning reserve margin requirement set for each provider and its single-year Planning Resource Auction are inadequate to incentivize the construction of new in-zone generation facilities.

Based on his speculative projections, Dauphinais predicts that the individual LCR will make AESs less competitive and increase the cost of the power they buy and sell to customers. He spins this out to conclude that the incumbent utilities' market power eventually will grow to the point where they could compel AESs to purchase capacity at the state reliability mechanism capacity charge price, which at approximately $330 per megawatt day is well in excess of the MISO cost of new entry price. That, he believes, would artificially increase the demand for

-18-

capacity in Michigan, inflating market prices and creating a distortion in the interstate electric transmission system.

Dauphinais described MISO as taking the results of the 2022/2023 planning resource auction to heart by beginning a stakeholder process to explore reforms to improve price formation and reduce the likelihood of a future shortfall.  He acknowledged that MISO has found that there was an elevated risk of electricity shortfalls last summer because of a reduction in generation capacity and that its expectation of the likelihood of a loss of load has risen to one day in 5.6 years, nearly twice the one-day-in-10-years industry standard benchmark risk.  But he accepts that as a small number and asserts that Michigan is a "bright spot" that is doing better than its neighbors: only Michigan and Arkansas have had a sufficient amount of committed capacity to cover a local clearing requirement.  Dauphinais also stated that, due to the interstate nature of the grid, Michigan cannot ensure reliability on its own.  Because MISO's provisions call for an allocation of firm load curtailments on a load ratio share basis, if there is a loss of load event in MISO as a whole, Zone 7's customers could still be curtailed even if Michigan's utilities have available resources well in excess of demand load.

Dauphinais disagreed that gradually phasing in the load-ratio share allocation of the individual LCR would address market power concerns, speculating that the existing market power dynamic is unlikely to change.  He therefore proposed two ways to modify the individual LCR to minimize the burdens on AESs: (1) reflecting new resource additions in the incremental need methodology and treating investments made for continued operation as capacity-still-in-service instead of as capacity-retired; and (2) allocating the incremental need for capacity only to the electric suppliers that are causing the need, e.g., those that do not have sufficient capacity in their demonstrations to meet a load ratio share of MISO's local clearing requirement.  Commenting on

the first alternative, Dauphinais believed that the MPSC excluded new generation from the incremental need methodology so that all electricity suppliers will eventually carry a full load ratio share of the local clearing requirement.  The Court sees little, if any, difference between the second alternative and the individual LCR in the MPSC's regulations.  Dauphinais maintained that the Commission could require a four-year forward demonstration process without also imposing an individual LCR, noting that it effectively has done so by staying the latter while implementing the former.  But that opinion does not account for the fact that Zone 7 did not meet MISO's local clearing requirement in planning year 2020/21, and that even now Zone 7 is right on the edge of not being able to meet MISO's local clearing requirement.

## 2.  The Defendants

### a.  Roger Doherty

Supplementing his report, Exhibit 279, Roger Doherty testified that in his opinion, the MPSC's individual LCR is necessary because there is a need for forward capacity planning and a need for locational resources within Zone 7 due to constraints within the transmission system.  In part because of transmission constraints, the MISO local clearing requirement for Zone 7 already is the highest in all of MISO's zones, both in terms of absolute value and in percentage terms (97 percent).  Doherty explained that the individual LCR was designed to ensure that MISO's zonal requirement is met: under the current MISO construct, individual LSEs can meet their own capacity obligations without contributing to meeting MISO's local clearing requirement.  Thus, any resources that would count as a zonal resource credit within MISO's planning resource auction also would count within Michigan's four-year forward capacity demonstration process — e.g., generation, ownership or contractual rights, load-modifying resources, demand response, etc.

Doherty opined that adding even a small amount of capacity in Zone 7 would increase reliability because of tight capacity conditions within the zone and within MISO more broadly. He noted that Zone 7 in recent years regularly has fallen short or come close to falling short of meeting MISO's local clearing requirement.  First, there was the shortfall in the 2020/2021 planning resource auction.  This was not an anomaly: the prior year, Zone 7 only narrowly had enough resources offered.  Second, in the 2022/2023 planning year auction, all zones in aggregate did not have enough resources to meet the planning reserve margin requirement, which means that they all cleared at CONE.  Third, MISO recently changed its tariff rules so that units with long-term outages no longer qualify as zonal resource credits.  Had that rule been in effect for 2019/2020, Zone 7 also would not have met its MISO local clearing requirement in that planning year.  According to Doherty, these shortfalls mean that there is a very limited amount of resources in any of the zones and call into question how much capacity is available to import into Zone 7.  Failing to meet MISO's local clearing requirement implicates both economic and reliability concerns because it means that customers are subject to a higher-than-acceptable risk of a loss of load.

In Doherty's opinion, the MPSC's individual LCR treats all load-serving entities the same and does not favor in-state utilities.  The requirement imposes the same load ratio share for all suppliers and allocates the need for local resources among them all.

Doherty testified that the MPSC's individual LCR is necessary because under the existing MISO construct, if MISO's prompt-year requirement is not met there is no time for LSEs to add additional resources.  By slowly ramping up the individual LCR, differently situated LSEs will have an opportunity to come up with ways to procure any necessary resources.  Doherty points out that the MPSC has established procedures for reevaluating and reassessing the LCR every other

year, and he argues that this means that the MPSC's methodology will change over the long term. Ex. 279, Doherty Supp. Rep., ECF No. 51-2, PageID.4220-21.   Doherty explained that in its biennial review of its incremental need methodology, the MPSC also would have options for updating the individual LCR if it grows too fast or becomes too high.   Doherty estimated that the individual LCR would grow to 10 percent in planning year 2025/2026, and to 20 percent in planning year 2030/2021.   He does not see this as a large change in comparison to what the individual LCR could have been under the other options the MPSC considered.   He acknowledged that his estimates would change based on updated data.   He concludes that the methodology does not require electricity providers to produce more capacity than is necessary to meet MISO's zonal local capacity requirement unless they do so voluntarily.   *Id.* at PageID.4221.

