UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MICHIGAN
                         SOUTHERN DIVISION

ENERGY MICHIGAN, INC., and
ASSOCIATION OF BUSINESSES
ADVOCATING TARIFF EQUITY,

                         Plaintiffs,

-v-                                      Case No. 20-12521

DANIEL C. SCRIPPS, KATHERINE L.
PERETICK, and TREMAINE L. PHILLIPS,

                         Defendants,
and

CONSUMERS ENERGY COMPANY,

                         Intervening Defendant.
_____/

                         MOTION HEARING
                       November 5, 2025
                BEFORE THE HONORABLE DAVID M. LAWSON
                   United States District Judge
          Theodore Levin United States District Courthouse
                   231 West Lafayette Boulevard
                       Detroit, Michigan

APPEARANCES:

FOR THE PLAINTIFF:     ZACHARY C. LARSEN
                       Clark Hill PLC
                       215 South Washington Square, Suite 200
                       Lansing, Michigan  48933

                       BRION B. DOYLE
                       Varnum, Riddering
                       Bridgewater Place
                       P.O. Box 352
                       Grand Rapids, Michigan  49501

(APPEARANCES CONTINUED ON FOLLOWING PAGE)

              To Obtain a Certified Transcript Contact:
               Rene L. Twedt, CSR-2907, RDR, CRR, CRC
                    www.transcriptorders.com

APPEARANCES CONTINUED:

FOR THE DEFENDANT          NICHOLAS QUINN TAYLOR
COMMISSIONERS:             State of Michigan
                           Department of Attorney General
                           7109 West Saginaw Highway
                           Lansing, Michigan  48917

FOR INTERVENING           SPENCER A. SATTLER
DEFENDANT                 Consumers Energy Company
CONSUMERS ENERGY:         Public Service Division
                          One Energy Plaza
                          Jackson, Michigan  49201

## TABLE OF CONTENTS

MATTER _____ PAGE

**MOTION HEARING**

**MOTION FOR PARTIAL SUMMARY JUDGMENT**

Argument by Mr. Larsen.................................... 5
Argument by Mr. Taylor.................................... 13
Further Argument by Mr. Larsen........................... 23

**MOTION TO EXCLUDE EXPERTS**

Argument by Mr. Taylor.................................... 27
Argument by Mr. Doyle.................................... 30

Motions Taken Under Advisement by the Court.............. 33

**CERTIFICATE OF COURT REPORTER**........................... 33

   **\*\*REPORTER'S NOTE:**  Material read into the record is transcribed verbatim as read and may not reflect exact quoting of the document as written.

Detroit, Michigan

November 5, 2025

3:03 p.m.

                                     *    *    *

THE CLERK:  All rise.  The United States District Court for the Eastern District of Michigan is now in session, the Honorable David M. Lawson presiding.

THE COURT:  You may be seated.

THE CLERK:  Now calling the case of Energy Michigan versus Scripps, Case Number 20-125211.

THE COURT:  Good afternoon, counsel.  May I have an appearance for the plaintiff?

MR. LARSEN:  Good afternoon, your Honor.  Zack Larsen on behalf of Plaintiff BATE.

THE COURT:  I'm sorry?

MR. LARSEN:  Zack Larsen on behalf of Plaintiff BATE.

MR. DOYLE:  And good afternoon, your Honor.  Brion Doyle on behalf of Energy Michigan.

THE COURT:  All right.  And then for the Commissioners.

MR. TAYLOR:  Good afternoon, your Honor.  Nick Taylor on behalf of the Defendant Commissioners.

THE COURT:  And for the intervening defendant?

MR. SATTLER:  Good afternoon, your Honor.  Spencer Sattler on behalf of Consumers Energy, intervening defendant.

THE COURT:  All right.  There are two motions up for hearing today.  One is a motion for partial summary judgment by the plaintiffs, and the other is a motion by the defendants concerning expert witnesses.  I hesitate to call it a Daubert motion.  It's more of a hybrid Daubert/motion in limine type of motion.

These matters are fully briefed.  I don't think I need much argument on them.  I would like to give you an opportunity to make a couple of points that you're dying to put on the record to prevent your heads from exploding. Beyond that, though, I don't -- I don't think I need you to spend a lot of time with this.