In addition to improving reliability, Doherty opined that the individual LCR advances fairness.   Although the benefit of reliability is shared by all customers of all LSEs within Zone 7, the cost of reliability is borne only by those that invest in local resources.   In Doherty's opinion, excluding new generation resources from the incremental need calculation lends to a more equitable situation in that all customers will bear the cost of ensuring reliability.   This is important to ensuring that utilities continue to invest in reliability.   Without the individual local clearing requirement, Doherty says, utilities do not have any obligation to replace retired generation with in-zone resources.   In fact, because utilities are held to a reasonable and prudent standard for adding resources, under the current construct they could be obligated to add more cost-effective out-of-zone capacity instead.   Doherty acknowledged that utilities may meet their individual LCRs by contracting for existing in-zone capacity without adding megawatts in Zone 7.   But even so, he believes, credibly, that the individual LCR will mean that in-zone resources are more highly valued and will encourage more one-to-one replacement within the zone.   That advances reliability.

Doherty also testified that the individual LCR provides for longer-term resource planning. He did not believe that there are any alternatives that would allow a four-year forward demonstration process properly to assess locational resources while also making it feasible for more resources to be added if needed. He acknowledged that since the four-year forward PRMR has gone into effect, all AESs (with one narrow exception) have demonstrated that they will have adequate resources four years in the future. But he also noted that suppliers have not demonstrated that they can meet the forward planning requirement using local capacity.

Doherty explained that the MPSC's SRM would come into play only if an AES was unable to purchase in-zone capacity but was required to do so through the individual locational requirement. The AES's customers then would then have to pay the SRM price.

Finally, Doherty answered several questions relating to the adequacy of the current MISO construct. He explained that MISO presently has in place a number of procedures for handling shortages: calling upon reserves and load-modifying resources, interrupting customers, demand response, making public appeals, and if necessary, shedding firm load. He clarified that transmission constraints are real, physical constraints determined through power flow modeling and are part of the equation for determining MISO's local clearing requirement. However, the MPSC does not restrict or limit the export of power or capacity of resources from Zone 7 to other zones and such exports do occur. And Doherty stated that, to his knowledge, all Michigan LSEs presently participate in the MISO planning resource auction or submit a FRAP because it would be irrational not to do so, as they would be subject to a price of three times CONE for failing to procure their obligated capacity. Based on the prices he has seen, Doherty believes that AESs typically play less than CONE to import resources into Zone 7.

b.   Thomas P. Clark

-23-

Thomas Clark expanded on his report as well.  Ex. 232.  He testified that he previously served as Consumers Energy's Executive Director of Electric Supply, where he was responsible for planning and procuring all energy to meet customer demands and MISO requirements.

Clark explained that the MISO local clearing requirement is designed to achieve reliability given the constraints of the transmission system.  It is intended to ensure that every zone has sufficient capacity to maintain the one-day-in-10-year loss-of-load expectation, which is the industry standard for the acceptable probability of having to shed load due to a lack of supply.  In the 2022/2023 planning year, the MISO north central region zones failed to meet MISO's planning reserve margin requirement and all cleared at CONE, indicating that the one-day-in-10-year standard was not met.  (Nevertheless, Zone 7 met MISO's local capacity requirement in the 2022/2023 planning year.)  MISO now estimates that the present risk of loss of load is one day in 5.6 years, which Clark opined is too high.  Clark stated that MPSC's SRM requirements ultimately aim to ensure that the MISO PRMR and LCR are met.

Clark testified that Consumers Energy views MISO as advancing resource adequacy by providing a place — the PRA — where residual capacity transactions can occur efficiently and cost-effectively.  Clark explained that LSEs all pay the same auction clearing prices in the MISO settlement process.  However, he also clarified that because the auction is a residual auction, the overall price LSEs pay for capacity largely is dependent on independent, long-term bilateral transactions or on the cost of the generation that they own.  In other words, the prompt-year residual market is just once subpiece of the overall capacity market.

Clark opined that there is a cost to meeting MISO's locational requirement, but that the requirement is necessary to reliability.  He also opined, sensibly, that, while neither MISO nor Public Act 341 explicitly mention equity, equity should be considered in efforts to advance

reliability.  He explained that, because all customers benefit from reliability, he believes they all

must share in the cost to support it.  The relationship between equity and reliability, then, is that

all customers benefit equally from the reliability that is provided by meeting the local clearing

requirement.

Clark acknowledged on cross-examination that around the same time the MISO north

central zones cleared at CONE for planning year 2022/2023, Consumers Energy sought and

received MPSC approval for the early retirement of base load assets: the retirement of Campbell

1, 2, and 3 in planning year 2025.

### c. Timothy Sparks

Timothy Sparks also gave testimony to supplement his report, Ex. 231, Timothy Sparks

Rep., ECF No. 104-3.  Sparks previously served as Consumers' Director of Electric Transmission

Planning and System Protection, Director of Fossil Fuel Supply, and Vice President of Energy

Supply Operations.

Sparks testified that the purpose of MISO's local clearing requirement is to ensure that

Zone 7 has the capacity it needs to meet the one-day-in-10-years loss-of-load expectation.  He

opined that in order to meet that standard, it is necessary to have generation located proximate to

the load to be served because there are thermal, voltage, and transient stability constraints that

prohibit infinite amounts of power from flowing from one location to another.  MISO constructed

the system we operate under now out of a recognition that there needs to be a certain amount of

local generation for reliability purposes.

Sparks expressed that, while MISO sets reliability standards, it does nothing to hold

individual entities responsible for meeting them.  He opined that the MISO planning resource

auction does not ensure reliability, because when the auction clears at CONE, LSEs simply wash

their hands of it and move on without taking further action.  He further opined that it is not sufficient to rely on MISO's PRMR because it does not take into consideration local transmission constraints.  Although Michigan has a certain amount of electric transmission capacity available to import power into Zone 7, Sparks opined that it is not nearly enough to serve all of the electric load at all times.  Thus, Michigan's legislature stepped in by passing Public Act 341.

Sparks explained why, under the statute, electricity providers in Michigan can only rely on the MISO planning resource auction to meet up to five percent of their SRM requirements.  He stated that it would not be prudent for LSEs to rely on the auction to meet more than that, because the auction is a prompt-year construct that merely helps bring together buyers and sellers who need or have a little extra capacity.  Prompt-year planning is insufficient in an environment of tight electric supply where long-term planning is needed to execute a capacity supply plan.