So Mr. Larsen, are you taking the lead on this?

MR. LARSEN:  Your Honor, yes, I am, with respect to the motion for partial summary judgment.

THE COURT:  Yeah, let's do that first, and if you would keep it to about ten minutes.

MR. LARSEN:  Sure, your Honor.

THE COURT:  All right.

MR. LARSEN:  And noting your instruction here, I will try to hit just the highlights.

As you noted, this is a motion for partial summary judgment, and we're only moving for judgment with respect to order U18444 or the adopted ILCR, not the more abstract question of whether or not the State could justify the need

for un-ILCR.  And so with that in mind, we're --

THE COURT:  Slow down.  Even though I gave you ten minutes, you don't have to torture my court reporter.

MR. LARSEN:  Understood, your Honor.  I have been accused before of having the breath capacity of Dizzy Gillespie by Judge Borrello on the Court of Appeals.  But I will try to slow down.

So even though -- because this is a motion for partial summary judgment and because we're looking just at order U18444, the specific contours of what the State has adopted here, what it has done, including its incremental need methodology, and including specifically the exclusion of new resources from the calculation of any ILCR is what is at issue.  We're looking at the adopted ILCR.

And so with that in mind, we don't think that the adopted ILCR meets either of the prongs of strict scrutiny when it comes to a legitimate local interest, because on that point we are looking at something that has been justified by an equity rationale; specifically, the exclusion of new resources.

THE COURT:  Well, that's just -- that's just one justification; right?

MR. LARSEN:  Well, the exclusion of new resources, when the State has been asked about that, they have addressed that in equity terms about shifting the burden and distributing

the burden.  And so --

THE COURT:  Among other things.

MR. LARSEN:  Well, I would say that what -- what they have said in testimony are things along the lines of --

THE COURT:  I'm familiar with the record.

MR. LARSEN:  Right.  We need this in order to -- you know, it is not reliability based, but it is equity based in terms of who is paying for it.  We need this in order to -- it's about who pays rather than about, you know, whether or not we have sufficient resources.

It's the question of, you know, when it comes to whether or not it meets that need, it's the question, in simple math terms, of whether or not you can justify a calculation that says even though we have, let's say, today, the resources that we need, we take 30 megawatts off and we put 30 megawatts on, are we going to all of a sudden have a different calculation, a different need?

And according to the State, yes, because they are taking that 30 megawatts off, you're putting the same capacity on, you have the same capacity-serving load, and yet, you know, it is, in their view, creating a different need or a different justification.

So the testimony that we have provided and the report from James Dauphinaiss which is at issue in the other motion, you know, he calls this a false or inflated need for the very

reasons that I just explained; that it is simply a question of math.

And because I think the equity justification is front and center here, you cannot -- you cannot determine there is a legitimate local interest served by the adopted ILCR.

Now, again, that's not the --

THE COURT: I'm sorry to interrupt. Could you just stand by for one second?

MR. LARSEN: Sure.

(Discussion held off the record.)

THE COURT: Forgive me, Mr. Larsen. Sorry to interrupt you.

MR. LARSEN: No, that's okay.

Your Honor, so I think responding to a couple of the points that have been made in the briefing by defendants on this issue, there is a question, you know, that they raised, well, is incremental need or is the exclusion of new resources actually discriminatory?

And I think it clearly is, from staff's own words. They said: "If we don't count the new" -- or -- "If we counted the new capacity, it would be the status quo forever."

That is exactly what the Sixth Circuit said was discriminatory, was that, you know, point of we need contributions from folks who are not currently discrim- -- currently contributing.

In terms of what the Sixth Circuit said, the Sixth Circuit, they have pointed to page 491 of the opinion in terms of defining discrimination and said that the discrimination is between electricity generated in state and that derived out of state.

But I think I would point you to an earlier page in the opinion where, when they are describing the discriminatory nature of the ILCR, the Sixth Circuit said --

THE COURT: What page are you looking at?

MR. LARSEN: This is 490. And where -- the paragraph that starts "30 years later" and starts describing what the Sixth Circuit viewed as the discriminatory nature of the ILCR, they said that that included, really, the choice to sweep up, broadly, all LLCs into its net, to go after all sources of energy rather than just one source of energy.