Sparks also explained why he believed that the MPSC's individual LCR is necessary.  He stated that Zone 7 is right on the edge of not being able to meet MISO's local clearing requirement. In recent years, the zone once failed to meet the requirement and otherwise has been within a few hundred megawatts — the equivalent of a small-to-medium power plant — of failing to do so.  He disputed that the outage at the Ludington pump storage facility caused Zone 7 not to meet MISO's local clearing requirement in planning year 2020/21, opining that the entire lower peninsula bore responsibility over the entire planning period.  He also noted that loss-of-load events have occurred in other MISO zones, including during the Texas winter outage event.

In Sparks' opinion, the plaintiffs' proposed alternatives for the individual LCR are unworkable because they merely would perpetuate the status quo.  He believes that if new generation is taken into account in calculating the individual LCR, then Zone 7 at times would continue to come close to not meeting the MISO local clearing requirement because of the lack of

accountability.  He stated that Consumers Energy is not planning to "overbuild" capacity going forward and thus there will be no guarantee that utilities will continue to have the excess capacity needed for Zone 7 to meet MISO's local clearing requirement.  Thus, the zone risks falling short in the future unless everyone contributes their share to reliability.  However, Sparks also allowed that the individual LCR may decrease if there is a significant investment in transmission, such as the $10 billion investment MISO recently approved that in part will benefit Michigan's lower peninsula.

Sparks explained the difference between CONE, the MISO capacity deficiency charge, and the SRM charge.  CONE is intended to incentivize LSEs to build in zones where there is a capacity deficiency.  The MISO capacity deficiency charge applies when a particular LSE decides not to participate in the PRA and ultimately is found not to have sufficient capacity to serve its electric load.  And under the MPSC's proposed rule, the SRM capacity charge applies when an electric retail open access customer does not have electric generation to meet its load and has not been able to acquire it from an AES and therefore has to go back to the supplier of last resort for the capacity. It is paid directly by the consumer (although there is a notice period during which a customer can switch back to the utility without being charged).  Thus, the three charges address different aspects of the costs associated with building new generation or sourcing existing generation.

According to Sparks, the CONE charge has not proven sufficient to incentivize the construction of new capacity.  Adding generation can create a surplus, which means that the supplier who builds it may not earn sufficient revenue to recoup its investment.  CONE does not adequately encourage suppliers to take on that significant cost.  Rather, certainty is needed to make investments in new power plants.

Sparks also elaborated on the mechanics of the SRM and how utilities serve as suppliers of last resort.  He acknowledged that, if an AES customer was going to be charged the SRM charge and came to Consumers Energy for capacity, and Consumers Energy's capacity was already completely designated, then Consumers would have to purchase capacity from the market through the PRA for up to the price of CONE.  But he also clarified that Consumers typically would know in advance whether it had to provide backup capacity because of the four-year forward demonstration requirement.

Describing the differences between incumbent utilities and AESs, Sparks testified that utilities are regulated by the MPSC and that the profit they are allowed to make is a return on equity set by the MPSC.  By contrast, AESs do not have a capped return and are not obligated to serve all of the electric load that asks them for supply.  Sparks took the position that relying exclusively on MISO's aggregate local clearing requirement actually subsidizes AESs.  He says that because public utilities locate most of their capacity in Michigan, "AESs opposing [Michigan's] LCR are attempting to use resources paid for by utility customers to satisfy reliability requirements for their customers."  Ex. 231, Timothy Sparks Supp. Rep., ECF No. 104-3, PageID.4257.  Moreover, Sparks cited data that indicate that his employer, Consumers Energy, likely will not benefit from selling capacity to AESs because over the last several years it did not have very much excess capacity to sell.  *Id.* at PageID.4260-64.  And he contends that allowing AESs to serve their customers without sourcing their supply within Zone 7 will result in "unfair" cost-shifting, or even service curtailment, to Michigan's retail electricity customers.  *Id.* at PageID.4250, 4261.

Sparks also stated that Consumers Energy only plans and builds for its own bundled customers.  An AES could sign a bilateral contract with Consumers Energy for capacity, but

whether Consumers would be willing to enter such a contract depends on whether Consumers had excess capacity to sell and on the market conditions in the PRA and energy markets. He acknowledged that some of Consumers Energy's capacity resources are located outside of Zone 7 and that the last time Consumers used capacity resources located outside of the Zone was in the last PRA. He explained that, any given time of day, Consumers may be buying power off the market because it is cheaper, or generating excess and selling it across the MISO footprint. And he explained that Consumers Energy has to file market power reports with FERC every three years.

### III.  Conclusions of Law

Based on the testimony of the witnesses and the exhibits received, the Court concludes as follows: (1) the MPSC's individual LCR does not effectively discriminate against out-of-state electricity suppliers because it burdens in-state and out-of-state suppliers equally; (2) the burdens produced by the individual LCR are not clearly excessive compared to the benefits; (3) the plaintiffs failed to demonstrate that the State lacks a legitimate local interest in grid reliability, or to provide adequate information by which to assess the speculative burdens produced by the requirement; and (4) the individual LCR advances a legitimate local purpose that cannot be served adequately by reasonable nondiscriminatory alternatives, and the alternatives proposed by the plaintiffs only perpetuate the status quo, which plainly is inadequate to ensuring grid reliability.

### A.  Legal Background

As discussed in the Court's opinion on the parties' cross-motions for summary judgment, *Energy Michigan, Inc.*, 587 F. Supp. 3d at 592, and the Court's previous opinion on the motion to dismiss, *Energy Michigan*, 549 F. Supp. 3d at 655, the Constitution reserves the power to regulate commerce among the states to the national legislature. U.S. Const. art. I, § 8, cl. 3. Even when Congress has not acted, "the Commerce Clause goes further and imposes limitations on the states."