It really goes to the question of the breadth of the ILCR, not just -- not just the choice to have an ILCR.

And so I think, you know, to the point of whether or not it's supported by a legitimate local interest, we would say that, you know, the testimony is very clear that the equity rationale is what motivated MPSC in this regard, and, therefore, because that is not a legitimate local interest, according to the Sixth Circuit, it is --

THE COURT: I'm sorry, what's not a legitimate --

MR. LARSEN: The equity rationale.

THE COURT: Okay. All right.

MR. LARSEN: Therefore, it is -- they cannot demonstrate that U18444 is supported by that.

In terms of the narrow tailoring question, just a few points on that, because I know you have read the brief and are familiar with the issue.

I want to -- I want to point out, number one, that the Waste Management Holdings case from the Fourth Circuit is very clear in adopting our view of the world on this narrow tailoring question.

And, you know, the issue there --

THE COURT: Even if there is another possibility that's discriminatory, if it's less discriminatory, then it qualifies.

MR. LARSEN: Correct. And the issue there in Waste Management Holdings was specifically could Virginia, when they were, you know, writing rules capping the amount of municipal solid waste that Virginia landfills could accept, could they have done something that was more targeted?

Could they have done something that even though it may have been discriminatory in the sense of applying different rules based on the location or the origin of the municipal solid waste would have been more targeted towards their purpose.

THE COURT: No, I get the argument.

MR. LARSEN: Yep. And the answer was -- the answer was, yes.

The other point that I'll point out on this question is, is the point -- it's really an a fortiori-type argument on the Pike balancing test. So given that Pike balancing, because there was some back and forth about the Philadelphia case and whether or not the least discriminatory or less discriminatory alternative language was reflecting Pike balancing, which it is, but the point that I'd make there is, given that Pike balancing is looking at even-handed or non-discriminatory, not facially discriminatory regulations and nonetheless saying that you need to tailor and ensure that the burden that you're putting on interstate commerce is, you know, proportionate, is limited as much as possible in relationship to the benefits, et cetera.

I think that, in an even-handed context, makes it all the more clear that in the clearly discriminatory context what is the core of the dormant Commerce Clause, that it is -- it is still incumbent upon the State to avoid discrimination as much as possible.

And I think that that's what the Hughes case says. I think that's, you know, our reading on a number of the Circuit Court cases that we have addressed as well.

THE COURT: Well, that's sort of the same thing as the least discriminatory alternative.

MR. LARSEN:  Least discriminatory alternative.

THE COURT:  It's the same argument; right?

MR. LARSEN:  It is -- yes, it's the second prong. It's the least discriminatory alternative prong.  Yeah.  But it's just giving you -- just giving you another point on that.

Your Honor, just a clarification going back, I guess, to the legitimate local interest point.

I will say that the State has somewhat briefed it as though the Sixth Circuit has said that their -- that liability -- or the ILCR serves reliability and it is justified by a legitimate local interest.

I don't think that's the way the Sixth Circuit has addressed this.  The Sixth Circuit has said that reliability is a legitimate local interest, in the abstract.  It has not addressed the question of whether or not an ILCR or the ILCR are serving that purpose.  So --

THE COURT:  That's what we have to decide now.

MR. LARSEN:  Correct.  And I think -- and I think that that's what's been remanded to the Court.  And for the reasons that we have explained, I think when it comes to the exclusion of new resources, it's clear that it doesn't serve that purpose and it cannot serve that purpose.

THE COURT:  Okay.  Mr. Larsen, thank you very much. Appreciate your argument.

Mr. Taylor, are you taking this one as well?

MR. TAYLOR: Yes, I am, your Honor.

THE COURT: All right. What I would like to hear from you is your best elevator speech as to why the individual local clearing rule is necessary to the exclusion of everything else to ensure grid reliability.

MR. TAYLOR: Absolutely, your Honor. And I will start with that, and I will keep any other comments brief, per your instructions.

Why the LCR is necessary, I think the framing of that answer to that question necessarily requires that we view it within the strict scrutiny standard.

THE COURT: I'm sorry?

Oh, the strict scrutiny standard.

MR. TAYLOR: Correct, your Honor.