*Foresight Coal Sales, LLC. v. Chandler*, --- F.4th ----, No. 21-6069, 2023 WL 1505226, at *2 (6th Cir. Feb. 3, 2023) (citing *South Dakota v. Wayfair, Inc.*, --- U.S. ----, 138 S. Ct. 2080, 2089 (2018)). Therefore, "[w]hile the Commerce Clause gives Congress authority to regulate interstate commerce, the converse is that states cannot impede Congress's power by 'unjustifiably . . . discriminat[ing] against or burden[ing] the interstate flow of articles of commerce.'" *Byrd v. Tennessee Wine and Spirits Retailers Ass'n*, 883 F.3d 608, 623 (6th Cir. 2018) (quoting *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 99 (1994)). This "negative" aspect, commonly referred to as the dormant Commerce Clause, "is driven by concern about 'economic protectionism — that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'" *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337-38 (2008) (quoting *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273-74 (1988)); *see also Foresight Coal Sales*, 2023 WL 1505226, at *2 ("This negative, or dormant, Commerce Clause requires courts to preserve the 'free flow of interstate commerce' with the aim of preventing the 'economic Balkanization' that plagued the early colonies.") (citing *S. Pac. Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761, 770 (1945), and *Wayfair*, 138 S. Ct. at 2089).

Under this doctrine, states are free to enact laws regulating "matters of local state concern, even though [these laws] in some measure affect[] commerce, provided [they] do[] not materially restrict the free flow of commerce across state lines, or interfere with it in matters with respect to which uniformity of regulation is of predominant national concern." *S. Pac. Co.* 325 U.S. at 770.

The Sixth Circuit has adopted a two-step analysis for evaluating dormant Commerce Clause challenges. *Am. Beverage Ass'n v. Snyder*, 735 F.3d 362, 369-70 (6th Cir. 2013) (citing *Int'l Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 644 (6th Cir. 2010)). First, the Court asks "whether the statute discriminates against interstate commerce, either by discriminating on its face,

by having a discriminatory purpose, or by discriminating in practical effect." *Cherry Hill Vineyards*, 553 F.3d at 431-32 (citing *E. Ky. Res. v. Fiscal Ct.*, 127 F.3d 532, 540 (6th Cir. 1997)). "If the statute is discriminatory, . . . it is virtually *per se* invalid, unless the state can demonstrate that it 'advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.'" *Id*. at 432 (quoting *Granholm v. Heald*, 544 U.S. 460, 489 (2005)). But if the state regulation is not discriminatory, then the Court still must weigh the burdens imposed on interstate commerce against the local benefits produced by the regulation under the balancing test established in *Pike v. Bruce Church*, 397 U.S. 137, 142 (1970). *See Snyder*, 735 F.3d at 368.

The parties agreed that Act 341 by itself does not offend the Commerce Clause, since it does not explicitly mandate that each electricity provider source at least some of its electric capacity locally. *See* Mich. Comp. Laws § 460.6w(12)(d) (which uses MISO's "zone" terminology in defining "local clearing requirement"). The Court also has found as a matter of law that the MPSC's regulations, including the individual LCR, do not have a discriminatory purpose, *Energy Michigan*, 587 F. Supp. 3d at 593-94, although the plaintiffs still persist in arguing that point at this stage of the case.

### B.  Discriminatory Effect

"A statute may be discriminatory in effect if 'the claimant [can] show both how local economic actors are favored by the legislation, and how out-of-state actors are burdened by the legislation.'" *Am. Beverage Ass'n v. Snyder*, 735 F.3d 362, 372 (6th Cir. 2013) (quoting *Int'l Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 648 (6th Cir. 2010)); *see also E. Kentucky Res. v. Fiscal Court of Magoffin County*, 127 F.3d 532, 543 (6th Cir. 1997) ("[T]here are two complementary components to a claim that a statute has a discriminatory effect on interstate

commerce: the claimant must show both how local economic actors are favored by the legislation, and how out-of-state actors are burdened by the legislation.").

The plaintiffs made no effort at trial to quantify the precise costs their members will incur if the MPSC's individual local clearing requirement is implemented.  But even without such an accounting, it is evident that compliance with the requirement may cause AESs to forgo purchasing less-expensive, out-of-state generation in lieu of more-expensive, in-state generation.  These are "real costs that are neither 'speculative nor conjectural.'"  MPSC Order No. U-18444, PageID.104-7, PageID.4426.  The MPSC itself has recognized that "AESs that become contractually bound to those generating in-state electricity will pass on those costs to their customers and that, in aggregate, those costs could amount to several millions of dollars."  *Ibid.*

It is not evident, however, that local economic actors are favored by the individual LCR.  To the contrary, witnesses offered extensive testimony at trial establishing that the requirement imposes the same burdens on utilities that it imposes on AESs.  Defense expert Roger Doherty testified that the individual LCR treats all entities the same, because load ratio share is "the same for both . . . in-state providers and out-of-state providers."  Trial Tr., Vol. II, ECF No. 102, PageID.4008-10.  That is no accident.  Because utilities presently lack any obligation to replace retired generation with in-zone capacity, Doherty testified, the individual LCR especially is important for holding incumbent utilities accountable.  *Id.* at PageID.4057.  Without it, utilities instead may be obligated to add more cost-effective *out-of-zone* capacity because they are held by law to a reasonable and prudent standard for adding new resources.  *Id.* at PageID.4057-58.  The individual LCR similarly is important to ensuring that utilities maintain existing in-zone capacity.  Plaintiffs' witness Cathy Cole testified that MPSC staff recommended excluding new resources from the incremental need methodology used to calculate the individual LCR because otherwise

utilities might "game the system" by "retir[ing] old generation and replac[ing] it with new generation even if a less expensive alternative to extend the life or increase the capacity of an existing plant exists."  Trial Tr., Vol. I, ECF No. 101, PageID.3842.

The burdens imposed by the MPSC's individual LCR are analogous to the burdens imposed by the unique-to-Michigan mark at issue in *American Beverage Association v. Snyder*, 735 F.3d 362 (6th Cir. 2013).  There, beverage bottlers challenged a Michigan state law that required certain bottled beverages sold in Michigan to bear a mark unique to the state, arguing that the statute "eliminates the competitive advantages otherwise enjoyed by interstate companies."  *Id.* at 367, 372.  The Sixth Circuit disagreed, finding that the provision does not effectively favor in-state beverage manufacturers and distributors because "any manufacturer who wants to sell and distribute beverage containers" is subject to the provision "regardless of whether they are in-state or out-of-state."  *Id.* at 373; *see also Int'l Dairy*, 622 F.3d at 649 (finding that an Ohio regulation banning the composition claim "rbST free" on milk labels was not protectionist because it "burdens Ohio dairy farmers and processors who do not use rbST in their production of milk products to the same extent as it burdens out-of-state farmers and processors not using rbST").  Likewise, any LSE that wants to sell electrical capacity in Michigan is subject to the individual LCR, which "burdens in-state" utilities "to the same extent it burdens out-of-state" suppliers.  *Am. Beverage Assoc.*, 735 F.3d. at 373.  Again, the equitable burden is a feature, not a bug, of the regulation:  Without the individual LCR, both utilities and AESs would lack incentives to invest in in-zone capacity.  *See* Trial Tr., Vol. II, ECF No. 102, PageID.4008-10, 4057-58; Trial Tr., Vol. I, ECF No. 101, PageID.3908-09.