And as you know, we think that the explicit and specific instructions of the Sixth Circuit, based on Supreme Court precedent and language used by the Supreme Court, is a comparison to non-discriminatory alternatives, and that makes sense.

So the question, I believe, your Honor --

THE COURT: Well, isn't it true, though, that if there are a few alternatives and one is less discriminatory than the others, then that's the one you should be picking under strict scrutiny? Isn't that the obligation?

MR. TAYLOR: I would say no, that the appropriate

comparison is to non-discriminatory alternatives for a couple reasons.

And I don't want to lose track of your original question, but quickly on that point, first of all, under the law of the case doctrine we have an explicit instruction from the Sixth Circuit that the standard for the defendants to prove on this remand is whether or not the local clearing requirement is superior in achieving its goals relative to non-discriminatory alternatives. And that's not an invention of the Sixth Circuit.

For example, plaintiffs cite repeatedly to the Hughes decision for that term, least discriminatory, and they do so, and they like that term, least discriminatory. The problem with that argument is the Hughes Court, when they used that term, wasn't explaining what the strict scrutiny standard was. It was explaining what Oklahoma actually did. It said far from choosing the least discriminatory alternative, Oklahoma has chosen to conserve its minnows in a way that most overtly discriminates against interstate commerce.

But the Court actually explicitly articulated what the strict scrutiny standard was, your Honor. And when it did so, it said that the appropriate comparison was the non-discriminatory alternative. It quoted the Hunt Court and it said that -- it said when discrimination against commerce is demonstrated, the burden falls on the state to justify it

in both terms of the local benefits flowing from the statute and the unavailability of non-discriminatory alternatives.

THE COURT: Okay. I understand your position on that, but let's go back to my original question.

MR. TAYLOR: Absolutely, your Honor. Why is it necessary?

And I think the question there is, why is the discrimination necessary? And the discrimination is the differential treatment of in-zone versus out-of-zone capacity.

And the reason that that's a necessary consideration to further reliability is that the physical equipment that makes up the transmission system has limitations on the amount of power it can transmit at any one given time. Therefore, when there is an excessive demand for electricity, there is an upper limit onto how much electricity we can import from out of the region. And that's why --

THE COURT: Yes, but why isn't MISO's wholesale local clearing requirement as opposed to an individual local clearing requirement sufficient?

MR. TAYLOR: So I would say two things to that.

First of all, it's a different structure in terms of the planning horizon. It's not the same four-year-forward planning horizon.

THE COURT: Oh, just because it's one year?

MR. TAYLOR: Correct. And it's changed a little bit

16

since the first time we were in front of your Honor and gone to a seasonal construct, but still the same forward-looking benefits of the State requirement are important.

And second of all, I would say that under the strict scrutiny standard that that's a little bit outside the question; right?  Because as your Honor and counsel were discussing earlier, we read the Sixth Circuit opinion as not questioning the first prong of the strict scrutiny standard that your Honor found in terms of the legitimate local purpose for reliability.

And so the second prong, like your Honor indicated, is what we're here to discuss and what we're here to address. And that was framed by the Court specifically as whether or not the local clearing requirement is superior in achieving those reliability goals compared to non-discriminatory alternatives.

And to the question of federal alternatives, this gets a little bit of overlap with our -- with defendant's motion, but we would note that comparisons under that second prong of the strict scrutiny analysis, the federal options like the MISO requirement, as MISO is a federally authorized regional transmission organization, are not the appropriate sphere to be looking at for the strict scrutiny standard, because the first prong asks us is there a legitimate local purpose, which is in essence asking is this a sphere in which

the state has a role that should be operating.

And then the second prong is essentially asking is what was found to be discrimination necessary; right?

And so the appropriate comparison is to alternatives that the State has, since we have already established that the State has a role to act here.  And that's consistent with the Granholm decision I point to, where they talked about the State's alternatives.

And as you know from the briefing, we also noted portions of the plaintiffs' own briefing that seemed to acknowledge that it's comparisons to the plaintiffs' alternatives that are relevant for that analysis.  So --

THE COURT:  Understanding, though, that it's not the plaintiffs' burden, it's your burden to show -- to basically prove all the negatives.