Because the weight of the evidence demonstrates that utilities equally are burdened by the individual LCR, the plaintiffs have failed to demonstrate that the requirement has the effect of discriminating against interstate commerce.

## C. *Pike* Balancing

"Where [a] statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970) (citing *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 443 (1960)). "The party challenging the statute bears the burden of proving that the burdens placed on interstate commerce outweigh the benefits that accrue to intrastate commerce." *E. Kentucky Res*., 127 F.3d at 544-45 (citing *USA Recycling, Inc. v. Town of Babylon*, 66 F.3d 1272, 1282 (2nd Cir. 1995)). "In identifying the putative local benefits to be weighed against incidental burdens on interstate commerce," the Court applies "a rational basis standard of review." *Colon Health Centers of Am., LLC v. Hazel*, 813 F.3d 145, 156 (4th Cir. 2016) (internal quotations omitted); *see also Int'l Dairy*, 622 F.3d at 650.

### 1. Benefits

At trial, the defendants established that the individual local clearing requirement produces two legitimate local benefits: (1) reliability, and (2) equity.

### a. Reliability

The plaintiffs baldly contend that the defendants failed to demonstrate that the individual LCR provides a reliability benefit despite nearly every witness testifying to the contrary.

Multiple witnesses testified that the MPSC's individual LCR creates an accountability mechanism for meeting MISO's local clearing requirement. As defense expert Timothy Sparks testified, presently there "is no accountability, really, with the MISO process." Trial Tr., Vol. III,

ECF No. 103, PageID.4104.  Although the MISO construct sets "the various reliability standards,"

only by "getting to a point where an individual clearing requirement is placed upon all of the load-

serving entities . . . can we be assured that the minimum reliability standards will be met."  *Id.* at

PageID.4104-05.  Doherty agreed, testifying that the individual LCR is "necessary" to "completely

ensure" that Zone 7 meets MISO's local clearing requirement.  *Id.* at PageID.4001-02.  As Doherty

explained, "without the individual LCR, LSEs can provide demonstrations that show that they

have enough capacity to meet their obligations, but those obligations, if met by resources outside

the zone, won't translate into meeting MISO's LCR, which is another component of reliability."

*Ibid.*

The plaintiffs' witnesses did not refute that reliability benefit.  Cole expressed her opinion

that, "[w]ithout a forward locational requirement," AESs lack "any incentive to own local

generation" or add capacity in Zone 7.  Trial Tr., Vol. I, ECF No. 101, PageID.3839.  Alexander

Zakem's testimony suggested that the same is true of utilities.  *See id.* at PageID.3908-09.  Zakem

"criticized" Consumers Energy's plans "to replace retiring generating capacity with three existing

natural gas plants located in Zone 7," because under the existing framework "reliability would

decrease if the plan were executed" and new capacity was not added to the Zone.  *Ibid.*  In effect,

Zakem acknowledged that Consumers Energy presently is not required to add new capacity within

Zone 7 to replace old capacity after it is retired.

By establishing an accountability mechanism, the individual LCR "greatly increases the

likelihood . . . that there will be enough locational resources within the zone."  Trial Tr., Vol. II,

ECF No. 102, PageID.4001.  Doherty testified that the individual LCR "provide[s] remedies" for

putting additional resources in place so that customers do not face elevated reliability risks if and

when Zone 7 lacks sufficient locational resources.  *Id.* at PageID.4021.  Clark similarly opined that

the MPSC's individual LCR is "about making sure there is enough of this capacity . . . to meet demand to comply with the reliability standards" established through MISO's local clearing requirement.  Trial Tr., Vol. III, ECF No. 103, PageID.4092, 98.  And Sparks opined that Michigan LSEs "cannot possibly" meet MISO's local clearing requirement "without a certain level of capacity sourced within LRZ [Zone] 7 by AESs," even if incumbent utilities source all of their capacity from within the Zone.  Ex. 231, Sparks Supp. Rep., ECF No. 104-3, PageID.4264.  He estimated that, without the MPSC's individual local clearing requirement, "over 1,400 MW of capacity could be excluded from the State's long-term planning requirement of being sited within Michigan," translating to "over 300,000 customers in Michigan" being served by resources "potentially located nowhere close to where it's needed to be delivered."  *Id.* at PageID.4265.

According to Doherty, Zone 7 repeatedly has come close to missing the MISO requirement, indicating that the Zone "is no longer within or meeting the reliability standards" and "Zone 7 customers were subject to a higher risk than the accepted standard of . . . loss of firm load."  Trial Tr., Vol. II, ECF No. 102, PageID.4006.  Doherty further explained that the individual LCR produces a reliability benefit even if individual LSEs meet it by buying existing megawatts from within Zone 7.  *Id.* at PageID.4058.  Encouraging load-serving entities to buy capacity in Zone 7 "might more appropriately value those megawatts in the zone which could help lead to megawatt development," *ibid.*, and adding "even a small amount of additional capacity [would] aid reliability in the zone," *id.* at PageID.4002-03.

### b.  Equity

The defendants likewise have established that the individual LCR equitably distributes the cost of reliability.  The State also has a legitimate local interest in this "fairness" benefit.  As Clark testified, "the only way to ensure that you're going to meet that reliability standard is to ensure

-36-

that all load-serving entities understand and can contribute an appropriate amount" by making sure "that all customers who are benefiting from that reliability are also sharing in the cost to support that reliability."  Trial Tr., Vol. III, ECF No. 103, PageID.4099.  Doherty explained that the individual LCR was structured in a way that would ensure that all customers bear the cost of providing reliability through local resources — including the customers of both AESs and incumbent utilities.  Trial Tr., Vol. II, ECF No. 102, PageID.4053.  If reliability were not a concern, Doherty testified, utilities also would choose "obviously cheaper capacity for their customers" and might not invest in locational resources.  *Id.* at PageID.4058.  The benefits and burdens of fairness are born by AESs and incumbent utilities alike.