MR. TAYLOR:  Yes.  And your Honor, proving the negative is a perfect way of phrasing it, especially in this instance; right?  Because -- and this, again, goes to overlap with the following motion.

But really, any methodology that the Michigan Public Service Commission could have adopted would have had the differential treatment of in-zone versus out-of-zone capacity, because that's a requirement of the statute that it was implementing.

MCL 460.6w, subpart 12(d), is the definition of a

local clearing requirement.  And I won't get into specific language, but defines it in terms of generation in the same zone as the load being served.  So those, all those methodological choices and alternatives that the Commission could have decided on, they all fall into that bucket of discriminatory alternatives that are outside the scope of the remand.

THE COURT:  What happens if the local clearing -- individual local clearing rule goes away?

MR. TAYLOR:  The requirement is currently stayed, but what happens is the Michigan -- the State of Michigan would be denied its opportunity and its obligation to further a legitimate local purpose in reliability and ensure that we don't -- we have a tool in its tool belt to ensure that we don't run into reliability concerns in the future.

THE COURT:  Now, this was enacted, what, in 2017, was it?

MR. TAYLOR:  The exact date, your Honor, I apologize, I don't have, but that is around the time we're speaking of, yes.

THE COURT:  Around that time -- so we're dealing with eight years.

MR. TAYLOR:  Yes.

THE COURT:  Any blackouts?

MR. TAYLOR:  The -- not as a direct result of this

type of issue.  But as plaintiffs can show and have indicated, the capacity picture has not gotten better since the last time we were before your Honor.  In fact, it's gotten worse; right?  And so these standards are set --

THE COURT:  Even when you account for new generation facilities coming on line?

MR. TAYLOR:  The overall capacity of MISO, under the MISO framework, my understanding is that the capacity picture has gotten tighter; that we're -- have less of a buffer than the last time we were in front of your Honor, subject to my expert.

THE COURT:  And so has the participation in the market of alternative energy suppliers exacerbated that condition?

MR. TAYLOR:  I don't know that --

THE COURT:  Or is there not a way to quantify that?

MR. TAYLOR:  I personally don't have a way to quantify and answer that for your Honor, and I apologize for that.

But what I would say is that the focus that plaintiffs had on comparisons to alternative electric suppliers and incumbent utilities in the first trial that we were here before your Honor, my reading of the Sixth Circuit's opinion takes those issues kind of out of this context.

The emphasis has shifted from that argument, which the Sixth Circuit acknowledged that plaintiffs may not have

met that burden to demonstrate that that was discriminatory, and they didn't overturn your Honor --

THE COURT:  Okay.  Your answer to my question is, "Don't ask that question, Judge.  It doesn't matter."

But this is perhaps not something that bears directly on the legal question.  As a practical matter, I'm kind of curious about it, though.

MR. TAYLOR:  Understood. Absolutely.  And that was not my intention to discredit the question.

THE COURT:  I didn't mean to be overly critical either.  But I'm just kind of curious about that.  I mean, they're still at a 10 percent market share cap; right?

MR. TAYLOR:  That is correct, your Honor.

THE COURT:  And so if it got to be dangerous, couldn't the legislature simply just say, "No, we're not going to have any alternative energy suppliers anymore and we're going with all the incumbents"?

MR. TAYLOR:  I still think, your Honor, because this requirement is one that is imposed on all energy providers, right, I think that the Sixth Circuit opinion, until we get to the answer of the strict scrutiny analysis, would potentially be used by parties to attack any attempt by the State to further that reliability if it's going to distinguish between generation by its geography.  And we know that it needs to distinguish between the generation's geography in order to

fully plan for reliability.  That's a -- that's a rather accepted and kind of foundational element of reliability planning.  It's one of the reasons --

THE COURT:  Oh, because of the way the FERC construct is to begin with?  Is that what -- by dividing the country into zones and things like that?

MR. TAYLOR:  Well, I would say, actually, just as a matter of the physical realities of transmitting electricity, it's just a physical reality that there are transmission constraints, and that means you must know where the capacity is to some extent in order to plan for reliability.

And it's kind of an assumed and understood matter, without -- throughout the field, which is why it didn't have so much emphasis in our first trial, because of the emphasis on comparing alternative electric suppliers and incumbent utilities.