## 2.  Burdens

"*Pike* balancing is already a difficult exercise," and "[d]ifficulty becomes unworkability when courts are forced to speculate about the extent of a hypothetical burden without concrete proof."  *Garber v. Menendez*, 888 F.3d 839, 845 (6th Cir. 2018) (citing *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 354 (2008)).  Although the plaintiffs adequately have demonstrated that they incidentally will be burdened by the individual LCR, they have provided the Court "no way of assessing" the extent of their burden.  *Ibid.*  They maintain that such proof is not necessary.  But although that may be true when considering if a regulation discriminates against out-of-state interests, such proof is crucial to allow a court to engage in *Pike* balancing.  And here, the record contains no concrete evidence of how many AESs presently operate in Zone 7, how much out-of-state capacity they supply, how much out-of-state capacity actually is available and at what price, or how much it will cost to comply with the individual LCR.  Nor have they made any demonstration that the "wide variety of options available to all load-serving entities for . . .

meet[ing] their resource obligations" are insufficient to enable them to avoid incurring excess costs. Trial Tr., Vol. II, ECF No. 102, PageID.4010, 4026.

The plaintiffs instead urge the Court to view the individual LCR "with particular suspicion," contending that the requirement amounts to a "state statute[] requiring business operations to be performed in the home State that could more efficiently be performed elsewhere." *Pike*, 397 U.S. at 145. But the plaintiffs have not demonstrated that grid reliability can be achieved more efficiently by importing capacity from out of state — only that out-of-state capacity sometimes may be cheaper to import if transmission constraints allow it to be imported at all. They even go so far as to suggest that reliability is overrated, presenting testimony that the State should accept a loss of load far above the long-accepted industry standard. *See* Trial Tr., ECF No. 102, PageID.3963. And they even seem to challenge the need for MISO's local clearing requirement for Zone 7. The State, however, has a legitimate interest in mitigating the loss-of-load risk and ensuring grid reliability. *See Arkansas Elec. Co-op. Corp. v. Arkansas Pub. Serv. Comm'n*, 461 U.S. 375, 377 (1983) ("[T]he regulation of utilities is one of the most important of the functions traditionally associated with the police power of the States."); *E. Kentucky Res.*, 127 F.3d at 545 ("Legislation which pertains to the public health and welfare has been consistently recognized as being important and legitimate."). Because the plaintiffs cannot actually refute that interest, they have not met their burden under *Pike*. *See General Motors Corp. v. Tracy*, 519 U.S. 278, 299 n.12 (1997)(noting that "several cases that have purported to apply the undue burden test (including *Pike* itself) arguably turned in whole or in part on the discriminatory character of the challenged state regulations").

There is a rational basis to believe that the individual LCR equitably will ensure reliable electrical generation, outweighing any incidental burdens imposed on interstate commerce.

-38-

D.  Strict Scrutiny

Even if the plaintiffs had demonstrated in fact that the individual LCR has discriminatory effects, the defendants have established that the requirement "advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *Cherry Hill Vineyards, LLC v. Lilly*, 553 F.3d 423, 432 (6th Cir. 2008) (quoting *Granholm v. Heald*, 544 U.S. 460, 489 (2005)); *see also Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979).

The plaintiffs offered four alternatives to the individual local clearing requirement at trial, two of which they reiterated in their post-trial brief: (1) continuing to rely exclusively on MISO's local clearing requirement to ensure grid reliability; (2) implementing a four-year forward-planning requirement without also imposing any locational requirement; (3) reflecting new resource additions in the incremental need methodology; and (4) allocating the incremental need for capacity only to the electricity suppliers that do not have sufficient capacity in their demonstrations.  None of these alternatives adequately serves the legitimate local purpose of equitably ensuring grid reliability.

The first alternative is the status quo, which plainly is inadequate.  Zone 7 fell short of meeting MISO's local clearing requirement in 2020/21, would have fallen short in 2019/20 if the current tariff rules were in place, and has come close to falling short in other recent years.  Trial Tr., Vol. II, ECF No. 102, PageID.3932, 4002-08, 4034.  Other zones are experiencing similar tight capacity conditions, suggesting that there also is very little capacity available for import. *Ibid.*  Zone 7 presently faces a loss-of-load expectation of nearly twice the excepted risk standard. Doherty Supp. Rep., ECF No. 104-2, PageID.4226.  And Michigan's incumbent utilities are planning to retire generation without necessarily replacing it with in-zone resources. *See id.* at PageID.3940-42, 4057; Trial Tr., Vol. III, ECF No. 103, PageID.3861, 3908-09, 4095-96.  The

MISO construct alone, therefore, does not provide adequate incentives to ensure the locational resources necessary for grid reliability.

The second alternative likewise reflects the status quo. Although the MPSC stayed its individual LCR, it did not stay the four-year-forward planning reserve margin requirement. Trial Tr., Vol. II, ECF No. 102, PageID.4031-33. And all AESs (with one narrow exception) recently demonstrated that they will be able to meet their PRMR four years into the future. *Ibid.* However, they have not demonstrated that they will use in-zone resources to meet that requirement, and therefore have not demonstrated that Zone 7 will meet MISO's local clearing requirement in four years. *Ibid.* Under the current construct, there are no remedies available to ensure that any locational resources lacking from the four-year forward capacity demonstration actually are put into place. *Id.* at PageID.4002, 4015-17.