There is a bit of a --  it's in there, but we think that one of the reasons we thought further evidence could be helpful to your Honor is that we see the Sixth Circuit decision at least changing the scope insomuch as it focuses it on the in-zone versus out-of-zone capacity.

THE COURT:  Did you argue this case in the Sixth Circuit?

MR. TAYLOR:  I did, your Honor.

THE COURT:  And did you explain the transmission

constraints to the panel?

MR. TAYLOR: That was part of our analysis, your Honor, yes.

THE COURT: Because they didn't seem to get that.

MR. TAYLOR: I can't speak to that, your Honor, but it was a -- it was a component of our arguments.

THE COURT: All right. Anything further?

MR. TAYLOR: Let me just check my notes real quick, your Honor. Make sure that I've...

Just briefly, in response to plaintiffs, I know I have probably already taken the time you have given me and exceeded it. I -- just on this notion that we need to justify the calculation of the incremental need methodology, defendants would disagree with that.

We think the strict scrutiny standard clearly requires us to justify the discrimination; right? Because the strict scrutiny standard in the dormant Commerce Clause paradigm as a whole isn't --

THE COURT: Well, you haven't -- I'm sorry. Finish your thought.

MR. TAYLOR: I was just going to say that it's not some arbitrary check on State power; right? It's intended to protect against economic protectionism. And it does so by asking, if there is discrimination found, it asks the State to justify that discrimination. But it does not ask the State to

justify other components.  It's not an arbitrary set of hoops for the State to jump through for the sake of jumping through them; right?

So I do think that we should not lose sight of the actual discrimination that was found, because that's the portion that the Sixth Circuit -- that the strict scrutiny standard asks us to justify.

THE COURT:  Okay.  All right.  Thank you.

MR. TAYLOR:  I have nothing further.  Thank you, your Honor.

THE COURT:  Thank you.

Do you feel compelled to talk to me some more, Mr. Larsen?

MR. LARSEN:  Your Honor, if I may just briefly provide rebuttal, and I'll keep it to two to three minutes here.  But just a few quick points.

So first of all, in terms of the standard --

THE COURT:  You understand I'm not ruling from the bench today.

MR. LARSEN:  Understood, your Honor.

THE COURT:  Okay.

MR. LARSEN:  In terms of the standard from the Sixth Circuit, Mr. Taylor quoted a certain portion of the last page of the opinion, but I think that you have to read that in context and you certainly have to read that consistent with

the earlier statement that the strict scrutiny inquiry becomes whether the State demonstrated the ILCR is the only means --

THE COURT: Slow down. Slow down.

MR. LARSEN: Sure.

-- the only means of achieving its goal of securing a reliable energy supply.

And so that framing, "the only means," is consistent with what, for instance, happened in Maine v. Taylor, the only case that you have where a regulation has been upheld by the Supreme Court against strict scrutiny.

C&A Carbone, the U.S. Supreme Court, in the C&A Carbone case in the mid '90s described Maine and said Maine had no other alternative to discrimination, so they had -- they had to choose that.

In terms of whether or not there are non-discriminatory or what is included in non-discriminatory alternatives, that includes the status quo.

The language in the Sixth Circuit's opinion says more than just justifying against the status quo, but "more than" means including, of course, that they have to justify it against the status quo. They have to do more than that, but they certainly have to do that as a component of justifying it.

THE COURT: Would one means of seeking grid reliability be to eliminate alternative energy suppliers altogether?

MR. LARSEN: The legislature certainly has certain authority, you know, to do certain things, but, you know, I think that they have a lot of different options in front of them, both the legislature and the MPSC.

THE COURT: Is that one of them?

MR. LARSEN: I think that -- I think that they have been there in the past, and I think that it would be a new question, but it certainly is something that they have done in the past.

THE COURT: Yeah. Is that one of the options that's a viable option, in your view?

MR. LARSEN: I mean, it is -- it is an alternative, I should say, yes. I mean, I -- I -- of course, it wouldn't be something that we would be recommending, but, you know, the legislature has authority to conduct a number of alternatives, including restricting the cap, changing things along those lines.

THE COURT: Okay.