According to Cole, the third alternative — excluding new generation from the incremental need methodology — also would result in "the status quo forever," in which "there would be no contributions to local reliability from anyone who isn't already contributing." Trial Tr., Vol. I, ECF No. 101, PageID.3864. Or, as Sparks put it, "if that alternative were adopted I believe that Zone 7 will continue to be close and at times not meet its local clearing requirement" because there still would be no way to hold LSEs accountable for meeting MISO's reliability requirement. *Id.* at PageID.4114. In other words, excluding new generation eliminates the reliability benefits produced by the individual LCR. It also is inequitable — to both utilities and AESs. As noted above, Cole explained that, if new capacity is excluded from the requirement, utilities might "game the system" by "retir[ing] old generation and replac[ing] it with new generation even if a less expensive alternative to extend the life or increase the capacity of an existing plant exists." *Id.* at PageID.3842. Doherty agreed, stating that there is an equity rationale for not counting new

-40-

generation to ensure that all customers are paying for the cost associated with developing new resources in the zone.  Trial Tr., Vol. III, ECF No. 102, PageID.4067; *see also* Doherty Supp. Rep., ECF No. 104-2, PageID.4221.

That leaves requiring electricity suppliers to pay for local resources only if they fall short in their capacity demonstrations.  The plaintiffs did not brief this alternative, which was raised by James Dauphinais at trial.  Trial Tr., Vol. II, ECF No. 102, PageID.3971-72.  But it is worth noting that the MPSC's individual LCR already provides for an equivalent penalty: the state reliability mechanism (SRM) charge.  That the plaintiffs' expert proposed imposing an analogous penalty suggests that AESs have the means necessary to avoid this charge, belying their claims that the individual LCR will force them to buy capacity from utilities at high cost.  And this fourth alternative effectively is equivalent to the individual LCR proposed by the MPSC.

None of the alternatives advanced by the plaintiffs will ensure reliability by providing an equitable accountability mechanism for ensuring that load-serving entities collectively meet MISO's local clearing requirement.

### E.  Supplemental Authority

After submitting their post-trial brief, the Court granted the plaintiffs' motion for leave to file supplemental authority in support of their trial arguments.  The parties then submitted supplemental briefs on two questions: (1) whether the Fifth Circuit's recent decision in *NextEra Energy Capital Holdings, Inc. v. Lake*, 48 F.4th 306 (5th Cir. 2022), confirms that *General Motors Corp. v. Tracy*, 519 U.S. 278 (1997), is inapplicable in the present case; and (2) whether the Federal Energy Regulation Commission order issued in *Midcontinent Independent System Operator, Inc.*, 180 FERC ¶ 61, 142 (2022), undermines the defendants' arguments that the existing MISO resource adequacy construct insufficiently ensures grid reliability.  The supplemental authorities

filed by the plaintiffs do not weigh against a finding that the individual LCR is necessary to ensure grid reliability. The Court already decided that *Tracy* does not control, and the FERC order at most demonstrates that MISO also is concerned about resource adequacy and grid reliability.

1. *NextEra Energy*

*NextEra Energy* involves the constitutionality of a Texas state law stating that the ability to build, own, or operate new lines "that directly [connect] with an existing utility facility . . . may be granted only to the owner of that existing facility." *NextEra Energy*, 48 F.4th at 310 (quoting Tex. Util. Code § 37.056(e)). In deciding whether the complaint plausibly pleaded a dormant Commerce Clause claim, the Fifth Circuit considered at length whether and when *Tracy* shields electric utilities from Commerce Clause scrutiny. Ultimately, the court held that *Tracy* is applicable only to facially-discriminatory statutes, and only in the narrow context of laws that give "in-state businesses a preference in both captive and noncaptive retail markets." *Id.* at 319. "[W]hen it comes to transmission," the court concluded that "a vertically integrated utility and a transmission-only company are similarly situated." *Id.* at 320.

The plaintiffs contend that *NextEra Energy* affirms the Court's earlier conclusion that *Tracy* is inapplicable in the present case. They also argue that *NextEra* holds that "a local-presence requirement" is unconstitutionally discriminatory in the electricity context. The defendants counter that the plaintiffs fail to distinguish *NextEra Energy* from binding Sixth Circuit precedent applying *Tracy* in dormant Commerce Clause cases. Moreover, they contend that the facts of *NextEra* are distinguishable because the Texas statute at issue effected an outright ban on new market entrants.

The plaintiffs are correct: the Court already found at the summary judgment stage that "*Tracy* does not provide a governing rule in this case." *Energy Michigan,* 587 F. Supp. 3d at 593.

*NextEra*, an out-of-circuit case regarding the pleading standard for dormant Commerce Clause claims, does not change that holding here. Beyond providing support for the Court's prior holding that incumbent utilities and alternative electricity suppliers are similarly situated for purposes of the dormant Commerce Clause analysis, *NextEra Energy* merely stands for the unremarkable proposition that "despite the complex regulatory environment, electricity is afforded no lesser restrictions under the Commerce Clause." Pl. Supp. Brief, ECF No. 110, PageID.4703 (quoting *NextEra Energy*, 48 F.4th at 320 ("Texas has an interest in promoting reliable electricity service . . . . But as with other police powers a state enjoys, that authority is not immune from Commerce Clause scrutiny when it impacts the interstate market.")). That legal reality is why the instant dispute presently is before this Court.

### 2. FERC Order

On August 31, 2022, FERC issued an order rejecting MISO's proposal to require LSEs participating in the Planning Resource Auction "to implement a Minimum Capacity Obligation." *Midcontinent Independent System Operator, Inc.*, 180 FERC ¶ 61, 142 (2022); *see* FERC Order, ECF No. 108-3, PageID.4647. MISO proposed implementing minimum capacity requirements for LSEs because "its generation fleet is undergoing an unprecedented transformation, causing increasing uncertainty for resource adequacy under current and expected future conditions." *Id.* at ¶ 3, PageID.4648. Due to these resource constraints, MISO determined that permitting LSEs to rely on the PRA to procure capacity for the upcoming Planning Year "introduces higher than acceptable risk" that individual entities "and potentially all or a portion of MISO" will have insufficient capacity "if the quantity of capacity offered into the Auction drops sharply." *Ibid.* It further determined that its current adequacy construct provides "no assurance that sufficient capacity will be offered in the Auction to satisfy the demand for capacity." *Id.* at ¶ 4, PageID.4849.

-43-

To address that concern, MISO sought leave to require most LSEs to procure sufficient Zonal

Resource Credits to meet 50% of their total reserve requirements prior to the PRA.  *Id.* at ¶ 5.