MR. LARSEN: With respect to non-discriminatory alternatives, that includes the four-year-forward requirement on a stand-alone basis. Four-year-forward, if they are justifying this on the basis of four-year-forward, it includes that without excluding new resources.

In terms of, you know, the argument that we're not here on the first prong of strict scrutiny, that's wrong.

What was remanded was the whole regulatory regime, and so reviewing the ILCR, not just one order of the two orders, but both orders in front of the Court.

THE COURT:  But your motion only is directed to one of them; right?

MR. LARSEN:  What's that?

THE COURT:  Your motion --

MR. LARSEN:  Our motion is directed to one order, but both prongs of strict scrutiny apply.

THE COURT:  No, okay.  I understand.

MR. LARSEN:  In terms of your question, what happens if the ILCR goes away, I think you have heard, effectively, nothing.  It's been stayed since, the date was, September of 2018.  So we're here seven-plus years later and more than eight years since the original ILCR was proposed in 2017.

And according to the Commission, the sky has not fallen, that was a quote that I think is in the record, notwithstanding the fact that it's been stayed for eight years.

Finally, I want to just make the point that the incremental need methodology, and specifically the exclusion of new resources is a question in many instances as to whether discrimination occurs.  It's a question of whether and to what extent, because just as Jim Dauphinaiss explained in his report, it's a question of a false or an inflated need, and

that's math.  And, you know, for all the reasons previously explained.

So with that, your Honor, I'm happy to take any questions.

THE COURT:  All right.  Thank you, Mr. Larsen. I have no questions.

Mr. Taylor, I'm very content to have the second motion submitted on the briefs unless there's something -- a couple of points you want to make.

MR. TAYLOR:  Your Honor, may I have two -- just two minutes to speak on it?

THE COURT:  Yes.  You can have three.

MR. TAYLOR:  Thank you, your Honor.  And I will be very brief.

And I feel compelled to speak just because of the overlap between the two issues and some of the comments just made.

This idea that defendants are changing the standard or misreading a limited portion of the Sixth Circuit's opinion to support their position that the relevant comparison is to non-discriminatory alternatives, one, we think it's incorrect; and, two, we would note that while defendants, I think, have provided your Honor an explanation of why that sentence that plaintiffs like to emphasize, that defendants must justify the ILCR as the only means of achieving its reliability goals,

we have provided an explanation of why that must be read consistent with Carbone to mean that the ILCR's discrimination is the only means to achieve the reliability goals of the statute or of the regulation.

And in response to the more specific and explicit instruction that defendants must show that the ILCR is superior in achieving its goals relative to all non-discriminatory alternatives, plaintiffs do not provide an explanation other than that we should just not focus as much on that part of the opinion.

But beyond just asking this Court to ignore the specific and explicit instructions of the Sixth Circuit, that argument also fails to recognize that that's not the only place in the Sixth Circuit opinion where they explain that to be the statute, which dovetails nicely into the last and final point that defendants are not asking your Honor to water down the strict scrutiny standard.  The Sixth Circuit --

THE COURT:  I'm not asking for a rebuttal to the rebuttal.  I want you to address anything that you have to say about the witnesses.

MR. TAYLOR:  Yes, absolutely, your Honor.

The point here, and I will -- then I will sit down, is just that the reason that these portions of the expert report and then the associated testimony should be excluded is because they deal with alternatives that are not within the

scope of the remand that the Sixth Circuit sent us down.

And that's just that minor point that I was trying to make, that the standard --

THE COURT:  So you are basically saying that -- if I may.

MR. TAYLOR:  Absolutely, your Honor.

THE COURT:  -- many of the statements in the report are not of consequence to the determination of the action as it's been defined by the Sixth Circuit?

MR. TAYLOR:  That's absolutely correct, your Honor. And for that reason, we think they do not meet the fit requirement of 702, and that's why we have asked them to be excluded.

THE COURT:  Or they don't meet the relevancy requirement of Rule 402.

MR. TAYLOR:  That is also true, in our opinion, your Honor.

THE COURT:  All right.  That's how I took your briefing to focus on.  I mean, there is a 702 component simply because they're experts.

MR. TAYLOR:  That's exactly right, your Honor.  And that's why we brought it under 702, and given the case schedule.  But you're absolutely correct that it also has obvious overlap with the 402 requirements.