FERC rejected MISO's proposed Minimum Capacity Obligation (MCO), finding that

"MISO has not demonstrated that the MCO will address or mitigate resource adequacy concerns"

or "reverse the trend of diminishing reserve margins."  *Id.* at ¶ 108, PageID.4688.  As the

Commission explained:

> MISO's resource adequacy construct is not a multi-year forward construct but
> rather the Auction is held approximately six weeks in advance of the Planning Year,
> and the proposed MCO requirement deadline just precedes the Auction. As such,
> the MCO requirement deadline is highly unlikely to facilitate the construction of
> new resources ahead of the relevant Planning Year, as resources, particularly
> generation resources, take longer to develop than 6 weeks.  As such, any capacity
> procured in the bilateral market to satisfy the MCO would likely be purchased from
> the same resources that would have otherwise been offered into the Auction.
> Therefore, and, as MISO recognizes, nothing inherent in the proposed MCO is
> likely to support the construction of new capacity in time to meet resource adequacy
> needs relative to the status quo. . . .
>
> Indeed, MISO's most recent Auction results for the 2022/2023 Planning Year
> demonstrate that the 50% MCO MISO proposed would not have affected the
> Auction's outcome of a capacity shortfall in MISO North in a manner that
> supported reliability. Even if LSEs were required to procure 50% of their Reserve
> Requirements prior to the 2022/2023 Planning Year Auction, there would not have
> been enough resources to meet MISO North's overall Reserve Requirements.

*Id.* at ¶¶ 108-09, PageID. 4688-89.

FERC reasoned that because the Auction is not "*and has never been*" intended to be the

primary mechanism for procuring capacity, LSEs already have adequate incentives for procuring

capacity through bilateral agreements.  *Id.* at ¶¶ 110-11, PageID.4689-90.  And it concluded that

the proposed Minimum Capacity Obligation would reduce "the flexibility currently offered to

LSEs by putting an administrative cap on the amount of capacity LSEs can choose to procure

through the Auction," and reduce the "disciplining effect of the Auction, a centralized market

where capacity sellers are subject to market power mitigation."  *Id.* at ¶¶ 111-12, PageID.4690.

Although FERC noted that it is particularly concerned about market power mitigation in MISO South, it made clear that it would "need to revisit its analysis" to determine the actual impact the proposal would have on market power. *Id.* at ¶¶ 112-13, PageID.4690-91.

FERC Commissioner Mark C. Christie wrote a concurring opinion in which he emphasized that FERC is "rejecting only the MCO proposal before us" and is "not prejudging a future MCO filing by MISO." Christie Concurrence, ¶ 2, ECF No. 108-3, PageID.4695. He also reiterated that, because "the MISO capacity market has always been a purely *residual* option . . . states need to focus on their own authority to ensure adequate generating resources to serve their citizens and not default to an administrative construct regulated by FERC." *Id.* at ¶ 4, PageID.4696-97. "[I]t is the *states* which retain the primary responsibility to ensure their load-serving entities have adequate resources to serve their states' consumers." *Id.* at ¶ 3.

The plaintiffs contend that the FERC order undermines the defendants' argument that something more than MISO's existing resource adequacy construct is needed to ensure grid reliability. They also say that the order validates their concern that the MPSC's individual LCR will grow utilities' market power and demonstrates that the PRA mitigates AESs' ability to serve as "free-riders." But the plaintiffs gravely misinterpret the import of FERC's decision. As the defendants point out, the FERC order demonstrates that MISO shares their reliability and resource adequacy concerns. FERC actually confirms the idea that the proposed Minimum Capacity Obligation is inadequate because it would not sufficiently mitigate the risk of future shortfalls. And it supports the defendants' position that MISO's PRA is an inadequate mechanism to incentivize the development of new resources because it is merely a prompt-year construct that helps bring together buyers and sellers who need or have a little extra capacity. By rejecting the

proposal, FERC implicitly placed the onus on states to promote reliability and incentivize generation.

The context of the FERC order is MISO's efforts to ensure future grid reliability and resource adequacy during a period where capacity is declining. FERC did not opine that MISO's effort is unnecessary; rather, it determined that MISO's proposed solution would be ineffectual because its prompt-year construct leaves no time for the long-term planning necessary to develop new generating capacity. Apparently, FERC concluded that MISO's Minimum Capacity Obligation would limit LSEs' ability to procure capacity through the PRA without actually ensuring that MISO regions satisfied their Planning Reserve Requirements. FERC therefore determined that the benefits generated by the Minimum Capacity Obligation would not outweigh that burden and the associated "impact on market power."

That FERC rejected an entirely different capacity mechanism — one that would have operated at the regional level and imposed no locational requirement — has little bearing on the constitutionality of the MPSC's proposed individual LCR. The two proposals are motivated by different concerns entirely. Concerned that insufficient capacity might be entered into the PRA, MISO sought to ensure that individual LSEs could meet their Reserve Requirements. In contrast, the MPSC sought to ensure that LSEs together deliver enough energy to service peak loads in Michigan; the MPSC was motivated by transmission restraints, not the inadequacy of the Auction. It is plain that the two proposals produce different burdens and benefits. That MISO's proposed Minimum Capacity Obligation could exacerbate market power concerns in the American South does not, for example, mean that the MPSC's individual LCR would exacerbate market power concerns in Michigan's lower peninsula. And even if the LCR has market power effects, the

defendants have demonstrated that the reliability and fairness benefits the individual LCR produces far outweigh any such burdens for the reasons outlined above.

The FERC order does not undercut the defendants' argument that the MPSC's individual LCR equitably advances grid reliability. If anything, it merely demonstrates that MISO believes that its own resource adequacy construct may be inadequate, necessitating State action to ensure the reliable provision of electrical power.

IV. Conclusion

The plaintiffs have not met their burden of establishing that that the MPSC's individual local clearing requirement discriminates against interstate commerce. The defendants, meanwhile, have established that the individual local clearing requirement is necessary to equitably ensure grid reliability in Michigan, a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives. The Court finds that the individual local clearing requirement in the September 15, 2017 order of the MPSC in Case No. U-18197 and the June 28, 2018 order of the MPSC in Case No. U-18444 does not violate the Commerce Clause.

Accordingly, it is **ORDERED** that the plaintiffs' complaint is **DISMISSED WITH PREJUDICE**.

s/David M. Lawson<br>
DAVID M. LAWSON<br>
United States District Judge

Date: February 24, 2023