THE COURT:  Many times on these relevancy arguments

I'm unable to make a decision outside of the context of the trial. And so if I end up going in that direction, it might be disappointing to you, and it also might, maybe, multiply your preparation activities. But that is sort of the reality of how these things shake out.

MR. TAYLOR: We understand that, your Honor, and we will be prepared. If that's how it unfolds, we will be prepared to make those arguments at trial.

THE COURT: Okay. All right.

MR. TAYLOR: Thank you, your Honor.

THE COURT: Thank you, Mr. Taylor.

Mr. Doyle, I guess this is your opportunity; right?

MR. DOYLE: Yes, your Honor. Thank you.

And I think it is a novel -- a novel motion in that respect, in a bench trial context, to go through expert reports and pick certain portions that they want stricken on relevancy grounds. I've never seen that. They presented no authority for that type of treatment. And I think --

THE COURT: Well, motions in limine on relevancy grounds are filed all the time.

MR. DOYLE: I understand that. But for an expert report in a bench trial, I mean --

THE COURT: I get your point on that.

MR. DOYLE: Yeah.

THE COURT: You know, when I used to teach evidence

at new judges school for the State we used to see these examples of transcripts where a judge says, "Well, I'll let it in for what it's worth," and we used to say that you can't do that.  You have to make a decision.

So what you're saying is, I should just let it in for what it's worth.

MR. DOYLE:  I think that's -- that's -- all legal arguments aside, I think that's the -- that practicalities would dictate that it be considered and not be -- considered at the bench trial.  I don't think they are suggesting that you're going to be confused or distracted --

THE COURT:  Right.  Well, you know --

MR. DOYLE:  -- as a jury might be.

THE COURT:  I'm sorry to interrupt you, but that's not quite the same as saying that I can't rule on it absent context, because relevancy determinations sometimes require other things to see how the picture fits together.

MR. DOYLE:  Well, and I will --

THE COURT:  But you get my point on that.

MR. DOYLE:  I'll use my last 180 seconds on relevancy, and here's what I'll say:  These reports are squarely relevant to the issue of, is the ILCR the only means of achieving the State's supposed goal of securing a reliable energy supply.

What the experts have done is they -- in part, is

they said, what is the status quo? What's going on right now?

And that goes to your question. What if the ILCR went away? Well, it's never gone into place. And so a large part of what the experts have done in their report and a large part of the content that defendants are seeking to strike is examining what's happening today, what's happened over the last eight years, what's happened since the last trial, because the status quo changes every day, every -- can change every day. It changes every year, certainly.

So -- and the Sixth Circuit says, looking at the status quo, the defendants have to do more than simply demonstrate that the ILCR is desirable against the backdrop of the status quo. They have to do more than that, but they most certainly have to show what they are proposing that's facially discriminatory is better than the status quo.

These experts the plaintiffs have named are looking at the status quo and they are concluding, we don't need the ILCR at all, because the status quo, including the MISO construct, is perfectly sufficient. It's been sufficient. It will be sufficient. That, that analysis looks at both what's happening with MISO, what's happening with other in-state resources, and it looks at why doesn't the ILCR advance the interest that the defendants claim it advances.

In very general terms, that's why we maintain that all of the portions of the report are relevant, your Honor.

Thank you.

THE COURT: All right. Mr. Taylor, any follow-up?

MR. TAYLOR: No follow-up, your Honor. Thank you.

THE COURT: Thank you. The motions are both taken under advisement. I'll get you a decision in due course.

Thank you.

Anything further for the record this afternoon from the plaintiffs?

MR. LARSEN: No, your Honor.

THE COURT: From the defendants?

MR. TAYLOR: No, your Honor.

THE COURT: Intervening defendant?

MR. SATTLER: No, your Honor.

THE COURT: Very well. You may recess court.

THE CLERK: All rise. Court is now in recess.

(Proceedings adjourned at 3:38 p.m.)

                    *       *       *


**CERTIFICATE OF COURT REPORTER**


I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


_____*s/ Rene L. Twedt*_____          **November 25, 2025**
RENE L. TWEDT, CSR-2907, RDR, CRR, CRC     Date
Federal Official Court Reporter